Exhibit 16

# Verfügung Nr. 39

## ÜBER DIE GELTEND GEMACHTE BESORGNIS DER BEFANGENHEIT DES VOM SCHIEDSGERICHT BESTELLTEN SACHVERSTÄNDIGEN

## 5. März 2013

### Das Schiedsgericht

Dr. Georg von Segesser, Vorsitzender
Prof. Dr. Wilhelm Haarmann und Univ.-Prof. Dr. Paul Oberhammer, Mitschiedsrichter
Dr. Andrea Meier, juristische Sekretärin

im ICC-Verfahren Nr. **15362/JHN/GFG**
in Sachen

**Dr. Andreas Ringstmeier,**
in seiner Eigenschaft als Insolvenzverwalter über das Vermögen der
**AgfaPhoto GmbH i.L.,**
Brückenstrasse 21, DISCH-Haus
50667 Köln
Deutschland

**Kläger**

vertreten durch
Prof. Dr. Siegfried H. Elsing, Orrick, Herrington & Sutcliffe LLP,
Heinrich-Heine-Allee 12, 40213 Düsseldorf, Deutschland
sowie
Dr. Benedikt Burger, Orrick, Herrington & Sutcliffe LLP,
Friedrichstrasse 31, 60323 Frankfurt am Main, Deutschland

gegen

**Agfa-Gevaert N.V. & Co. KG,**
Kaiser-Wilhelm-Allee 1, 51373 Leverkusen, Deutschland

**Beklagte 1**

**Agfa-Gevaert Healthcare GmbH,**
Tegernseer Landstrasse 161, 81539 München, Deutschland

**Beklagte 2**

**Agfa-Gevaert Graphics Systems GmbH,**
Kasteler Strasse 45, 65203 Wiesbaden, Deutschland

**Beklagte 3**

**Agfa-Gevaert N.V.,**
Septestraat 27, 2640 Mortsel, Belgien

**Beklagte 4**

alle vertreten durch
Robert T. Greig und Aren Goldsmith, Cleary Gottlieb Steen & Hamilton LLP,
12, rue de Tilsitt, 75008 Paris, Frankreich
sowie
Thomas Buhl, Klaus Banke, Larry Work-Dembowski, Annett Rombach
und Dr. Mariel Dimsey, Cleary Gottlieb Steen & Hamilton LLP, Main Tower,
Neue Mainzer Strasse 52, 60311 Frankfurt am Main, Deutschland

# Inhaltsverzeichnis

| I. | Einleitung | 3 |
|---|---|---|
| II. | Überblick über das Verfahren | 3 |
| 1) | Sachverständigenauftrag und Gutachten | 3 |
| 2) | Beschwerde wegen Besorgnis der Befangenheit | 4 |
| III. | Beschwerdegründe | 5 |
| IV. | Anwendbare Rechtsnormen für das Ablehnungsverfahren | 8 |
| 1) | Bestimmungen der Deutschen Zivilprozessordnung | 8 |
| 2) | Einhaltung der Frist zur Geltendmachung der Ablehnungsgründe | 8 |
| 3) | Ablehnungsgründe | 11 |
| V. | Zu den einzelnen vorgetragenen Ablehnungsgründen | 11 |
| 1) | Eigenmächtige Erstellung eines Unternehmensplans | 11 |
| 2) | Anwendung eines strengeren Prüfungsmassstabes | 16 |
| 3) | Willkürliche Verschlechterung der Annahmen des Managements | 17 |
| 4) | Sanierungsfall | 21 |
| 5) | Generelle Benachteiligung der Position der Beklagten | 21 |
| 6) | Verletzung einer Offenlegungspflicht | 21 |
| VI. | Schlussfolgerung | 24 |

## I.    EINLEITUNG

1.    Die vorliegende Verfügung befasst sich mit einer Beschwerde der Beklagten gegen den vom Schiedsgericht bestellten Sachverständigen Max Falckenberg ("Sachverständiger") und dessen vorgelegtes Sachverständigengutachten ("Gutachten").

Im ersten Teil werden das Zustandekommen des Auftrages an den Sachverständigen, die Zusammenstellung der Fragen an den Sachverständigen und die Mitwirkung der Parteien in diesem Prozess dargelegt.

Im zweiten Teil werden die einzelnen Beschwerdegründe und die Stellungnahmen der Parteien sowie des Sachverständigen aufgeführt.

Im dritten Teil nimmt das Schiedsgericht zu den einzelnen Vorwürfen der Befangenheit des Sachverständigen Stellung.

## II.    ÜBERBLICK ÜBER DAS VERFAHREN

### 1)    Sachverständigenauftrag und Gutachten

2.    Mit Verfügung Nr. 28 vom 23. Dezember 2011 hat das Schiedsgericht den Auftrag an den Sachverständigen des Schiedsgerichtes erteilt ("Sachverständigenauftrag"). Im Anhang A zu dieser Verfügung hielt das Schiedsgericht die Verfahrensgeschichte fest, soweit im Vorfeld der Beauftragung des Sachverständigen relevant, und führte im Einzelnen die Fragen des Schiedsgerichts sowie die Fragen der Parteien an den Sachverständigen an. Vorgängig zur definitiven Fassung des Sachverständigenauftrags hatten die Parteien Gelegenheit, zu einem Entwurf des Sachverständigenauftrags Stellung zu nehmen und ihrerseits Zusatzfragen zu formulieren, die das Schiedsgericht in die endgültige Fassung des Sachverständigenauftrags aufnahm.

3.    Dem Sachverständigenauftrag fügte das Schiedsgericht als *Annex A* ein Memorandum vom 10. Oktober 2011 ("Memorandum") bei, in welchem im Hinblick auf eine Fokussierung des Sachverständigenauftrags bestimmte für die Erstellung des Gutachtens wesentliche Rechtsfragen vorab entschieden wurden. Im Wesentlichen hielt das Schiedsgericht darin die für die Überprüfung der Tatsachengrundlagen, der vorhandenen Planungen und der Finanzplanung massgebenden rechtlichen Parameter fest. Im Zusammenhang mit der Behandlung der gegen das Gutachten und den Sachverständigen erhobenen Rügen wird auf einzelne Anforderungen in diesem Memorandum verwiesen.

4.    Dem Sachverständigenauftrag lag als Annex B das Begleitschreiben des Sachverständigen vom 8. Dezember 2011 bei ("Begleitschreiben des Sachverständigen").

5.    Am 9. März 2012 unterbreitete der Sachverständige einen Entwurf seines Gutachtens und stellte diesen den Parteien direkt zu. Entsprechend dem mit den Parteien vereinbarten Verfahren unterbreiteten die Parteien in der Folge ihre Fragen zum Entwurf des Gutachtens, wobei sie sich auch der Unterstützung ihrer Parteigutachter bedienten. Zusätzlich zu den Fragen und Ausführungen der Parteien erstellte das Schiedsgericht eine Liste seiner eigenen Fragen an den Sachverständigen. Zur Vorbereitung der auf den 7. und 8. Mai 2012 anberaumten Verhandlung mit den Parteien zur Besprechung des Entwurfes des

ICC Verfahren Nr. 15362/JHN/GFG                 Verfügung Nr. 39                           5. März 2013

Gutachtens erstellte der Sachverständige eine nach Themen konsolidierte Liste der von den Parteien und vom Schiedsgericht zum Entwurf des Gutachtens vorgelegten Fragen. An der Verhandlung wurde diese Liste im Detail besprochen, worüber das erstellte Verhandlungsprotokoll Aufschluss gibt ("Verhandlungsprotokoll").

6.   Im Anschluss an die Verhandlung vom 7./8. Mai 2012 erstellte der Sachverständige sein Gutachten in der definitiven Fassung vom 16. Juli 2012 ("Gutachten") sowie mit gleichem Datum die Beantwortung der Fragen zum Gutachtenentwurf ("Antwortenkatalog").

## 2)   Beschwerde wegen Besorgnis der Befangenheit

7.   Am 30. Juli 2012 reichten die Beklagten ihre Beschwerde gegen den Sachverständigen, dessen Gutachten und den Antwortenkatalog ("Beschwerde") ein, mit dem Hinweis, dass sie den Sachverständigen wegen der Besorgnis der Befangenheit ablehnen. Die Beklagten stellten die Anträge:

> "a)   *Der Sachverständige wird von seiner Tätigkeit entbunden.*
>
> b)   *Das vom Sachverständigen erstellte Gutachten sowie seine Ausführungen während des Termins zur Anhörung des Sachverständigen vom 7./8. Mai 2012 werden verworfen und nicht zur Entscheidungsfindung des Schiedsgerichts herangezogen."*

8.   Mit Eingabe vom 28. August 2012 nahm der Kläger zum Gutachten und Antwortenkatalog des Sachverständigen sowie zur Eingabe der Beklagten vom 30. Juli 2012 Stellung und beantragte, den Befangenheitsantrag der Beklagten zurückzuweisen.

9.   Der Sachverständige nahm in seiner Eingabe vom 4. September 2012 an das Schiedsgericht zur Beschwerde der Beklagten vom 30. Juli 2012 Stellung. Der Kläger verzichtete mit Schreiben vom 24. September 2012 auf eine separate Stellungnahme zur Stellungnahme des Sachverständigen; die Beklagten reichten ihre abschliessende Stellungnahme am 25. September 2012 ein. Der Schiedskläger antwortete darauf mit seiner Eingabe vom 1. Oktober 2012.

10.   Mit Eingabe vom 22. Oktober 2012 teilten die Beklagten dem Schiedsgericht mit, dass sie Kenntnis von einer möglichen Mandatsbeziehung zwischen der Anwaltskanzlei des klägerischen Rechtsvertreters, Orrick Hölters & Elsing, und der Beratungsfirma Roland Berger Strategy Consultants GmbH, deren Partner der Sachverständige ist, erhielt. Sie ersuchten daher das Schiedsgericht um Anordnung einer vollständigen und detaillierten Offenlegung des Mandatsverhältnisses zwischen Orrick und Roland Berger.

11.   Auf entsprechende Aufforderung des Schiedsgerichtes wies der Sachverständige in seinem Schreiben vom 2. November 2012 den Vorwurf der Befangenheit erneut zurück. Der Schiedskläger legte mit seiner Stellungnahme vom 2. November 2012 offen, dass nach Fertigstellung des finalen Gutachtens des Sachverständigen Roland Berger eine Mandatsbeziehung zu Orrick Rambaud Martel in Paris aufnahm.

12.   Daraufhin reichten die Beklagten ihre Stellungnahme am 14. November 2012 ein und beantragten erneut, *"[d]er Sachverständige [sei] unverzüglich von seiner Tätigkeit [zu entbinden]".*

GVS 02409887                                                                                               4/25

ICC Verfahren Nr. 15362/JHN/GFG                  Verfügung Nr. 39                  5. März 2013

13.    Mit seiner Eingabe vom 21. November 2012 beantragte der Schiedskläger, den Befangenheitsantrag abzuweisen.

## III.    BESCHWERDEGRÜNDE

14.    Die Beklagten führen aus, dass Gründe vorliegen, die den Sachverständigen aus der Sicht der Beklagten als befangen erscheinen lassen. Ihre Zweifel an der Unvoreingenommenheit des Sachverständigen ergeben sich insbesondere daraus, dass der Sachverständige

- *"einseitig zum Nachteil der Schiedsbeklagten eigenmächtig von seinem Auftrag abgewichen ist, indem er einen eigenen neuen Unternehmensplan erstellt hat;*

- *einseitig zum Nachteil der Schiedsbeklagten eigenmächtig von seinem Auftrag abgewichen ist, indem er bei der Erstellung seiner Unternehmensplanung einen anderen strengeren Prüfungsmassstab angewandt hat, als den vom Schiedsgericht vorgegebenen;*

- *die massgeblichen Planungsannahmen des CI-Managements systematisch und willkürlich zum Nachteil der Liquiditätssituation des CI-Geschäftsbereiches und damit zugleich zum Nachteil der Schiedsbeklagten verändert hat;*

- *seine Pflicht gemäss § 1049 Abs. 3 in Verbindung mit § 1036 Abs. 1 ZPO dadurch verletzt hat, dass er das Mandatsverhältnis zwischen seinem Unternehmen und den Prozessbevollmächtigten des Schiedsklägers nicht offengelegt hat."*

15.    Zum ersten Vorwurf der eigenmächtigen Abweichung vom Sachverständigenauftrag führen die Beklagten aus, dass der Sachverständige eine gänzlich neue Unternehmensplanung erstellt habe, obwohl das nicht seine Aufgabe gewesen sei. Zudem habe der Sachverständige einseitig zum Nachteil der Beklagten bei der Erstellung seiner Unternehmensplanung einen strengeren Massstab angewendet als den vom Schiedsgericht vorgegebenen. Insbesondere habe er die für insolvenzrechtliche Sanierungsgutachten entwickelten Grundsätze entgegen den ausdrücklichen Instruktionen des Schiedsgerichts auf den CI-Geschäftsbereich angewendet und sei bei der Überprüfung der Planung vom Massstab der *"überwiegenden Wahrscheinlichkeit"* statt Plausibilität ausgegangen.

16.    Zum Vorwurf der Veränderung der Planungsannahmen des CI-Managements zum Nachteil der Liquiditätssituation des CI-Geschäftsbereiches führen die Beklagten an, dass der Sachverständige systematisch und willkürlich liquiditätsrelevante Positionen einerseits abgewertet, andererseits Forderungslaufzeiten willkürlich erhöht, die Vorratsreichweite neu festgesetzt und die rechnerische Abfindung pro Arbeitnehmer zu hoch angesetzt habe.

17.    Zu weiteren Ausführungen der Beklagten zu den Beschwerdegründen wird in den nachfolgenden Ausführungen des Schiedsgerichts Stellung genommen.

18.    Der Sachverständige weist in seiner Eingabe vom 4. September 2012 die seitens der Beklagten vorgebrachte Besorgnis der Befangenheit als unbegründet zurück. Zum Vorwurf der eigenmächtigen Erstellung eines eigenen Unternehmensplans führt der Sachverständige aus, dass keine ausreichende Unternehmensplanung vorlag und die verfügbare Planung

ICC Verfahren Nr. 15362/JHN/GFG                Verfügung Nr. 39                5. März 2013

nicht auf richtigen und vollständigen tatsächlichen Grundlagen basierte. Der für das Gutachten angewendete Planungsmassstab entspreche den Anforderungen des Sachverständigenauftrags.

19.   Was die Vorwürfe der einzelnen Bewertungen zur Berechnung der Liquiditätssituation anbelangt, weist der Sachverständige darauf hin, dass er mehrere Prämissen objektiv zum Vorteil der Liquidität des CI-Geschäftsbereiches gesetzt habe und diese auf der Basis der verfügbaren Informationen in Verbindung mit seiner langjährigen Erfahrung in komplexen Restrukturierungssituationen ermittelt und umfassend begründet habe.

20.   Der Kläger weist in seiner Stellungnahme vom 28. August 2012 darauf hin, dass die Beklagten ihre mit der Beschwerde vorgebrachten Rügen weitestgehend schon in einer Eingabe vom 10. April 2012 geäussert hätten, weshalb ihre Befangenheitsbeschwerde nach den Bestimmungen des Artikels 33 ICC Schiedsgerichtsordnung verspätet erfolgt sei und die Beklagten damit ihr Rügerecht verwirkt hätten.

21.   Eigene ergänzende Sachverhaltsermittlungen des Sachverständigen würden eine Ablehnung wegen Befangenheit nicht rechtfertigen. Der Sachverständige habe den vorhandenen Prozessstoff detailliert und akribisch untersucht und deutlich dargelegt, wieso die vorhandenen Planungsunterlagen keine integrierte, realistische, widerspruchsfreie, stichtagsaktuelle Planung widerspiegelten. Von einer Überschreitung des Sachverständigenauftrages könne keine Rede sein; vielmehr liege ein ausgewogenes, unabhängiges und auf Fachkunde basierendes Gutachten vor. Allein der Umstand, dass der Sachverständige zu einem für die Beklagten nachteiligen Ergebnis gelangt sei, rechtfertige dessen Ablehnung keinesfalls.

22.   Zum Vorwurf einer vorhandenen Mandatsbeziehung zwischen Roland Berger und Orrick führen die Beklagten in ihrer Eingabe vom 14. November 2012 aus, dass der Sachverständige gegenüber dem Schiedsgericht und dem Schiedsbeklagten das Bestehen dieses Mandatsverhältnisses nicht offengelegt hat, obwohl er gemäss § 1049 Abs. 3 in Verbindung mit § 1036 Abs. 1 ZPO dazu verpflichtet sei. Danach habe der Sachverständige nach seiner Bestellung bis zum Ende des schiedsrichterlichen Verfahrens solche Umstände den Parteien unverzüglich offen zu legen, die Zweifel an seiner Unparteilichkeit oder Unabhängigkeit begründen könnten.

23.   Bei dem Mandatsverhältnis mit den Prozessbevollmächtigten des Schiedsklägers handele es sich um eine Information, die aus der verständigen Sicht des Schiedsbeklagten für die Beurteilung der Unparteilichkeit und Unabhängigkeit des Sachverständigen relevant sei.

24.   Diese Pflicht zur Offenlegung bestehe auch nach Abgabe des finalen Gutachtens fort, da der Sachverständige nach Einreichen des finalen Gutachtens am 16. Juli 2012 noch wesentliche Ausführungen im Schiedsverfahren vorgetragen habe.

25.   Nach Ansicht der Beklagten sei es im Übrigen für das Vorliegen berechtigter Zweifel an der Unabhängigkeit des Sachverständigen unerheblich, ob der Sachverständige Kenntnis von der Eingehung des Mandatsverhältnisses durch Roland Berger hatte. Die Schiedsbeklagten dürften auf die uneingeschränkte Unabhängigkeitserklärung des Sachverständigen vom

24. März 2011 vertrauen, in der dieser ausdrücklich bestätigte, weder unmittelbar noch mittelbar mit einer der Parteien dieses Schiedsverfahrens verbunden zu sein.

26.    Die Zweifel an der Unabhängigkeit des Sachverständigen würden zusätzlich durch das weitere Verhalten des Sachverständigen und der Prozessbevollmächtigten des Schiedsklägers bestärkt. Zum einen habe es der Sachverstände in seiner Eingabe vom 2. November 2012 unterlassen, auf die Mandatsbeziehung zwischen Roland Berger und Orrick hinzuweisen, obwohl die Schiedsbeklagten ausdrücklich mit ihrem Schreiben vom 22. Oktober 2012 um Aufklärung der Mandatsbeziehung gebeten hätten. Zum anderen datiere die eingegangene Mandatsbeziehung zwischen Orrick und Roland Berger vom 17. Juli 2012, genau einen Tag nach Einreichen des finalen Gutachtens, was vor dem Hintergrund einer vorausgehenden Phase der Kontaktaufnahme fragwürdig erscheine und den zweifelbehafteten Eindruck verstärke.

27.    Auf weitere Ausführungen der Schiedsbeklagten wird im Folgenden näher eingegangen, soweit sie als relevant erachtet werden.

28.    Der Sachverständige weist in seiner Eingabe vom 2. November 2012 den neuen Vorwurf als unbegründet zurück. Er betont, dass die von ihm abgegebene Unabhängigkeitserklärung von ihm persönlich und nicht im Namen von Roland Berger abgegeben wurde.

29.    Der Sachverständige führt weiterhin aus, dass aus den Unterlagen von Roland Berger der letzten zehn Jahre keine Mandatsbeziehungen zu Orrick hervorgingen. Es hätte einen einzigen Kontakt im Jahr 2002 gegeben, der die Rückerstattung von Reisekosten zum New Yorker Büro betraf. Der Sachverständige versichert, dass weder er noch ein anderes Mitglied seines Teams, das sich mit der Erstellung des Gutachtens beschäftigte, an diesem internen Projekt beteiligt waren. Seine Erklärung basiere auf der Untersuchung der Buchhaltungsdaten von Roland Berger unter Eingabe der Begriffe "*Orrick*" oder "*Hölters & Elsing*".

30.    Der Kläger weist den neuen Befangenheitsvorwurf der Beklagten in seinen Eingaben vom 2. und 21. November 2012 zurück. Die Schiedsbeklagten liessen den Umstand ausser Acht, dass Herr Falckenberg als Person und nicht Roland Berger zum Sachverständigen ernannt wurde. Der Schiedskläger bestätigt die inhaltliche Richtigkeit der Aussagen, die der Sachverständige in seiner Eingabe vom 2. November 2012 getroffenen hat. Der Sachverständige habe die Mandatsbeziehung von Roland Berger zu Orrick Rambaud Martel in Paris nicht offenlegen können, da sie aufgrund ihres hochvertraulichen Charakters nicht aus den "*Tools des Roland Berger Conflicts Check Systems*" ersichtlich sei.

31.    Darüber hinaus bestehe für den Sachverständigen schon keine gesetzliche Offenlegungspflicht gemäss § 1049 Abs. 3 in Verbindung mit § 1036 Abs. 1 ZPO. Bei der Erfüllung der Offenlegungspflicht komme es entscheidend darauf an, dass der Sachverständige Kenntnis von den offenbarungspflichtigen Tatsachen hat, was vorliegend nicht der Fall sei.

ICC Verfahren Nr. 15362/JHN/GFG                Verfügung Nr. 39                5. März 2013

32.    Mit der Abgabe des finalen Gutachtens ende ausserdem die Tätigkeit des Sachverständigen und damit auch seine Pflicht zur Offenlegung.

## IV.    ANWENDBARE RECHTSNORMEN FÜR DAS ABLEHNUNGSVERFAHREN

### 1)    Bestimmungen der Deutschen Zivilprozessordnung

33.    Gemäss Ziff. 9 des Schiedsauftrags vom 5. September 2008, finden auf das Schiedsverfahren die ICC Schiedsgerichtsordnung, die zwingenden Bestimmungen des deutschen Schiedsrechts als der *lex arbitri* und die vom Schiedsgericht erlassenen Verfahrensregeln Anwendung. Die ICC Schiedsgerichtsordnung enthält keine Bestimmungen, die auf einen Antrag einer Partei, einen vom Schiedsgericht bestellten Sachverständigen wegen Befangenheit abzulehnen, Anwendung finden. Aus den auf das Schiedsverfahren anwendbaren Bestimmungen der Deutschen Zivilprozessordnung (ZPO), 10. Buch, ergibt sich, dass gemäss § 1049 Abs. 3 ZPO auf den vom Schiedsgericht bestellten Sachverständigen die §§ 1036, 1037 Abs. 1 und Abs. 2 ZPO entsprechend Anwendung finden.

34.    § 1036 ZPO sieht vor, dass ein Schiedsrichter und auch ein Sachverständiger alle Umstände offenzulegen hat, die Zweifel an seiner Unbefangenheit und Unabhängigkeit wecken können. Für die Ablehnung eines Sachverständigen gelten dieselben Voraussetzungen, wie sie an ein Mitglied des Schiedsgerichts gestellt werden, sowie der Umstand, dass der Sachverständige die zwischen den Parteien vereinbarten Voraussetzungen nicht erfüllt (G. WAGNER, in Practitioner's Handbook on International Arbitration edited by Frank-Bernd Weigand, München 2002 [zit. Weigand/Wagner], S. 769, Rz. 272).

### 2)    Einhaltung der Frist zur Geltendmachung der Ablehnungsgründe

35.    Gemäss Abs. 2 von § 1037 ZPO, in Verbindung mit § 1049 Abs. 3 ZPO, hat die Partei, der ein Umstand zur Ablehnung des Sachverständigen bekannt wird, innerhalb von zwei Wochen dem Schiedsgericht schriftlich die Ablehnungsgründe darzulegen. Das Schiedsgericht hat die Kompetenz, über die Ablehnung zu entscheiden (SACHS/LÖRCHER, in Arbitration in Germany, edited by K.-H. Böckstiegel, St.M. Kröll, P. Nacimiento, 2007, S. 338, Rz. 14).

36.    Die Beschwerde der Beklagten ist am 30. Juli 2012 innert zwei Wochen seit der Zustellung des Gutachtens eingereicht worden, so dass die Frist von § 1037 Abs. 2 ZPO als eingehalten zu betrachten ist, soweit den Beklagten die Umstände, die zur Begründung des Ablehnungsgesuches geltend gemacht werden, nicht schon früher bekannt waren.

37.    Die Partei, die ein Gesuch um Ablehnung eines Sachverständigen stellt, muss die tatsächlichen Gründe, die zur angeblichen Befangenheit führen, wirklich kennen. Blosse Vorwürfe und Verdachtsmomente genügen nicht:

> *"Wenn die Zweifel an der Unparteilichkeit oder Unabhängigkeit sich aus mehreren einzelnen Vorkommnissen speisen, so muss man der ablehnenden Partei ein gewisses Ermessen zugestehen, bei Kenntnis welcher Einzelumstände sie den Schritt der [Sachverständigen-]*

*Ablehnung unternehmen will."* (Stein/Jonas/Schlosser, Kommentar zur Zivilprozessordnung, 22. Auflage, Tübingen 2002, § 1037 Rdnr. 2 ZPO)[1]

38.    Der Kläger wendet ein, die Beklagten hätten im Wesentlichen schon mit ihrer Eingabe vom 10. April 2012 die mit der Beschwerde vorgebrachten Ablehnungsgründe gerügt, weshalb ihre Beschwerde als verspätet abzuweisen sei. In der Eingabe vom 10. April 2012 kritisieren die Beklagten tatsächlich den Umstand, dass der Sachverständige eine eigene Unternehmensplanung erstellt und sich auf die Plausibilisierung der bestehenden Planung hätte beschränken sollen. Auch wurden die Vorwürfe, der Sachverständige wende einen strengeren Planungsmassstab an als vom Schiedsgericht vorgegeben und lasse eine Vielzahl von Finanzierungsquellen ausser Acht, schon damals erhoben.[2]

39.    Im vorliegenden Verfahren erstreckten sich die Beauftragung des Sachverständigen sowie die Ausarbeitung des Gutachtens über eine Zeitspanne von sieben Monaten, wobei ein erster Entwurf des Gutachtens nach ca. drei Monaten vorlag. Ausdrücklich wurde vereinbart, dass der Sachverständige einen Entwurf seines Gutachtens vorlegen soll, zu dem die Parteien Stellung beziehen können. Auch war mit den Parteien vereinbart, dass sie dem Sachverständigen Zusatzfragen unterbreiten werden, was in der Folge zum erwähnten Antwortenkatalog führte, der mit dem Sachverständigen an der Verhandlung vom 7./8. Mai 2012 besprochen wurde. Es liegt in der Natur eines derartigen Ablaufes, dass die Parteien mit entsprechenden Hinweisen und Ausführungen an den Sachverständigen versuchen, diesem nahezulegen, er möge die Umstände, Analysen und Schlussfolgerungen so darlegen, dass sie dem Standpunkt der jeweiligen Partei möglichst nahe kommen oder im Gutachten sogar nachgebildet werden. Dass dies seitens der Parteien zu kritischen Bemerkungen bezüglich des Gutachtenentwurfs führt, gehört zur Interessenwahrung der Parteien in einem streitigen Verfahren und die Parteien rechnen auch damit, dass sie mit ihren Hinweisen, Einwendungen und kritischen Bemerkungen die Schlussfolgerungen des Sachverständigen noch beeinflussen bzw. die eine oder andere *"Richtigstellung"* noch bewirken können. In diesem Prozess wäre es verfehlt und systemwidrig, wenn man in solchen Hinweisen schon die Geltendmachung von Ablehnungsgründen wegen Befangenheit des Sachverständigen erblicken würde.

40.    Das mit den Parteien und dem Sachverständigen besprochene Verfahren soll gerade dazu dienen, die Tätigkeit und die Arbeit des Sachverständigen zu hinterfragen und in einem zweiten Prozess den Entwurf des Gutachters zu besprechen. Dieses Vorgehen würde vereitelt, wenn Ablehnungsanträge, die auf thematisch unterschiedlichen Ansichten zwischen dem Sachverständigen und der einen oder anderen Partei beruhen, schon in diesem Stadium zur Vermeidung der Verwirkung eines Beschwerderechts gestellt werden müssten. Zudem besteht bis zur endgültigen Fassung des Gutachtens auch keine Gewissheit, ob der Sachverständige bei all seinen im Entwurf getroffenen Annahmen und Äusserungen bleibt. Desgleichen kann das Schiedsgericht auch aus dem weiteren Einwand des Klägers, die Beklagten hätten schon auf der Grundlage der mündlichen Verhandlung vom 7./8. Mai 2012 die mit der Beschwerde gerügten Ablehnungsgründe gekannt, nicht den Schluss ziehen, das Beschwerderecht sei verwirkt.

---

[1]    In der Folge zitiert mit STEIN/JONAS/BEARBEITER[22], § ..., Rdnr. ...

[2]    Eingabe der Beklagten vom 10. April 2012, insbesondere S. 7, 8 und 10.

41. Im Allgemeinen ist davon auszugehen, dass für Schiedsrichter bezüglich Unbefangenheit, Unabhängigkeit und Unparteilichkeit ebenso strenge Anforderungen gelten wie für die staatlichen Richter. Meinungsäusserungen eines Richters im frühen Stadium des Verfahrens können unter Umständen eine Besorgnis der Befangenheit auslösen, was bei staatlichen Richtern in der Regel weniger der Fall ist (s. Stein/Jonas/Schlosser[22] § 1036, Rdnr. 25).

42. Soweit die Bestimmung von § 1036 ZPO auf vom Schiedsgericht bestellte Sachverständige Anwendung findet, darf auch nicht übersehen werden, dass die Arbeit eines Sachverständigen vom Prozess her anders strukturiert ist als die eines Schiedsrichters. So sieht § 1049 Abs. 2 ZPO vor, dass der Sachverständige nach Erstellen seines schriftlichen oder mündlichen Gutachtens an einer Verhandlung teilnimmt und entsprechende Fragen der Parteien beantwortet. Solches ist für ein Schiedsgericht und den Schiedsspruch nicht vorgesehen. Dort wo, wie im vorliegenden Fall, mit den Parteien vereinbart wird, dass der Sachverständige einen Entwurf seines Gutachtens vorlegt und dieser von den Parteien im Rahmen einer Verhandlung mit dem Sachverständigen besprochen und überprüft wird und gestützt darauf Fragen vorgebracht werden können, ergibt sich zwangsläufig vor der definitiven Erstellung des Gutachtens, dass Meinungsäusserungen des Sachverständigen, soweit sie mit entsprechenden Hinweisen auf Unterlagen und gemachte Abklärungen unterlegt sind, nicht als eine vorzeitige Meinungsäusserung zur Befangenheit des Sachverständigen führen können.

43. In dem vom Kläger zitierten Entscheid des Brandenburgischen Oberlandesgerichts vom 14. November 2000 (K-Lex 289) hatte die Expertin vor ihrem definitiven Gutachten eine "Sachstandsmitteilung" abgegeben. Das OLG führte aus: "*im Wesentlichen hat sie dort über den Stand ihrer Untersuchungen in tatsächlicher Hinsicht berichtet; soweit sie dabei auch Schlussfolgerungen zieht, handelt es sich erkennbar um vorläufige Meinungsäusserungen, die nicht geeignet sind, in objektiver Hinsicht an der Unparteilichkeit zu zweifeln.*" Ebenso gab der Entwurf des Gutachtens im vorliegenden Fall eine vorläufige Meinungsäusserung wieder.

44. Vor der definitiven Erstellung des Gutachtens durch den Sachverständigen kann es selbstverständlich gleichwohl Ablehnungsgründe geben, die unmittelbar innert der Frist von zwei Wochen geltend zu machen sind, sofern es sich um solche handelt, die in der Person des Sachverständigen, in seiner Beziehung zu den Parteien oder in seinen spezifischen Qualifikationen liegen. Dergleichen wird aber hier nicht geltend gemacht, und die an den Sachverständigen gerichteten Vorwürfe betreffen ausschliesslich Themen, die er im Rahmen des Sachverständigenauftrages zu prüfen hatte. Hier gilt als massgebender Zeitpunkt für den Beginn der Zweiwochenfrist die Vorlage des definitiven Gutachtens. Die Beschwerde ist somit fristgerecht eingereicht worden.

45. Hinsichtlich des zweiten Beschwerdeantrages haben die Parteien in ihrem Schriftenverkehr vom 24./25. Oktober 2012 einvernehmlich vereinbart, dass die zweiwöchige Frist nicht vor dem 2. November 2012 beginnen soll. Das Ablehnungsverfahren, und damit auch die einzuhaltenden Fristen, unterliegen nach § 1049 Abs. 3 in Verbindung mit § 1037 Abs. 1 ZPO der Parteiautonomie. Eine getroffene Vereinbarung geht der gesetzlichen Fristenregelung nach § 1049 Abs. 3 in Verbindung mit § 1037 Abs. 2 ZPO vor. Mit Einreichen des Beschwerdeantrages am 14. November 2012 haben sich die Beklagten an

die Vereinbarung gehalten. Somit ist auch der zweite Beschwerdeantrag fristgerecht eingegangen.

**3)      Ablehnungsgründe**

46.    Im Wesentlichen geht es bei der ersten Befangenheitsrüge gegenüber dem Sachverständigen darum, ob sich dieser an den Auftrag gehalten hat. Weitere Massstäbe für das Verhalten und Vorgehen des Sachverständigen ergeben sich aus der Unabhängigkeitserklärung und Vertraulichkeitsvereinbarung (s. insbesondere Ziff. 4, 5 und 6 des Sachverständigenauftrags).

47.    Die Schlussfolgerungen des Sachverständigen müssen mit entsprechenden Unterlagen, Berechnungen oder plausiblen Annahmen unterlegt sein. Sie sollen insbesondere die im Memorandum festgelegten Kriterien befolgen.

48.    Die Hinweise der Beklagten, die Ablehnung eines Sachverständigen sei begründet, wenn objektive Gründe vorliegen, die in den Augen einer verständigen Partei geeignet sind, Zweifel an der Unparteilichkeit des Sachverständigen zu wecken, kann als genereller Massstab nur insoweit herangezogen werden, als sich die Schlussfolgerungen des Sachverständigen tatsächlich nicht belegen oder mit ausreichender Wahrscheinlichkeit plausibilisieren lassen. In dem von den Beklagten in diesem Zusammenhang zitierten Entscheid des OLG München vom 5. März 1991,[3] hat der Senat festgehalten hat, dass bei Vorliegen von Umständen, "*die auch in einer vernünftigen, nüchtern denkenden Partei die Befürchtungen rechtfertigen können, der Sachverständige habe sich einseitig festgelegt, er glaube den Angaben der einen Partei mehr als den Angaben der anderen*", die Besorgnis der Befangenheit begründet sei. Das Gericht bejahte die Befangenheit des ärztlichen Sachverständigen in diesem Fall, da dieser den Ausführungen der einen Partei in seinem Gutachten einen breiten Raum einräumte und die entsprechenden Erwiderungen der Gegenpartei nicht erwähnte. Zudem hatte der Gutachter einen umstrittenen Umstand seinem Gutachten als erwiesen zugrunde gelegt. Seine Kritik des Befangenheitsantrages war sodann geeignet, in der Partei die Befürchtungen zu rechtfertigten, der Sachverständige sei verärgert und deshalb nicht mehr unbefangen. Auf weitere Entscheide,[4] die von den Beklagten zur Offenlegungspflicht des Sachverständigen, bzw. zur Befangenheit angeführt werden, wird in den nachfolgenden Erwägungen eingetreten.

**V.      ZU DEN EINZELNEN VORGETRAGENEN ABLEHNUNGSGRÜNDEN**

**1)      Eigenmächtige Erstellung eines Unternehmensplans**

49.    Die Beklagten rügen, dass der Sachverständige entgegen den Weisungen des Schiedsgerichts eine eigene, neue Unternehmensplanung erstellt und sich dabei von den vorhandenen Planungsannahmen abgesetzt habe. Dabei habe er seine vorsichtige Planung an einem nicht einschlägigen Massstab, der "*überwiegenden Wahrscheinlichkeit*", anstatt dem gebotenen Massstab der Plausibilität und Vertretbarkeit ausgerichtet. Sein Vorgehen

---

[3]    B-R-Lex 136.

[4]    B-R-Lex 133, 134, 135.

verstosse zugleich gegen fundamentale Regeln der Beweislastverteilung und untergrabe den Beibringungsgrundsatz.

50.     Mit der Verfügung Nr. 16 vom 31. Januar 2011 informierte das Schiedsgericht die Parteien, dass es die Bestellung eines Sachverständigen für erforderlich halte zur Beurteilung der für die Fortführung des CI-Geschäftsbereiches notwendigen Finanzierung. Ausschlaggebend für die Beurteilung seien die Sicht des Einbringungs-Stichtages und die zu diesem Zeitpunkt zu berücksichtigenden Erkenntnisse ("Wurzeltheorie") auf der Basis einer zugrunde zu legenden Planung. Relevant sei eine aus einem vorhandenen Fortführungskonzept hergeleitete Planung und/oder unabhängig davon eine damals zu erwartende wirtschaftliche Entwicklung (ggf. Best Case / Worst Case) mit der Perspektive von einem Jahr ab Stichtag. Wie im Memorandum (Ziff. 3) festgehalten, bestand über die Grundlagen einer Bewertung keine Einigkeit zwischen den Parteien. Das Schiedsgericht hielt deshalb im Memorandum (Rz. 23) fest:

> *"Der Sachverständige hat im Rahmen der vorstehend festgelegten Kriterien die vorhandene(n) Finanzplanung(en) zu überprüfen. Sofern er dabei Korrekturen an den Tatsachengrundlagen vornimmt, muss er für jedes relevante Tatbestandselement eine Analyse über die Wurzel und die Erkennbarkeit erstellen, damit das Schiedsgericht die vom Sachverständigen gezogenen Schlüsse überprüfen kann. Die vorhandenen Planungen sind darauf zu prüfen, ob sie realistisch und widerspruchsfrei waren. Ist dies nach Ansicht des Gutachters nicht der Fall oder fehlte es gar an einer Planung, hat er die Gründe dafür festzuhalten und eine eigene Planung aus Sicht des Stichtags zu erstellen."*

51.     Der Sachverständige führte in diesem Zusammenhang in seiner Stellungnahme vom 4. September 2012 aus, dass er eine eigene Unternehmensplanung erstellt habe, da nach seiner Ansicht die vorhandenen Planungen aufgrund der im Memorandum festgehaltenen Beurteilungskriterien nicht realistisch und widerspruchsfrei waren. Verschiedene Widersprüche und teilweise nicht vertretbare Prämissen und Annahmen hätten ihn dazu bewogen, eine eigene Planung zu erstellen. Dabei weist er darauf hin, dass auch eine Korrektur der bestehenden Unternehmensplanung im Ergebnis seiner gutachterlichen Planung entsprochen hätte, d.h. unter Zugrundelegung realistischer und widerspruchsfreier Prämissen hätte die Korrektur der vorgefundenen Planungen ein identisches Resultat wie jenes, aufgrund der neuen Planung erstellte, ergeben.

52.     Gemäss den Vorgaben des Schiedsgerichtes, wie sie im Memorandum festgelegt sind, hatte der Sachverständige den CI-Geschäftsbereich als Einlagegegenstand mit dessen objektivem Wert zu berücksichtigen, soweit er ermittelbar ist, wobei für die Unternehmensbewertung die Tatsachengrundlagen zum Bewertungsstichtag und die darauf beruhenden Zukunftsplanungen zu berücksichtigen sind. Die tatsächlichen Grundlagen, wie z.B. Umsätze, Jahresergebnisse, Zinssätze, etc. müssen richtig und vollständig sein, nicht nur plausibel. Nach dem Stichtag eintretende Entwicklungen sind nach der Wurzeltheorie für die Bewertung zu berücksichtigen und finden nicht nur auf die Planung, sondern auch auf die Tatsachengrundlagen Anwendung (Memorandum Rz. 10). Zur Bedeutung der Wurzeltheorie in diesem Zusammenhang kann auf die Ausführungen im Memorandum und auf die dort zitierte Judikatur verwiesen werden.

53.    Die erforderliche objektive Betrachtung verlangt, dass auf die Sorgfalt eines ordentlichen und gewissenhaften Geschäftsleiters abzustellen ist. Der Grundsatz der sogenannten *"business judgement rule"* besagt, dass die in der Wurzel angelegten Tatsachen, die dem branchenkundigen, sorgfältigen Geschäftsführer erkennbar waren, berücksichtigt werden, auch wenn sie erst später eingetreten sind (Memorandum Rz. 12).

54.    Eine vorhandene Planung darf nicht durch eine andere – ebenfalls nur vertretbare – Annahme des Gerichtes oder eines vom Schiedsgericht bestellten Sachverständigen ersetzt werden, wenn die Geschäftsführung aufgrund realistischer Grundlagen vernünftigerweise annehmen durfte, ihre Planung sei richtig. Massstab ist dabei, ob die Verantwortlichen bei der Planung die Sorgfalt eines ordentlichen und gewissenhaften Geschäftsleiters haben walten lassen (Memorandum Rz. 16 und dort zitierte Judikatur).

55.    Der Sachverständige weist in seinem Gutachten darauf hin, dass für die Beurteilung der rechtlichen Einheit AgfaPhoto GmbH nur eingeschränkte historische Daten in sehr hoher Aggregationsebene in Form von Daten zum Geschäftsbereich Consumer-Imaging der damaligen Muttergesellschaft Agfa-Gevaert NV vorlagen, welche jedoch nicht in die zum Zeitpunkt der Auslagerung des CI-Bereiches als beste Schätzung erstellten sogenannten *"carve-out financials"* überleitbar waren (Gutachten Ziff. 3.1). Für sein Gutachten verwendete der Sachverständige unter anderem folgende Planungsunterlagen: *"Greenfield"*-Planungen, *"Revised Business Plan"*, *"Investor Concept"* sowie *"Deal Analysis"*-Modelle des Investors. Zum Verhältnis der vorhandenen Planungsunterlagen und seiner eigenen Planung, hält der Sachverständige fest:

> *"Die mir vorliegenden Präsentationen stellen als reine Ergebnis-Präsentationen keine vollumfassende Dokumentation der Planungsrechnungen dar. Somit ist bei der Beurteilung der vorhandenen Planungsprämissen mehr auf meine gutachterlichen Einschätzungen und Erfahrungswerte zurückzugreifen, als dies beim Vorhandensein einer vollständigen Planungsdokumentation notwendig wäre. Die von mir getroffenen Annahmen sind an den entsprechenden Stellen im vorliegenden Gutachten vermerkt.*
>
> *Gleichwohl stellt dies aber keine grundsätzliche Kritik an den Planungsrechnungen bzw. den darin enthaltenen Prämissen dar. Wie beispielsweise die "Agfa Consumer Imaging Management Presentation" auszugsweise für die Massnahme "Streamline organization to '1,300' units capacity" oder der "2005 Business Plan" hinsichtlich der Hinterlegung der Restrukturierungsziele mit konkreten Massnahmen zeigt, scheinen diese weiterführenden Informationen im Rahmen der verschiedenen Planungsprozesse und -perioden sehr wohl erstellt und berücksichtigt worden zu sein.*
>
> *Insofern komme ich zu dem Schluss, dass die von Käufer und/oder Verkäufer erstellten Planungsrechnungen insbesondere mit Hinblick auf die geplanten Restrukturierungsmassnahmen und deren finanzielle Auswirkungen eine akzeptable Basis für meine gutachterliche Tätigkeit darstellen. Die vorliegenden Informationen in Verbindung mit meinen eigenen Erfahrungen sind grundsätzlich ausreichend, um die im Verlauf des Gutachtens vorgestellte Planungsrechnung zu erstellen."*
> (Gutachten S. 16)

56.    Im Einzelnen führt der Sachverständige aus, dass "die mir vorliegenden Planungsrechnungen jeweils für sich betrachtet [ungeeignet waren], um die Zahlungsfähigkeit in der Folgeperiode zu beurteilen. Grund dafür sind nicht nur enthaltene Widersprüche oder teilweise nicht vertretbare Prämissen, sondern auch die Notwendigkeit der Stand-Alone-Betrachtung, die in der mir vorliegenden Planung nicht gegeben war." (Ziff. 2.3 Antwortenkatalog)

Auf die Frage nach der Verwendung vorhandener Planungen antwortete der Sachverständige: "Wie bereits unter 2.1 bis 2.4 beschrieben, konnte ich aus verschiedenen Gründen keine der mir vorliegenden Planungen für sich genommen als Grundlage für eine formale unternehmerische Planungs- und Ermessungsentscheidung nutzen. Nichtsdestotrotz wurden die vorhandenen Planungen überprüft und plausible Annahmen aus den Planungen zur Erstellung der neuen Planung genutzt." (Ziff. 2.5 Antwortenkatalog)

57.    Der Sachverständige hat auf S. 110 in seinem Gutachten in einer tabellarischen Übersicht dargestellt, welche vorhandenen Planungsunterlagen in welchen Bereichen für eine zuverlässige Unternehmensbewertung nicht ausreichen. Er hebt hervor, dass die meisten Prämissen nicht dokumentiert waren und der aktuelle Erkenntnisstand mit ganz wenigen Ausnahmen nicht berücksichtigt worden ist. Diese Feststellungen des Sachverständigen werden von den Beklagten in der Beschwerde nicht widerlegt.

58.    Zur Verlässlichkeit der vorhandenen Planungen und zur Zuverlässigkeit und Vertretbarkeit der getroffenen Prämissen befragt, führte der Sachverständige aus:

> "Diese Aussage kann ich so nicht bestätigen. Zunächst muss ich darauf hinweisen, dass mir Planungen teilweise nur als Ergebnispräsentationen vorliegen, sodass ich nur eingeschränkt über die Ordentlichkeit bzw. Gewissenhaftigkeit des Geschäftsführers urteilen kann. Grundsätzlich erscheinen die vorhandenen Planungen jedoch ausreichend, um zumindestens Elemente daraus für eine neue Planung verwenden zu können. An verschiedenen Stellen sind jedoch unzulässige und nicht vertretbare Prämissen enthalten. Dies führt dazu, dass insgesamt ein falsches Gesamtbild über die mögliche Liquiditätsentwicklung des CI-Geschäftsbereichs entsteht und es notwendig ist, eine neue Planung mit teilweise angepassten Annahmen zu erstellen." (Ziff. 2.3 Antworten-katalog)

59.    Der Sachverständige stellt auch fest, dass die vorhandenen Planungen "unplausible Annahmen wie z.B. der Cash-Anfangsbestand, die Grundannahmen zur Berechnung des Working Capitals (z.B. die Entwicklung der Zahlungseingänge aus Altforderungen)" enthielten oder "Prämissen der Umsatzentwicklung korrigiert bzw. an neuere Informationen angepasst" werden mussten (Antwortenkatalog S. 11).

60.    Gestützt auf diese Ausführungen des Sachverständigen, wonach die vorhandenen Planungsunterlagen teilweise in den relevanten Bereichen unrealistisch und widersprüchlich sind, erscheint es als gerechtfertigt, eine eigene Unternehmensplanung zu erstellen, zumal diese in sorgfältiger Ausgewogenheit die vorhandenen Daten mitberücksichtigt. Der Sachverständige hat an mehreren Stellen ausgeführt, dass er für seine Planung Angaben und Prämissen in den vorhandenen Unterlagen berücksichtigt hat, soweit diese richtig und widerspruchsfrei waren. Er verwendete dabei das Bild des Steinbruches, aus dem einzelne

Teile der CI-Managementplanung und der weiteren Planungsunterlagen bezogen wurden (Verhandlungsprotokoll 256: 27 ff.). Es handelt sich somit bei seiner Planung nicht um eine von den vorhandenen Planungen vollständig losgelöste Berechnung. Der Sachverständige ist damit nicht von dem ihm erteilten Sachverständigenauftrag abgewichen.

61. In dem von den Beklagten zitierten Urteil des OLG Stuttgart vom 7. Februar 2001 hielt der Zivilsenat fest, dass im Rahmen einer Unternehmensberatung vorhandene Planungen zwar nicht kritiklos zu übernehmen, sondern auf Plausibilität zu prüfen sind. *"Sie haben jedoch Ausgangspunkt für den Bewertungsgutachter zu sein. Es steht diesem nicht zu, eine eigene Planung zu entwerfen und diese an die Stelle der des Unternehmens zu setzen"* (Rz. 349). In diesem vom OLG Stuttgart beurteilten Fall lagen unabhängige Mehrjahresplanungen vor, die aufgrund eines konzerneinheitlichen, formalen Planungsverfahrens entstanden waren und nicht zum Zwecke der im Raum stehenden Bewertung gefertigt wurden. Der Sachverständige hatte diese Unterlagen für seine Bewertung übernommen und war von deren Planungsmethodik überzeugt. Insofern ist aus diesem Entscheid für den Vorwurf der Beklagten im vorliegenden Verfahren nichts abzuleiten, da er sich nicht damit auseinandersetzt, was ein Sachverständiger zu tun hat, bzw. wie er vorzugehen hat, wenn die Unterlagen und Planungen, wie im vorliegenden Fall, unvollständig, widersprüchlich und teilweise unplausibel sind. Der im Memorandum vorgegebene Massstab ist für den Sachverständigen verbindlich und daran mag der Entscheid des OLG Stuttgart nichts zu ändern.

62. In ihrer Beanstandung, der Sachverständige habe die bestehenden Planungsrechnungen des CI-Managements willkürlich verworfen und stattdessen selbst eine fiktive planerische Zukunft des CI-Konzerns bestimmt, setzen sich die Beklagten denn auch nicht mit den Einzelheiten der vorhandenen Planung, die der Sachverständige als widersprüchlich oder fehlerhaft bezeichnet, auseinander. Sie unterstellen dem Sachverständigen zu Unrecht, dass er eine komplett neue Unternehmensplanung erstellt hat, und übergehen, dass diese, wie vom Sachverständigen mehrfach zum Ausdruck gebracht, die Planungsunterlagen, die objektiv richtig waren, mitberücksichtigt hat (s. vorne Ziff. 44).

63. Dem Vorwurf der Beklagten, der Sachverständige sei eigenmächtig vorgegangen und habe sich ein bestimmtes, vorgefasstes Bild vom CI-Geschäftsbereich gemacht und im Nachhinein diejenigen Dokumente aus den Verfahrensakten herausgezogen, mit denen seine Annahmen am besten zu unterlegen waren, kann das Schiedsgericht nicht folgen. Vielmehr hat der Sachverständige den gesamten Prozessstoff detailliert und mit grosser Sorgfalt ausgewertet und in seinem Gutachten aufgearbeitet und dort, wo er Lücken oder Fehler feststellte, mit verbesserten Angaben und Berechnungen ergänzt. Etwas anderes geht auch nicht aus den von den Beklagten angesprochenen Äusserungen des Sachverständigen anlässlich der Verhandlung vom 7./8. Mai 2012 hervor. Das Vorgehen des Sachverständigen, ausgehend von den vorhandenen Planungen neue Informationen mitzuberücksichtigen, um die Zuverlässigkeit der Planung zu hinterfragen (Verhandlungsprotokoll 302: 22–30; 303: 17-28), entspricht in jeder Hinsicht einem gemäss Sachverständigenauftrag vorgeschriebenem Vorgehen.

**2)      Anwendung eines strengeren Prüfungsmassstabes**

64.    Auf den vom Sachverständigen anzuwendenden Prüfungsmassstab mit Bezug auf die vorhandenen Planungsunterlagen kann auf die Ausführungen in Ziff. 52 – 54 verwiesen werden. Wie die Beklagten in ihrer Beschwerde auf S. 8 in Fussnote 29 richtig festhalten, muss der Sachverständige Planungsrechnungen, die nicht plausibel sind, durch sachgerechte Prognosen ersetzen oder anpassen.

65.    Insbesondere in Bezug auf die Finanzierungsprognosen ist der Sachverständige der Frage nachgegangen, welche Anforderungen erfahrungsgemäss in vergleichbaren Fällen an eine Planung gestellt werden. Dabei verweist er auf Anforderungen, wie sie bspw. von Banken oder anderen Investoren in Sanierungssituationen gestellt werden (Gutachten S. 108 f.). Auch wenn die für insolvenzrechtliche Sanierungsgutachten entwickelten Grundsätze auf eine gesellschaftsrechtliche Unternehmensbewertung *tel quel* nicht anwendbar sind, basieren sie doch auf dem Begriff *"realistisch"*, wie er als Synonym für vertretbar von der Rechtsprechung verstanden wird.[5] Wenn der Sachverständige in diesem Zusammenhang auf das Kriterium der überwiegenden Wahrscheinlichkeit abstellt, bewegt sich seine Analyse im Rahmen des Plausibilitäts- und Vertretbarkeitsstandard. Sollte eine Differenzierung zwischen *"überwiegender Wahrscheinlichkeit"* und *"Vertretbarkeit"* überhaupt nötig sein, wird sich das Schiedsgericht damit in seiner Würdigung des Gutachtens auseinandersetzen. Auf keinen Fall vermag diese Differenzierung aber eine Befangenheit begründen.

66.    Auf S. 85 ff. des Gutachtens nimmt der Sachverständige zu den Finanzierungsmöglichkeiten Stellung und führt die externen Quellen im Einzelnen an. Zusätzlich zum Eigen- und Mezzanine-Kapital der Investoren, dem Factoring, dem Betriebsmittelkredit der Dresdner Bank AG und den Leasing-Cash-Streams I und II, war mit weiteren externen Finanzierungsquellen nach Einschätzung des Sachverständigen nicht zu rechnen. Potentielle Bankfinanzierungen waren in der Einschätzung des Sachverständigen mangels freien Sicherheiten der AgfaPhoto-Gruppe unwahrscheinlich (Gutachten S. 90).

67.    In seiner Eingabe vom 4. September 2012 weist der Sachverständige zudem auf die Vorgaben des IDW S 1 hin, die er für die Unternehmensplanung weitestgehend berücksichtigt hat und die auch den Vorgaben im Sachverständigenauftrag entsprechen. Zutreffend ist die Feststellung des Sachverständigen, dass eine Planung der Geschäftsführung nicht als realistisch, widerspruchsfrei, plausibel und vertretbar angesehen werden kann, wenn selbst die Geschäftsführung von deren Eintritt nicht überzeugt ist (s. Stellungnahme des Sachverständigen vom 4. September 2012, S. 10). In den entsprechenden Ausführungen im Antwortenkatalog (S. 49/50), weist der Sachverständige bezüglich *"Zusatzfinanzierung – Land und Gebäude"*, *"Kontokorrentkredit"*, auf die Bedenken von Herrn Nellissen hin und geht aufgrund dieser Einschätzung des CFO davon aus, dass mit diesen Finanzierungen realistisch nicht zu rechnen war. Daher lässt keine dieser Aussagen einen Schluss auf eine Befangenheit des Sachverständigen zu.

---

[5]    OLG Stuttgart vom 3. April 2012 (B-R-Lex 153); OLG Stuttgart vom 14. Oktober 2010 (B-R-Lex 77).

**3)          Willkürliche Verschlechterung der Annahmen des Managements**

68.      Die Beklagten rügen die Reduzierung des Forderungsbestandes in der Eröffnungsbilanz um 25 Mio. EUR. Der Sachverständige weist diesbezüglich darauf hin, dass bezüglich dieser Bewertung unterschiedliche Angaben bzw. Annahmen seitens der Beklagten vorliegen und er den Wertansatz des Mezzanine Balance Sheet als massgebend betrachtet. Im Antwortenkatalog (S. 47) führt der Sachverständige aus:

> *"Die vorgebrachte Kritik hinsichtlich des Ansatzes von EUR 175 Mio. Altforderungen ist nicht begründet und entkräftet nicht meine Annahme, dass 'Erkenntnisse erlangt wurden, die auf eine Wertminderung (...) hinweisen'. Darüber hinaus wurde vorgebracht, der niedrigere Ansatz im Mezzanine Balance Sheet hätte als Grund die Vermittlung eines niedrigeren Kaufpreises gegenüber den Investoren gehabt. Diese Aussage erscheint spekulativ und entzieht sich somit einer Beurteilung. Ich weise daraufhin, dass in Artikel 15.10.3 des Mezzanine Facility Agreement (B-R-136) versichert wird, dass die gemachten Angaben 'true, complete and accurate in all respects' sind. Der Argumentation, dass ein Ansatz von EUR 175 Mio. zu niedrig sei, da alle anderen damaligen Planungen von höheren Ansätzen ausgingen, kann ich nicht folgen, da für keine dieser Planungen sachlich und inhaltlich belegt wird, warum diese Planansätze besser seien. Die Tatsache, dass verschiedene Planungsstände eines identischen Personenkreises zu vergleichbaren Ergebnissen kommen lässt keinerlei Rückschlüsse über die Qualität dieser Ergebnisse zu."*

69.      Weiter führt der Sachverständige auf S. 14 seiner Stellungnahme vom 4. September 2012 an, dass bei Fehlen einer objektiven Unternehmensbewertung - wie im vorliegenden Fall - und bei einem Sachverhalt der schon Jahre zurückliegt, die Forderungen nach objektivierten Massstäben berechnet werden müssen. Der von ihm festgelegte Wertansatz weiche von jenem des CI-Managements ab. Dabei sei aber zu beachten, dass dieselben Personen an der einen Stelle, im Mezzanine-Balance-Sheet, einen anderen Wert als angemessen erachtet haben als jenen, den sie an anderer Stelle bei ihren Zeugenaussagen genannt haben. Bei diesen unterschiedlichen Vorgaben auf die niedrigeren Ansätze im Mezzanine-Balance-Sheet abzustellen, kann nicht als ungerechtfertigt und schon gar nicht als Ausdruck einer Befangenheit des Sachverständigen bezeichnet werden.

70.      Die weiteren Erklärungen des Sachverständigen hierzu anlässlich der Verhandlung vom 7./8. Mai 2012 verdeutlichen sein Vorgehen und lassen weder Willkür noch unzulässige Pauschalierung in Bezug auf relevante Planungsunterlagen erkennen.[6] Die Bewertung des Forderungsbestandes ist mit sachlichen Überlegungen unterlegt, so dass keinerlei Anhaltspunkte für eine Befangenheit indizierende Vorgangsweise bestehen.

71.      Die Beklagten werfen dem Sachverständigen vor, er hätte den Wertansatz des Vorratsbestandes in spekulativer Weise und pauschal reduziert. Der Sachverständige führt dazu aus (Stellungnahme vom 4. September 2012, S. 16), dass sich keine der vorhandenen Unternehmensplanungen aufgrund der zahlreichen Widersprüche zwischen verschiedenen Planungsständen und im Vergleich zu weiteren vorhandenen Informationen als vollumfänglich verwendbar erwiesen, weshalb es unumgänglich gewesen sei, eine

---

[6]      Verhandlungsprotokoll 96 – 185.

ICC Verfahren Nr. 15362/JHN/GFG                    Verfügung Nr. 39                    5. März 2013

objektivierte Wertermittlung anzustellen. Das Gutachten des Sachverständigen stellt auf S. 50 fest:

> *"Das Vorratsvermögen wird in der CI-Carve-Out-Pro-Forma-Bilanz zum 30. September 2004 mit 221,4 Mio. EUR ausgewiesen. Bzgl. der Vorratshöhe in der Eröffnungsbilanz zum 01. November 2004 liegen unterschiedliche Werte vor. So führt das Investor Concept 186,9 Mio. EUR Vorratsvermögen auf. Der 2005 Business Plan kommt sogar nur auf 171,4 Mio. EUR. Trotz dieser unterschiedlichen Bewertung wird ein genereller Abwertungsbedarf deutlich. Um diesem Bedarf gerecht zu werden, habe ich auf Basis der historischen, rechnerischen Reichweite von 98 Tagen und der Umsatzprognose der nächsten drei Monate das Vorratsvermögen erneut berechnet und dadurch einen um 44,4 Mio. EUR reduzierten Wert von 177,0 Mio. EUR erhalten."*[7]

Diese Bewertung des Vorratsbestandes kann nicht als spekulativ und pauschal bezeichnet werden, zumal die vom Sachverständigen hinzugezogenen Planungsunterlagen verschiedene Werte enthalten und der 2005 Business Plan mit 171,4 Mio. EUR sogar unter dem Wert liegt, den der Sachverständige seiner Bewertung zu Grunde gelegt hat.

72. Die Beklagten werfen dem Sachverständigen ebenfalls vor, bei der Bewertung des Forderungsbestandes auf den Wertansatz des Mezzanine Balance Sheet abzustellen, nicht aber bei der Bewertung des Vorratsbestandes. Diese Kritik verkennt, dass der Sachverständige bezüglich jeder Bewertung getrennt zu prüfen hatte, welche Quellen sinnvollerweise zugrunde zu legen waren. Es war deshalb aufgrund der vorgenommenen Gesamtwürdigung der Quellen weder zwingend noch erforderlich, das Mezzanine Balance Sheet sowohl im einen als auch im anderen Fall als massgeblich zu erachten. In seiner Stellungnahme vom 4. September 2012, S. 16, führt der Sachverständige dazu aus:

> *"In Bezug auf die Quellenauswahl möchte ich auf die in der mündlichen Verhandlung geführte Diskussion der vorliegenden Unternehmens-planungen und Dokumente als "Steinbruch" verweisen. Da sich im Ver-lauf der Arbeiten keine der vorliegenden Unternehmensplanungen aufgrund der zahlreichen Widersprüche zwischen verschiedenen Planungsständen und im Vergleich zur weiteren vorhandenen Informationen als vollumfänglich verwendbar erwies, war es unvermeidbar, für unterschiedliche Annahmen auf unterschiedliche Quellen zurückzugreifen."*

73. Zur Rüge der *"pauschal"* und ohne *"belastbare Anhaltspunkte"* erfolgten Reduzierung der Kreditorenlaufzeit führt der Sachverständige aus, dass der Ansatz von dreissig Tagen wohl am unteren Ende einer akzeptablen Bandbreite liege, aber auf hinreichender Informationsbasis und verlässlichen Anhaltspunkten beruhe. Aus Annex 5 zum Gutachten geht das historische Zahlungsziel des CI-Geschäftsbereiches auf Basis des 2005 Business Plan in Verbindung mit dem Liquiditätsplan vom 25./28. Oktober 2005 hervor. Weitere vom Sachverständigen in diesem Zusammenhang angestellte Berechnungen und Datenquellen sind auf S. 4/4 von Annex 5 zusammengefasst und zeigen im Median/Mittelwert Zahlungsziele zwischen 24 und 97 Tagen.

---

[7]   Siehe auch Verhandlungsprotokoll 170: 1 ff; 176: 30 ff.

74.     Die Beklagten weisen in diesem Zusammenhang darauf hin, dass der Sachverständige detailliertes historisches und zum Stichtag aktuelles Datenmaterial nicht berücksichtigt habe. Insbesondere würde die Anlage B-R-74 (Investorkonzept vom 24. Mai 2004 und Anlage 81 zum "Expert Report of Merryck Lowe and Alvarez & Marsal" eine Übersicht liefern über die Lieferanten, deren Kreditorenkonto ein Soll von mehr als EUR 100'000 aufweist und für die Berechnung der Laufzeiten massgebend sei.

75.     Dem Investorkonzept sind Zahlungsziele zwischen 20 und 30 Tagen zu entnehmen.[8] Zusammenfassend erscheint die Berechnung der Kreditorenlaufzeit durch den Sachverständigen als hinreichend unterlegt und kann nicht als willkürlich bezeichnet werden. Soweit sie sich mit den Annahmen im Investorkonzept deckt, ist nicht ersichtlich, wie die Annahme des Sachverständigen für die Schiedsbeklagte nachteiliger sein soll.

76.     Zur gerügten Erhöhung der Forderungslaufzeit verweist der Sachverständige auf Anhang 5 zum Gutachten, der die Analyse der historischen Zahlungsziele bis zum Dezember 2004 sowie der vom CI-Management geplanten Zahlungsziele ab November 2004 wiedergibt. Die Reduzierung der Forderungslaufzeiten nach dem Stichtag um zwanzig Tage aufgrund eines verbesserten Working-Capital-Management hat der Sachverständige als unrealistisch von seiner Berechnung ausgeschlossen und das Vorgehen in seiner Stellungnahme auf S. 18 f. begründet. Insbesondere kommt der Sachverständige zum Schluss, dass die Programme zur Verbesserung der Forderungslaufzeiten keine positiven Effekte erzeugt haben und er deshalb auf ein historisches Zahlungsziel als entsprechende Planungsmassnahme abgestellt habe. Den Ausführungen der Beklagten in der Beschwerde ist nicht zu entnehmen, inwiefern die historischen, vom Sachverständigen verwendeten Zahlen nicht relevant sein sollen, zumal sie ja bis September 2004 die Auswirkungen des schon 2001 eingeführten Programms zur Verbesserung der Forderungslaufzeiten und auch das Folgeprogramm hätten reflektieren müssen. Der Vorwurf, der Sachverständige hätte erneut ohne Kenntnis der Details seine eigene, pessimistische Vorstellung in den Vordergrund gerückt, ist nicht gerechtfertigt.

77.     Zur Rüge der Festsetzung der Vorratsreichweite auf 98 Tage führt der Sachverständige in seiner Stellungnahme vom 4. September 2012 an, dass er sämtliche ihm zur Verfügung stehenden Informationen zur historischen und erwarteten Vorratshaltung berücksichtigt habe. Die veranschlagten 98 Tage lägen in der Bandbreite der Referenzwerte wie auch der geplanten Werte des CI-Managements.

78.     Inwiefern der Sachverständige bei dieser Planung besonders voreingenommen ans Werk gegangen sein soll, ist nicht ersichtlich. Es ist ja gerade die Aufgabe des Sachverständigen, die Planung des CI-Management auf ihre Vertretbarkeit zu überprüfen (s. oben Ziff. 52 – 54) und dort Korrekturen anzubringen, wo er mit einer entsprechenden Begründung zum Schluss kommt, dass die vorhandenen Planungen nicht vertretbar sind. Bei der Berücksichtigung der historischen Zahlen hat der Sachverständige darauf hingewiesen, dass diese auf signifikant höheren Vorratsbeständen beruhen. Er kommt aber zum Schluss, dass aufgrund der Planungsrechnungen des CI-Managements und der historischen Fakten zum Umlaufvermögen der Wettbewerber für die Realisierbarkeit der geplanten Verbesserung/Verringerung der Vorratsreichweite keine ausreichenden Indikatoren

---

[8]     Merryck Lowe, "Questions for Mr Max Falckenberg", 10. April 2012, S. 39 Figure Q4.2.

vorliegen. Der Sachverständige konnte die positiven Effekte des geplanten Programms zur Verbesserung des Working-Capital-Managements aus keinen Unterlagen und Berechnungen der Beklagten herauslesen, so dass er solche bloss geplante Verbesserungen in seiner Berechnung ausser Acht gelassen hat. Auch dieses Vorgehen lässt keinerlei Schluss auf eine Befangenheit des Sachverständigen zu.

79.    Mit Bezug auf die rechnerischen Abfindungen von 70 TEUR je Mitarbeiter rügen die Beklagten, dass der Sachverständige mit stetig wechselnden und vagen Ausflüchten an seiner Berechnung festhalte und verschiedene Umstände, wie z.B., dass sich 149 der auf die Gemeinschuldnerin übergegangenen Arbeitnehmer am Stichtag bereits in Altersteilzeit befanden, nicht berücksichtigt habe. Der Sachverständige hält dem entgegen, dass auch die Beklagten ihrer Argumentation zum Unternehmenswert des CI-Geschäftsbereiches eine identische Abfindungshöhe zu Grunde legen. So führt der Gutachter der Beklagten, PwC, in seinem Bericht vom 5. Februar 2010 (Annex 6, Tz 124, S. 50) aus, dass die entsprechenden Restrukturierungskosten im Investor Concept auf einer Abfindung von 70 TEUR je Mitarbeiter beruhten. Unter Berücksichtigung, dass Personalreduktionen in der Regel weitere Reorganisationskosten nach sich ziehen, hält PwC diesen Ansatz für gerechtfertigt.

80.    Im Antwortenkatalog führt der Sachverständige näheres zur Rechtfertigung seiner Berechnungen aus:

> *"Ja, mir sind die Abfindungshöhen aus den vorherigen Restrukturierungs-runden bekannt und ich habe diese auch in Betracht gezogen. Die Abfindungshöhe von 70 TEUR ist meines Erachtens dennoch der Wert mit der höchsten Eintrittswahrscheinlichkeit. Wie bereits in meinem Gutachten erläutert, weisen verschiedene Planungen Abfindungskosten in Höhe von bis zu 100,000 EUR aus. Dass diese Werte teilweise höher sind als tatsächliche geleistete Zahlungen, reduziert für mich nicht deren Aussagekraft. Obwohl also z.B. der Sozialplan eine Abfindung von max. TEUR 62 vorsah, sind in Agfa-Gevaert-Plänen höhere Werte ausgewiesen. Es ist davon auszugehen, dass in den Agfa-Gevaert-Plänen Risikopuffer für evtl. Klagen und zusätzliche Prozess- und Anwaltskosten eingeplant sind. Dies ist m.E. auch absolut notwendig und somit ein fester Bestandteil der relevanten Abfindungskosten für die Planung. Zusätzlich sollte an dieser Stelle gesagt werden, dass in meiner Erfahrung eine durchschnittliche Abfindungshöhe von 70 TEUR je Kopf für einen Konzern nicht hoch ist.*

> *Meiner Erfahrung nach ist die Gründung einer Beschäftigungs- und Qualifizierungsgesellschaft (Transfergesellschaft) grundsätzlich eine sinnvolle Idee, da Arbeitgeber dadurch Klagen aufgrund des Kündigungsschutzes vermeiden können und Arbeitnehmer oft höhere Zahlungen aufgrund der staatlichen Unterstützung erhalten. Die Kosten einer solchen Gesellschaft für ein Unternehmen sind jedoch stark abhängig vom Einzelfall und stellen keinesfalls immer eine kostengünstigere Lösung als normale Abfindungszahlungen dar."*

81.    Die vom Sachverständigen angebrachte Höhe der Abfindung ist damit hinreichend unterlegt und sorgfältig begründet. Sie lässt daher keinerlei Schluss auf eine Befangenheit des Sachverständigen zu. Im fortgesetzten Verfahren wird das Schiedsgericht ohne Bindung an diese Bewertung zu beurteilen haben, wie diese Kosten im Rahmen des Liquidationswerts der Sacheinlage zu veranschlagen sind.

ICC Verfahren Nr. 15362/JHN/GFG                Verfügung Nr. 39                        5. März 2013

## 4)        Sanierungsfall

82.        In Ihrer Eingabe vom 24. September 2012 bringen die Beklagten zusätzlich vor, dass die Behauptung, dass der CI-Geschäftsbereich *"unbestrittenermassen ein langjähriger Sanierungsfall"* gewesen sei, Zeugnis ablege von der verfehlten Grundhaltung des Experten. Dem ist entgegenzuhalten, dass die Beklagten selbst in der Duplik (S. 36 Rz. 106) ausführen liessen, *"die Greenfield-Szenarien wurden im Rahmen umfassender Restrukturierungs-bemühungen zum Zwecke der Erreichung einer grösseren Kostendisziplin im CI Geschäfts-bereich erstellt"*. Das Schiedsgericht kann daher nicht erkennen, weshalb der Hinweis des Experten auf einen Sanierungsfall dessen Befangenheit zum Ausdruck bringen sollte.

## 5)        Generelle Benachteiligung der Position der Beklagten

83.        An verschiedenen Stellen in ihrer Beschwerde und in Bezug auf mehrere Berechnungen des Sachverständigen rügen die Beklagten, dass der Sachverständige einseitig zum Nachteil der Beklagten seine Unternehmensplanung erstellt habe. Das Schiedsgericht kann diesem generellen Vorwurf nicht folgen. Der Sachverständige hat mit grosser Sorgfalt, Sachkenntnis und Akribie die vorhandenen Unterlagen und Planungen gemäss den Vorgaben des Memorandums eingehend geprüft und dabei eine ausgewogene Analyse vorgenommen. Wie er in seiner Stellungnahme vom 4. September 2012 ausführt, ist auch eine Reihe von Korrekturen an den vorhandenen Unternehmensplanungen *"zugunsten"* der Beklagten ausgefallen. So hat z.B. die Berücksichtigung des Netting Verfahrens positive Auswirkungen auf die Liquidität. Auch hat er den im Investorkonzept vorhandenen Leitsatz *"Manage for Cash"* berücksichtigt und dementsprechend die notwendigen Investitionen am unteren Ende der möglichen Bandbreite angesetzt, was wiederum eine positive Auswirkung auf die Liquiditätssituation hat. Auch die Einstellung der Pensionsverpflichtungen in die Planung des Sachverständigen hätte mit einer höheren Belastung die Liquidität nachteilig beeinflusst, wenn man bei einer vorsichtigeren Planung berücksichtig hätte, dass der Pensionsplan in der Auszahlungsphase steht.

## 6)        Verletzung einer Offenlegungspflicht

84.        Die Beklagten rügen weiterhin, der Sachverständige habe seine Pflicht, das Mandatsverhältnis zu den Prozessbevollmächtigten des Schiedsklägers offenzulegen, verletzt. Sie führen zunächst aus, dass das Bestehen der Mandatsbeziehung zwischen Orrick Rambaud Martel und Roland Berger für sich genommen ausreiche, den Anschein begründeter Zweifel an der Unparteilichkeit des Sachverständigen gegenüber den Schiedsbeklagten zu erregen. Hierfür führen die Beklagten mehrere Urteile der deutschen Zivilgerichte an. Die Ablehnung des Sachverständigen sei begründet, wenn *"vom Standpunkt der ablehnenden Partei aus genügend objektive Gründe vorhanden sind, die in den Augen einer verständigen Partei geeignet sind, Zweifel an der Unparteilichkeit des Sachverständigen zu erregen."*[9] Liegen solche Zweifel vor, sei es unerheblich, ob es dem Sachverständigen tatsächlich an der Unparteilichkeit oder Unabhängigkeit fehlt. Massgeblich sei mithin allein, *"ob für die das Ablehnungsgesuch anbringende Partei der Anschein nicht vollständiger Unvoreingenommenheit besteht. Dies kann unter anderem in Betracht*

---

[9]        BGH vom 13. Januar 1987 (B-R-Lex-133).

*kommen, wenn der Sachverständige in einem aktuellen Mandatsverhältnis zu den Prozessbevollmächtigten des Prozessgegners oder in näheren Beziehungen zu einer der Parteien steht. [...] [D]ie Frage, ob der Sachverständige sich selbst subjektiv in der Lage sieht, das Gutachten frei und völlig unparteilich zu erstatten, ist nicht entscheidend."*[10]

85. Die zitierten Entscheide behandeln jeweils Fälle, die sich tatbestandlich erheblich vom vorliegenden Sachverhalt unterscheiden. Es geht um unmittelbare persönliche oder geschäftliche Beziehung eines Schiedsrichters/ Sachverständigen zu einer der Parteien oder deren Prozessbevollmächtigten.

86. Vorliegend hat Roland Berger "Orrick Rambaud Martel", Paris, mit der rechtlichen Vertretung in einer Angelegenheit beauftragt. Ein direktes persönliches oder geschäftliches Verhältnis vom Sachverständigen Falckenberg zu Prozessbevollmächtigten des Schiedsklägers lässt sich daraus nicht ableiten. In dem von den Beklagten zitierten Beschluss des BGH[11] bestand das Mandatsverhältnis zwischen dem Sachverständigen selbst und dem Prozessbevollmächtigten. Der vorliegende Fall unterscheidet sich wesentlich von diesem Sachverhalt, indem nicht der Sachverständige selber und auch nicht der Prozessvertreter des Klägers in einem Mandatsverhältnis stehen. Zudem ist das Mandatsverhältnis mit dem Pariser Büro von Orrick erst nach Einreichen des Gutachtens begründet worden. Das Schiedsgericht verkennt dabei nicht, dass es wahrscheinlich schon zu einem früheren Zeitpunkt zu einer Anbahnung dieses Mandatsverhältnisses gekommen ist. Es besteht indessen keinerlei Hinweis darauf, dass der Sachverständige davon Kenntnis hatte.

87. Die Schiedsbeklagten beanstanden weiterhin, der Sachverständige habe es unterlassen, in seiner Eingabe vom 2. November 2012 auf das Mandatsverhältnis zwischen Roland Berger und Orrick Rambaud Martel hinzuweisen. Er habe dadurch seine Pflicht gemäss § 1049 Abs. 3 in Verbindung mit § 1036 Abs. 1 ZPO verletzt. Eine Verletzung der Offenlegungspflicht führe zu einer Ablehnung (Geimer in ZÖLLER, ZPO, 28. Auflage 2010, § 1036 Rn. 9). Die Beklagten verweisen auf einen Beschluss des OLG Karlsruhe.[12] In diesem Fall hat es der Schiedsrichter unterlassen, offenzulegen, dass er für eine Zweigniederlassung der Antragsgegnerin tätig geworden ist. Das OLG bejahte das Vorliegen berechtigter Zweifel aus der massgeblichen Sicht der ablehnenden Partei und gab dem Ablehnungsgesuch wegen Befangenheit statt. Der zugrunde liegende Sachverhalt dieses Entscheids ist mit dem vorliegenden Fall jedoch nicht vergleichbar. Es ging dabei um die Befangenheit eines Mitschiedsrichters, bei dem objektive Gründe gegen seine Unvoreingenommenheit vorlagen, da er sich bei der Bestellung des Obmanns des Schiedsgerichtes durch parteiische Vorschläge disqualifizierte und zudem selbst sowie auch seine Anwaltskanzlei regelmässig von der Partei, die ihn ernannt hatte, und von deren Zweigniederlassungen mandatiert wurden.

---

[10]    BGH vom 24. Juli 2007 (B-R-Lex-157).

[11]    BGH vom 13. Januar 1987 (B-R-Lex-133).

[12]    OLG Karlsruhe vom 14.7.2006 (B-R-Lex-160).

88.    Zudem erscheint zweifelhaft, ob es sich bei dem neu eingegangenen Mandatsverhältnis überhaupt um eine offenlegungspflichtige Tatsache im Sinne des § 1036 I ZPO handelt. Schliesslich wurde das Mandatsverhältnis am 17. Juli 2012, einen Tag nach Einreichen des finalen Gutachtens, begründet. Die Beklagten vertreten hierzu die Ansicht, dass die Pflicht zur Offenlegung in zeitlicher Hinsicht nicht erloschen sei. Der Sachverständige habe nach Eingehung der Mandatsbeziehung zwischen Roland Berger und Orrick Rambaud Martel noch wesentliche Ausführungen im Schiedsverfahren vorgetragen.

89.    Der Entwurf des Gutachtens wurde vom Sachverständigen bereits im Frühjahr 2012 ausgearbeitet. Die finale Fassung, die die Ergebnisse der Verhandlung mit dem Sachverständigen und den Parteien vom 7./8. Mai 2012 festhielt, lag dem Schiedsgericht am 16. Juli 2012 vor. Damit endete auch der gutachterliche Auftrag des Sachverständigen. Weitere Ausführungen des Sachverständigen im Verfahren betreffend die Befangenheitsvorwürfe der Schiedsbeklagten fallen nicht in das Auftragsverhältnis und konnten dieses auch nicht verlängern.

90.    Die Befangenheitsrüge ist schlussendlich auch abzuweisen, weil der Sachverständige glaubhaft dargelegt hat, dass er von der Beziehung zu Orrick Rambaud Martel nichts wissen konnte. Es erscheint durchaus plausibel, dass in einem grossen Beratungsunternehmen wie Roland Berger für die einzelnen Mitarbeiter keine andere Möglichkeit besteht, als sich aus dem internen Conflicts Check System über etwaige Mandatsbeziehungen zu informieren. Herr Falckenberg legte in einer verständlichen und für das Schiedsgericht nachvollziehbaren Weise dar, dass Mandatsbeziehungen zu Orrick aus den internen Tools von Roland Berger nicht ersichtlich und ihm darüber hinaus auch nicht bekannt waren. Dem Sachverständigen kann in diesem Zusammenhang auch kein Sorgfaltsverstoss zur Last gelegt werden, der irgendwelche Rückschlüsse auf eine Befangenheit zuliesse. Vom Sachverständigen kann nicht verlangt werden, dass er über die Überprüfung der internen Unterlagen von Roland Berger hinaus, weitere Nachforschungen anstellt. Solche höheren Sorgfaltspflichtanforderungen können an ihn insbesondere vor dem Hintergrund, dass sein Arbeitsauftrag mit Einreichen des finalen Gutachtens beendet war, nicht gestellt werden.

91.    Der Sachverständige führt in seiner Stellungnahme vom 2. November 2012 aus, dass aus den Unterlagen der Roland Berger Strategy Consultants GmbH der letzten zehn Jahre lediglich eine Mandatsbeziehung mit Orrick hervorgehe. Dabei hätte es sich um eine Beziehung aus dem Jahr 2002 mit dem New Yorker Büro von Orrick, Herrington & Sutcliffe LLP gehandelt. Der Sachverständige versichert, dass weder er noch ein anderes Mitglied seines Teams, welches sich mit der Ausarbeitung des Gutachtens beschäftigte, an diesem internen Projekt beteiligt waren. Dies wird von den Beklagten im Übrigen auch nicht in Frage gestellt.

92.    Schliesslich ist in diesem Zusammenhang darauf hinzuweisen, dass die Beklagten nicht geltend machen, Roland Berger sei von Orrick mandatiert worden; vielmehr wurde ja Orrick von Roland Berger beauftragt. Insofern besteht auch keinerlei Verdacht, dass Orrick sich Roland Berger durch Erteilung eines Mandates gewogen machen wollte.

ICC Verfahren Nr. 15362/JHN/GFG                    Verfügung Nr. 39                    5. März 2013

93.    Das Schiedsgericht kommt daher zu dem Ergebnis, dass der Sachverständige keine Offenbarungspflicht nach § 1049 Abs. 3 in Verbindung mit § 1036 Abs. 1 ZPO verletzt hat.

94.    Die Beklagten führen weiter aus, dass sich die Notwendigkeit der Entlassung des Sachverständigen auch aus der ICC-Schiedsordnung und aus der Entscheidungspraxis des ICC-Schiedsgerichtshofes ergebe. Hierfür führen die Beklagten mehrere Urteile des ICC-Schiedsgerichtshofes an. Den von den Schiedsbeklagten angeführten Urteilen aus der Entscheidungspraxis des ICC-Schiedsgerichtshofes können keine für den vorliegende Fall massgebende Hinweise entnommen werden, ebenso wenig der Entscheidung des französischen Cour d'Appel de Reims. Die ICC-Schiedsordnung ist - entgegen dem Vortrag der Schiedsbeklagten - bei der Ablehnung von Sachverständigen gerade nicht anwendbar. Sie gilt nur für Schiedsrichter. Selbst wenn man die Praxis des ICC-Schiedsgerichtshofes *per analogiam* auf Sachverständige anwenden würde, ergeben sich für den vorliegenden Fall keine neuen Erkenntnisse, weil die Praxis zu § 1049 Abs. 3 in Verbindung mit § 1036 Abs. 1 ZPO auf dieselben Befangenheitsgründe abstellt. Das gleiche gilt auch für die IBA Guidelines on Conflict of Interest in International Arbitration, auf die die Beklagten in diesem Zusammenhang hinweisen.

## VI.    SCHLUSSFOLGERUNG

95.    Entsprechend den vorstehenden Ausführungen, kommt das Schiedsgericht zum Schluss, dass der Sachverständige bei der Erstellung des Gutachtens und insbesondere im Rahmen seiner Planung keinerlei Verhalten gesetzt hat, welches irgendeinen Schluss auf eine Befangenheit zuliesse.

96.    Es liegen keine Umstände vor, die den Schluss rechtfertigen würden, der Sachverständige sei willkürlich und einseitig zum Nachteil der Beklagten von den vorhandenen Planungen abgewichen. Das Vorgehen des Sachverständigen und die Erstellung seines Gutachtens mit dem Antwortenkatalog ergeben keinerlei Hinweise dafür, dass der Sachverständige befangen war.

97.    Der Sachverständige hat keine Offenlegungspflicht nach § 1049 Abs. 3 in Verbindung mit § 1036 Abs. 1 ZPO verletzt.

98.    Die Beschwerde wegen Besorgnis der Befangenheit ist daher abzuweisen.

Gestützt auf die vorstehenden Ausführungen, erlässt das Schiedsgericht folgende

## Verfügung:

(1)   Die Beschwerde der Schiedsbeklagten wegen Besorgnis der Befangenheit des Sachverständigen wird abgewiesen.

(2)   Über die Kosten des Schiedsgerichts für dieses Beschwerdeverfahren und über die Zuerkennung von Kosten, die die Parteien bezüglich dieses Beschwerdeverfahrens aufgewendet haben, wird zu einem späteren Zeitpunkt im Rahmen des Schiedsverfahrens entschieden.

(3)   Diese Verfügung wird mit Zustimmung und Ermächtigung durch die Mitschiedsrichter vom Vorsitzenden allein unterzeichnet.

(4)   Diese Verfügung wird den Rechtsvertretern der Parteien vorab per Telefax und danach im Doppel mit Einschreiben gegen Rückschein sowie den Mitschiedsrichtern, dem Sachverständigen und der ICC per Telefax und danach mit normaler Post zugestellt.

Frankfurt, 5. März 2013

Das Schiedsgericht

Dr. Georg von Segesser
Vorsitzender des Schiedsgerichts

*Courtesy Translation*

**ORDER No. 39**
**March 5, 2013**

**The Arbitral Tribunal**

Dr. Georg von Segesser, Presiding Judge
Prof. Dr. Wilhelm Haarmann and Prof. Dr. Paul Oberhammer, Co-Arbitrators
Dr. Andrea Meier, Legal Secretary

in the ICC Case No. 15362/JHN/GFG
in the matter

**Dr. Andreas Ringstmeier,**
in his capacity as the insolvency receiver over the assets of
**AgfaPhoto GmbH i.L.,**
Brückenstrasse 21, DISCH Building
50667 Cologne
Germany

**Claimant**

represented by Prof. Dr. Siegfried H. Elsing, Orrick, Herrington & Sutcliffe LLP,
Heinrich-Heine-Alle 12, 40213 Düsseldorf, Germany
and
Dr. Benedikt Burger, Orrick, Herrington & Sutcliffe LLP,
Friedrichstrasse 31, 60323 Frankfurt am Main, Germany

versus

Agfa-Gevaert N.V. & Co, KG,
Kaiser-Wilhelm-Allee 1, 51373 Leverkusen, Germany

**Respondent 1**

Agfa-Gevaert Healthcare GmbH,
Tegernseer Landstrasse 161, 81539 Munich, Germany

**Respondent 2**

Agfa-Gevaert Graphics Systems GmbH,
Kasteler Strasse 45, 65203 Wiesbaden, Germany

**Respondent 3**

Agfa-Gevaert N.V.,
Septestraat 27, 2640 Mortsel, Belgium

**Respondent 4**

All represented by […]

*Courtesy Translation*

**Table of Contents**

I.      **INTRODUCTION**.................................................................................................3

II.    **SUMMARY OF THE PROCEEDINGS**......................................................3

1)    Terms of Reference and Report .....................................................................3

2)    Objection due to the apprehension of bias...................................................4

III.   **REASONS FOR THE OBJECTION** .........................................................5

IV.   **LEGAL STATUTES APPLYING TO THE REJECTION PROCEDURE**............8

1)    Provisions of the German Code of Civil Procedure.......................................8

2)    Compliance with deadline for filing grounds for rejection............................8

3)    Grounds for rejection ...................................................................................11

V.    **ON THE INDIVIDUAL SUBMITTED GROUNDS FOR REJECTION**..............11

1)    Expert unilaterally created his own business plan .......................................11

2)    Application of a stricter standard of review.................................................16

3)    Arbitrary modification of management's assumptions.................................17

4)    Financial distress.........................................................................................21

5)    General bias against Respondents' position ................................................21

6)    Breach of disclosure obligations..................................................................21

VI.   **CONCLUSION** ........................................................................................24

*Courtesy Translation*

## I.    INTRODUCTION

1.    This Procedural Order addresses the issue of Respondents' Challenge to the Tribunal-appointed expert Max Falckenberg, ("Expert") and the Report he submitted ("Report").

The first part addresses the genesis of the mandate to the Expert, the composition of the questions posed to the Expert and the cooperation of the Parties in this proceeding.

The second part lists the reasons for the Challenge and the comments by the Parties and the Expert.

In the third part, the Tribunal comments on the individual accusations of the bias of the Expert.

## II.    SUMMARY OF THE PROCEEDINGS

### 1)    Terms of Reference and Report

2.    The Tribunal issued the mandate to the Tribunal Expert  by Procedural Order No. 28 of December 23, 2011 ("Terms of Reference").  In Annex A of the Order, the Tribunal related the history of the proceedings to the extent these were relevant in advance of mandating the Expert, and listed each of the individual questions posed by the Tribunal and the Parties to the Expert.  In advance of the final version of the Terms of Reference, the Parties had the opportunity to comment on a draft of the Terms of Reference and to formulate additional questions, which the Tribunal included in the final version of the Terms of Reference.

3.    The Tribunal attached a Memorandum of October 10, 2011 ("Memorandum") as Annex A to the Terms of Reference in which legal issues playing a key role in the preparation of the Report were resolved in advance in order to provide focus to the Terms of Reference.  Therein the Tribunal essentially specified the definitive legal parameters for the examination of the underlying facts, the existing planning and the financial planning. Individual requirements specified by the Memorandum will be referred to in connection with the treatment of the objections raised to the Report and the Expert.

4.    The Terms of Reference was attached as Annex B to the cover letter of the Expert of December 8, 2011 ("Expert Cover Letter").

5.    On March 9, the Expert distributed a draft of his Report, serving it directly to the Parties.  In keeping with the procedure agreed by the Parties, the Parties then supplied their questions regarding the Expert's Draft Report, taking advantage of the support of their own Party experts as well.  In addition to the questions and arguments by the Parties, the Tribunal prepared a list of its own questions to the Expert.  In preparation for the Hearing with the Parties on May7/8, 2012 to discuss the Draft

Report, the Expert prepared a consolidated list of the questions organized by topic that were submitted by the Parties and the Tribunal in response to the Draft Report. This list was discussed extensively at the Hearing, as to which information can be found in the Minutes of the Hearing ("Minutes of the Hearing").

6.   Following the Hearing on May 7/8, 2012, the Expert prepared the definitive version of his report of July 16, 2012 ("Final Report") and with the same date the responses to the questions regarding the Draft Report ("Catalogue of Responses").

2)   **Objection due to the apprehension of bias**

7.   Respondents submitted their Challenges regarding the Expert, his Report and Catalogue of Responses ("Objection") on July 30, 2012, stating that they rejected the Expert due to an apprehension of bias. Respondents filed the following applications:

> *"a)   The Expert is to be relieved of his assignment.*
>
> *b)   The Opinion issued by the Expert, and his remarks during the hearing to consult the Expert of May 7/8, 2012 are to be discarded and not used for the decision by the Tribunal."*

8.   In its submission of August 28, 2012, Claimant commented on the Report, the Expert's Catalogue of Responses and the submission by Respondents of July 30, 2012, applying for Respondents' bias application to be dismissed.

9.   The Expert commented on Respondents' Challenge of July 30, 2012 in his submission to the Tribunal of September 4, 2012. In the letter dated September 24, 2012, Claimant chose to forego commenting separately on the Expert's Comments; Respondents submitted their concluding remarks on September 25, 2012. Claimant responded in the submission of October 1, 2012.

10.  In their submission of October 22, 2012, Respondents informed the Tribunal that they had gained knowledge of a potential attorney-client relationship between the law firm of Claimant's legal counsel, Orrick Hölters & Elsing, and the consulting firm Roland Berger Strategy Consultants GmbH, of which the Expert is a partner. They consequently requested the Tribunal to order a complete and detailed disclosure of the attorney-client relationship between Orrick and Roland Berger.

11.  On accordingly being requested by the Tribunal, the Expert again renounced the charge of bias in his letter of November 2, 2012. In his comments of November 2, 2012, Claimant related that Roland Berger had entered into a relationship mandating Orrick Rambaud Martel in Paris after the completion of the Final Report by the Expert.

12.  Respondents thereupon submitted their comments of November 14, 2012, again requesting that "*the Expert be immediately relieved of his assignment*".

4

13.   In the submission of November 21, 2012, Claimant applied for the bias application to be dismissed.

## III.   REASONS FOR THE OBJECTION

14.   Respondents contend that from Respondents' point-of-view, there are reasons for believing that the Expert is biased.  Their doubts about the impartiality of the Expert result in particular from the allegation that the Expert

- "*unilaterally deviated from his mandate without authorization and to the detriment of Respondents, by creating his own new business plan;*

- *unilaterally deviated from his mandate without authorization and to the detriment of Respondents by applying a different, stricter standard of review than that prescribed by the Arbitral Tribunal in devising said business plan;*

- *systematically and arbitrarily modified the relevant planning assumptions of the CI management to the detriment of the liquidity situation of the CI Division, and thus at the same time to the detriment of Respondents;*

- *had violated its duty under Section 1049(3) in conjunction with Section 1036(1) of the German Code of Civil Procedure by failing to disclose the attorney-client relationship between its company and Claimant's legal counsel.*"

15.   In regard to the first Challenge of deviating from the Terms of Reference on his own initiative, Respondents argue that the Expert had prepared a completely new business plan, despite the fact that this was not the task assigned to him.  The Expert had also applied a standard that was stricter than that specified by the Tribunal, thereby one-sidedly prejudicing Respondents on preparing his business plan.  In particular, as opposed to the express instructions of the Tribunal, he applied the principles for restructuring opinions under insolvency law to the CI Unit, and in examining the planning had proceeded on the basis of the parameter of "*predominant probability*" rather than plausibility.

16.   Respondents argue in response to the charge of altering the planning assumptions by the CI management to the detriment of the liquidity situation of the CI Unit that the Expert had systematically and arbitrarily on one hand devalued liquidity-relevant positions, and on the other hand had arbitrarily increased days receivables outstanding, newly established days inventory outstanding, and set an estimate of the severance pay calculated per employee that is too high.

17.   Further comments on the arguments by Respondents as to the reasons for the Challenges are provided by the Tribunal in the following.

18. In his submission of September 4, 2012, the Expert rejected Respondents' concern of bias as unfounded. The Expert argues in regard to the charge of taking his own initiative in preparing his own business plan that there was no adequate business plan available and that the available planning was not prepared on an accurate and complete factual basis. The planning standard applied to the Report had complied with the requirements of the Terms of Reference.

19. As to the charges of the individual valuations used to calculate the liquidity situation, the Expert points out that he had applied several premises objectively to the benefit of the liquidity of the CI Unit and had determined, and had furnished extensive reasoning for, these on the basis of the information available and in the context of his many years of experience in complex restructuring situations.

20. Claimant states in his comments of August 28, 2012 that Respondents had already submitted their Challenges for the most part in the points they objected to in their submission of April 10, 2012, for which reason their Challenge of bias was being submitted on a late basis under the provisions of Article 33 of the ICC Arbitration Rules and Respondents had therefore forfeited their right to object.

21. The fact that the Expert on his own initiative conducted certain investigations into the facts of the case would not justify a bias challenge. The Expert had examined the available materials in the proceeding in detail and with great diligence and shown clearly how the available planning materials did not reflect an integrated, realistic, uncontradictory, up-to-date plan. It could not be said that he had exceeded the bounds of the Terms of Reference; to the contrary, the Report being furnished was well-balanced, independent and based on a professional knowledge of the field. The simple fact that the Expert had arrived at a result detrimental to Respondents did not justify rejecting him.

22. In regard to the charge of an attorney-client relationship between Roland Berger and Orrick, Respondents argue in their submission of November 14, 2012 that the Expert had failed to disclose this attorney-client relationship to the Tribunal and Respondents despite being required to do so under Section 1049(3) in conjunction with Section 1036(1) of the German Code of Civil Procedure. According thereto, once appointed, the Expert was required to promptly disclose to the Parties any circumstances forming the basis for any doubts as to his partiality or dependence until the close of the arbitration.

23. The information regarding the attorney-client relationship with Claimant's legal counsel was relevant to the assessment of the impartiality and independence of the Expert from the informed point of view of Respondents.

24. The duty of disclosure also continued to exist after the submission of the Final Report, as the Expert continued to submit material arguments in the arbitration after the submission of the Final Report on July 16, 2012.

25. In Respondents' view it was also irrelevant to the existence of justified doubts as to the independence of the Expert whether the Expert was aware of the fact that Roland Berger had entered into the attorney-client relationship. Respondents were permitted to rely on the unrestricted declaration of independence by the Expert

6

of March 24, 2011, in which he stated explicitly that he was neither directly nor indirectly associated with any of the Parties to this arbitration.

26. The doubts as to the independence of the Expert were also exacerbated by the further conduct of the Expert and Claimant's legal counsel. For one, the submission of November 2, 2012 had failed to relate any information about the attorney-client relationship between Roland Berger and Orrick, despite being explicitly requested by Respondents in their letter of October 22, 2012 to explain the attorney-client relationship between Orrick and Roland Berger. Secondly, the attorney-client relationship between Orrick and Roland Berger was established on July 17, 2012, precisely one day after submitting the Final Report, which appeared questionable in view of a preceding phase of establishing contact and thereby reinforcing the impression of being dubious.

27. Further arguments by Respondents will be addressed in the following in more detail to the extent appearing relevant.

28. In his submission of November 2, 2012, the Expert rejects the renewed charge. He stresses that the declaration of independence he submitted had been submitted by him personally and not on behalf of Roland Berger.

29. The Expert argues further that no attorney-client relationship with Orrick could be found in Roland Berger's records for the past ten years. There had been a single contact in 2002 which was related to the reimbursement of travel expenses to the New York office. The Expert assured that neither he nor any other member of his team involved in preparing the Report had participated in this internal project. His declaration was based on the examination of the bookkeeping dates of Roland Berger under the entry of the terms "Orrick" or "Hölters & Elsing".

30. In the submissions of November 2 and 21, 2012, Claimant rejected the renewed charge of bias by Respondents. Respondents had failed to regard the fact that Mr. Falckenberg as a person was appointed as the Expert and not Roland Berger. Claimant confirms the accuracy of the contents of the statements made by the Expert in his submission of November 2, 2012. The Expert had been unable to disclose the attorney-client relationship between Roland Berger to Orrick Rambaud Martel in Paris, because due to is highly confidential nature it had not been visible in the "Tools of the Roland Berger Conflicts Check System".

31. Furthermore, the Expert was not subject to any statutory disclosure duties under Section 1049(3) in conjunction with Section 1036(1) of the German Code of Civil Procedure. In the case of the fulfillment of the duty of disclosure it was decisive whether the Expert knew of the facts requiring disclosure, which in this instance is not the case.

7

32.    Furthermore, once the Final Report was submitted, the Expert's engagement and therefore his duty of disclosure ended.

## IV.    LEGAL STATUTES APPLYING TO THE REJECTION PROCEDURE

### 1)    Provisions of the German Code of Civil Procedure

33.    Under item 9 of the Request for Arbitration of September 5, 2008, the arbitral proceeding is subject to the ICC arbitration rules, the mandatory provisions of German arbitration law as the *lex arbitri* and the procedural rules issued by the Tribunal.  The ICC arbitration rules do not contain any provisions applicable to an application by a party for the rejection of an expert appointed by the Tribunal due to bias.  Based on the provisions of the German Code of Civil Procedure, Book 10, which are applicable to the arbitration, it can be concluded under Section 1049 (3) of the German Code of Civil Procedure that Sections 1036, 1037(1) and (2) of the German Code of Civil Procedure apply to the Expert appointed by the Tribunal *mutatis mutandis*.

34.    Section 1036 of the German Code of Civil Procedure stipulates that an arbitrator and also an expert is required to disclose all circumstances that may give rise to doubts as to his impartiality and independence.  The same requirements apply to the rejection of an expert that apply to a member of the Tribunal, and the circumstance that the expert fails to meet the requirements to which the parties agreed (G. WAGNER, in: Practitioner's Handbook on International Arbitration edited by Frank-Bernd Weigand, Munich 2002 [cit. Weigand/Wagner], p. 769, para. 272).

### 2)    Compliance with deadline for filing grounds for rejection

35.    Under paragraph (2) of Section 1037 of the German Code of Civil Procedure in conjunction with Section 1049(3) of the German Code of Civil Procedure, the party learning of a circumstance calling for the expert to be recused must describe the grounds for rejection  to the Tribunal in writing within a period of two weeks.  The Tribunal is competent to decide on the rejection (SACHS/LÖCHER, in: Arbitration in Germany, edited by K.-H. Böckstiegel, St. M. Kröll, P. Nacimiento, 2007, S. 338, para. 14).

36.    Respondents' Challenge was filed on July 30, 2012 within the two-week period as of the service of the Report, so that the deadline specified under Section 1037 of the German Code of Civil Procedure was met, to the extent that the circumstance forming the basis for filing  the rejection petition were not already known of earlier.

37.    The party filing a rejection petition must be truly familiar with the factual basis for the alleged bias.  Simple accusations and suspicions do not suffice:

> "*If the doubts as to impartiality and independence are derived from several individual occurrences, a certain degree of discretion must be given to the rejecting party as to which circumstances it learned of led to the step to the rejection [of the expert].*"  (Stein/Jonas/Schlosser, Kommentar zur Zivilprozessordnung, 22nd ed., Tübingen 2002, § 1037 para 2 ZPO)[1]

---

[1] Quoted in the following as STEIN/JONAS/BEARBEITER[22], §…., para….

8

38.     Claimant objects that Respondents had essentially already objected in the submission of April 10, 2012 on the grounds for rejection brought in the Challenge, for which reasons the Challenge should be dismissed due to being dilatory.  In the submission of April 10, 2012, Respondents do in fact criticize the circumstance that the Expert prepared his own business plan and should have limited himself to the plausibility of the existing planning.  The charges that the Expert was applying a stricter planning standard than the one specified by the Tribunal and had disregarded a large number of sources of financing was also already raised at that time.[2]

39.     In this proceeding the engagement of the Expert and the development of the Report extended over a period of seven months, while a first draft of the Report was already available after about three months.  It was expressly agreed that the Expert should produce a draft of the Report on which the Parties could comment.  The Parties had also agreed that they would pose additional questions to the Expert, subsequently leading to the above-mentioned Catalogue of Responses, which was discussed with the Expert at the Hearing on May 7/8, 2012.  It is in the nature of such a course of events that by furnishing corresponding information and arguments to the Expert, the Parties attempt to convince him to depict the circumstances, analyses and conclusions in such a way as to conform with the stance taken by the given Party as closely as possible, or to even reflect it in the Report.  The fact that this results in critical remarks by the Parties on the draft of the Report is part and parcel to the maintenance of the Parties' interests in contentious proceedings, and the Parties also expect to be able to influence the conclusions drawn by the Expert with their remarks, Challenges and critical comments, or as the case may be, to succeed in having the one or the other "correction" made.  It would be misguided and run counter to the underlying basis of this proceeding if one were already to see in such information the assertion of grounds for rejection due to the bias of the Expert.

40.     The procedure contemplated by the Parties and the Expert was in particular to question the activity and the work of the Expert, and in a second step to discuss the Expert's draft.  The purpose of this approach would have been defeated if rejection petitions based on thematic differences in opinion between the Expert and the one or the other Party would have already had to be filed at that juncture.  Furthermore, there is no certainty in regard to the Final Report of the Expert as to whether the Expert sticks to everything he assumed or stated in the draft.  Likewise, the Tribunal cannot conclude either that the right to object had already become time-barred based on a further Challenge by Claimant that Respondents had already known of the grounds for the rejection described  in the Challenge based on the Hearing of May7/8.

---

[2] Respondent's submission of April 10, 2012, in particular p. 7, 8 and 10.

41.     Generally, it can be assumed that in regard to impartiality, independence and neutrality equally strict requirements are placed on arbitral judges as they are on State judges.  Statements by a  judge regarding his opinion at an early stage of the proceeding may under certain circumstances trigger concerns of bias, which in the case of State judges as a rule is less frequently the case (see Stein/Jonas/Schlösser[22] §1036, para. 25).

42.     To the extent that the provision set forth in Section 1036 of the German Code of Civil Procedure is applicable to experts appointed by the Tribunal, the fact should not be overlooked that in terms of the process involved, the work of an Expert differs in structure from that of an arbitral judge. For example, Section 1049(2) of the German Code of Civil Procedure provides that after preparing a written or oral opinion the Expert shall participate in the negotiations and respond to corresponding questions by the parties.  Such opportunities are not available for an arbitral court or the arbitral award.  Wherever, just as in this matter, the parties agree that the expert shall submit a draft, and that it will be discussed by the parties in the hearing with the expert and based thereon questions are posed, it is inevitable that statements made by the expert to the extent these are backed by corresponding references and documents and clarifications cannot lead to an early statement of opinion on the bias of the expert before the definitive report is prepared.

43.     In the decision cited by Claimant of the Brandenburg Higher Regional Court of November 14, 2000 (K-Lex 289), the expert had submitted a "*notification of the status*" in advance of her definitive report.  The Higher Regional Court stated: "*Essentially she reported on the status of her investigations in terms of the facts; to the extent she also draws conclusions in that regard, these are obviously preliminary expression of her opinion that do not form not a suitable basis for doubting her impartiality in objective terms.*" The draft of the Report in this matter also reflected the statement of a preliminary opinion.

44.     Prior to the definitive preparation of a report there can of course nonetheless naturally be grounds for a rejection filed directly within the period of two weeks, to the extent any are involved that are related to the person of the expert, his relationship to the parties or his specific qualifications.  None of such grounds are being asserted here though, and the charges directed at the Expert are exclusively related to topics that he was called upon to examine in connection with the Terms of Reference.  The definitive date in regard to the two-week deadline here is therefore the submission of the Final Report.  The Challenge was therefore filed in a timely manner.

45.     In regard to the second application in the Challenge the Parties in their correspondence of October 24/25, 2012 agreed mutually to the fact that he two-week period should not commence before November 2, 2012.  The rejection procedure and therefore also the deadlines to be met are subject to party autonomy under Section 1049(3) in conjunction with Section 1037(1) of the German Code of Civil Procedure. An agreement regarding the deadline superseded the statutory deadline set forth under Section 1049(3) in conjunction with Section 1037(1) of the German Code of Civil Procedure. On submitting the rejection application on November 14, 2012 Respondents

10

abided by the agreement.  Thus the second application in the Challenge was also filed in a timely manner.

### 3) Grounds for rejection

46.  The first Challenge of bias of the Expert essentially relates to whether he abided by the Terms of Reference.  Further standards regarding the conduct of and approach taken by the Expert can be found in his declaration of independence and the confidentiality agreements (see especially items 4, 5 and 6 of the Terms of Reference).

47.  The Expert's conclusions must be supported by corresponding materials, calculations or plausible assumptions.  They were expected in particular to meet the criteria specified in the Memorandum.

48.  Respondents references to the fact that the rejection of an expert is merited if there are objective reasons in the eyes of an informed party that give rise to doubts as to the impartiality of the expert, can only be drawn on as a general standard insofar as the Expert's conclusions in fact cannot be proven or shown to be plausible with adequate likelihood.  In the decision cited by Respondents in this regard by the Higher Regional Court of Munich of March 5, 1991,[3] the Division ruled that if there are circumstances "*that would warrant the concerns of a party giving reasonable and level-headed thought to the matter that the expert may have taken a position one-sidedly, lending more credence to the information provided by one party than he did to the other,* ", the concern of bias is merited.  The Court agreed that the medical expert in that case was biased, as in his arguments he gave greater consideration to one party and failed to mention the corresponding responses of the counterparty.  The expert had also based his opinion on a disputed circumstance as having been proven.  His criticism of the bias application did therefore justify the reservations of the party that the expert was upset and therefore no longer unbiased.  Further decisions,[4] cited by Respondents in regard to the disclosure duty of the Expert and his bias will be elaborated on in the following considerations.

## V.  ON THE INDIVIDUAL SUBMITTED GROUNDS FOR REJECTION

### 1) Expert unilaterally created his own business plan

49.  Respondents criticize that the Expert, contrary to the Tribunal's instructions, prepared his own, new business plan, and in doing so departed from the existing planning assumptions.  Respondents allege that he had oriented his cautious planning to a standard that is not generally accepted, that of "*predominant probability*", instead of the proper standard of plausibility and reasonableness.  His approach

---

[3] B-R-Lex 136.
[4] B-R-Lex 133, 134, 135.

11

allegedly also broke the fundamental rules of the allocation of the burden of proof and undermined the principle that it is up to the parties to adduce evidence.

50.    With its Procedural Order Nr. 16 of January 31, 2011, the Tribunal informed the Parties that it deemed it necessary to engage an Expert in order to assess the financing required for the continuation of the CI Division. Key to the assessment was the perspective of the date of Contribution and on the basis of knowledge that called for being taken into consideration at that time ("root theory") on the basis of underlying planning derived from an existing concept as a going concern, and/or independently thereof on the basis of the anticipated economic development at the time (as applicable best case / worst case) with the perspective of one year as of the reporting date. As noted in the Memorandum (para. 3), the Parties were in disagreement over the foundations for a valuation. The Tribunal therefore held in the Memorandum (para. 23) that:

> "*The Expert should examine the available financial planning within the framework of the criteria specified above. Should he perform any corrections of the underlying facts, he must prepare an analysis of the roots and recognizability for each relevant criterion in order to allow the Arbitral Tribunal to verify the Expert's conclusions. The existing planning should be examined as to whether it was realistic and free of contradictions. If the Expert believes that this was not the case, he should record the reasons for not believing so and draft his own planning as of the effective date.*"

51.    In this context, the Expert explained in his comments of September 4, 2012 that he had prepared his own business plan since in his opinion the existing plans were not realistic and free of contradictions based on the assessment criteria set out in the Memorandum. Various contradictions and in some cases unjustifiable assumptions and assumptions had induced him to prepare his own planning. He points out that even a correction of the existing business plans would in the end have corresponded with his plan in the Expert Report, *i.e.*, a correction of the existing plan of management using realistic assumptions free of contradictions would have produced an identical result as the new plan prepared based on the new planning.

52.    According to the Tribunal's requirements as set forth in the Memorandum, the Expert had to take the CI Division as the object being contributed into account with its objective value, to the extent determinable, whereby the underlying facts as of the valuation date and the future planning based thereon should be taken into consideration. The factual basis, such as, *e.g.*, sales, annual net income/loss, interest rates, etc. must be accurate and complete, not merely plausible. *Ex-post* developments must be taken into consideration in accordance with root theory and apply not only to planning, but also to the underlying facts (Memorandum para. 10). On the meaning of root theory in this context, we refer to the elaborations in the Memorandum and the case law cited therein.

53. The necessary objective examination calls for relying on the care of a diligent and conscientious business manager. The principle of the "*business judgment rule*" states that circumstances that had taken root and were recognizable to a diligent managing director familiar with the industry must be taken into account, even if they only occurred later (Memorandum, para. 12).

54. Existing planning may not be substituted by another – equally merely reasonable – assumption by the Court or an expert engaged by the Arbitral Tribunal, if the management was reasonably entitled to assume on a realistic basis that its planning was accurate. Crucial in this respect is whether the responsible parties managed the planning with the care of a diligent and conscientious business manager (Memorandum para. 16 and case law cited therein).

55. The Expert points out in his Report that he only had limited historical data on a very highly aggregated level at his disposal for assessing the legal entity AgfaPhoto GmbH, in the form of numbers for the Consumer Imaging division of the then parent company Agfa Gevaert N.V. However, this data could not be reconciled to the "carve-out financials" produced as a best estimate by the parent company Agfa Gevaert N.V. at the time of the carve-out (Report para. 3.1). For his Report, the Expert used, among others, the following planning documents: "Greenfield Plans", the "Revised Business Plan", the "Investor Concept", as well as the investor's "Deal Analysis" models. With respect to the ratio of existing planning documents and his own planning, the Expert noted:

> "*The presentations supplied to me merely present the results and do not constitute the exhaustive documentation of planning calculations. In assessing the given planning assumptions, it is therefore necessary to lean more heavily on my estimates and experience than would have been necessary if the planning documentation had been complete. The assumptions I made are noted at the appropriate places in this report.*
>
> *This observation does not, however, constitute any fundamental criticism of the planning calculations or of the assumptions they contain. As examples show – such as sections of the "Agfa Consumer Imaging Management Presentation" in relation to the action "Streamline organization to '1,300' units capacity" and the "2005 Business Plan" in relation to the definition of specific actions to underpin restructuring goals – this more detailed information does indeed appear to have been produced and taken into account during the various planning processes and periods.*
>
> *I therefore arrive at the conclusion, in particular in relation to planned restructuring actions and their financial impact, that planning calculations produced by the buyer and/or the seller constitute an acceptable basis for my activity as an independent expert. In connection with my own experience, the information supplied was essentially sufficient to allow me to produce the planning calculations presented in this report.*" (Final Report, p. 16)

13

56.    In particular, the Expert explains that "*none of the individual planning calculations made available to me were sufficient as the basis on which to assess liquidity in the subsequent period, and that for a number of reasons. These reasons concern not only inherent contradictions and certain untenable assumptions, but also the need for a stand-alone analysis, which was not given in the plans supplied to me.*" (Catalogue of responses, para. 2.4)

As to the question of the use of existing plans, the Expert replied: "*As explained in 2.1 through 2.4, I was, for a number of reasons, unable to use any of the plans made available to me (and taken in isolation) as the basis for formal business planning and discretionary decisions. The existing plans were, however, examined and plausible assumptions were retrieved from them and used in preparing the new planning data.*" (Catalogue of responses, para. 2.5)

57.    On p. 104 of his Report, the Expert presented a table showing which existing planning documents are insufficient in which areas for a reliable corporate valuation.   He emphasized that most assumptions were not documented and the latest knowledge status had not been taken into account.  These findings by the Expert were not rebutted by Respondents in their Challenge.

58.    The Expert stated the following on the reliability of the existing plans and on the reliability and reasonableness of the assumptions made:

> "*No, I cannot confirm this assertion. To begin with, I must stress that some of the plans made available to me were only in the form of the presentation of results. Accordingly, I can judge the prudence and diligence of the manager who prepared them only to a limited extent. The existing plans do appear reasonable enough to allow at least elements thereof to be used to prepare a new plan. However, inadmissible and unreasonable assumptions are included at various points. As a result, the overall picture that emerges of liquidity development in the CI division is incorrect, which makes it necessary to prepare a new plan on the basis of adjusted assumptions in some cases.*" (Catalogue of responses, para. 2.3)

59.    The Expert also noted that the existing plans "*implausible assumptions (such as the initial cash status), basic assumptions underpinning the calculation of working capital (such as the development of cash inflows from old receivables) and assumptions about sales development, aligning these assumptions with more recent information*" (Catalogue of responses, p.11 [or: para. 2.7]).

60.    Having regard to the Expert's comments, according to which some of the existing planning documents were   unrealistic and contradictory in the relevant areas, it appears justified to create an own business plan, especially as it struck a fine balance also taking the existing data into account.  The Expert explained on several occasions that he took data and assumptions into account for his planning to the extent that these were accurate and free of contradictions, using the image of a stone quarry, from

14

which individual parts of the CI management's planning and other planning documents were sourced (Hearing Transcript of May 8, 2012 (English version), 38:6 ff.). His planning is therefore not a calculation completely detached from the existing plans. The Expert therefore did not deviate from the Terms of Reference.

61. In the judgment cited by Respondents of the Higher Regional Court of Stuttgart of February 7, 2001, the Civil Division held that as part of corporate valuation, existing planning should not be blindly taken into account, but should be checked for plausibility. "*However, they have to be the starting point for the appraising expert. It is not his task to draw up his own plan and use it to replace the plan of the company.*" (Higher Regional Court of Stuttgart of February 7, 2001 – 20 U 52/97 (quoted in juris), para. 349). In this case ruled on by the Higher Regional Court of Stuttgart, independent multi-year plans were available, which had been prepared on the basis of a formal, uniform group planning process, and had not been created for the purposes of a potential valuation. The Expert had adopted these documents for his valuation and was convinced by their planning methodology. As such, nothing can be derived from this decision for Respondents' accusation in the present case concerning what an expert should do, or what approach to take, if the documents and plans, as in the present case, are incomplete, contradictory and in part implausible. The standard laid down in the Memorandum is binding on the Expert, and the decision of the Higher Regional Court of Stuttgart does not change this at all.

62. In their Challenge that the Expert had arbitrarily discarded the CI management's planning calculations, and instead himself determined a fictitious future planning for the CI group, Respondents also fail to address the details of the existing planning which the Expert described as contradictory or erroneous. They wrongly accuse the Expert of preparing an entirely new business plan, and ignore the fact that this planning, as the Expert has repeatedly expressed, also took into account those planning documents that were objectively accurate (see para. 44 above).

63. The Tribunal also cannot follow Respondents' reproach that the Expert had proceeded independently and had formed a preconceived impression of the CI Division and subsequently picked out those documents from the case file which best supported his assumptions. Rather, the Expert evaluated the entire subject matter of the dispute in detail and with utmost care and included it in his Report, and wherever he found gaps or errors, supplemented it with improved data and calculations. Nothing else can be gleaned from the Expert's statements at the hearing of May 7/8, 2012 as alleged by Respondents. The Expert's approach of beginning with the existing planning yet also taking into account new information, in order to question the reliability of the planning (Hearing Transcript of May 8, 2012 (English version), 89:21-90:5; 90:21-91:8), is in every respect in line with the Terms of Reference.

15

2)      **Application of a stricter standard of review**

64.     As far as the standard of review to be applied by the Expert with respect to the existing planning documents is concerned, we refer to the elaborations in paras. 52-54.  As Respondents rightly note on p. 8 (footnote 29) of their Challenge, the Expert must substitute or modify planning calculations that are not plausible with appropriate forecasts.

65.     In particular with regard to the financing forecasts, the Expert addressed the question of which requirements, in his experience, had been placed on business planning exercises in comparable cases.  He refers to requirements of the kind placed, for example, by banks or other investors in turnaround situations (Final Report, p. 103).  Even if the principles developed for turnaround opinions under insolvency law are not applicable *tel quel* to a valuation under corporate law, they are based on the term "*realistic*", understood as a synonym for reasonable in the case law.[5]  If in this context the Expert opts to apply the criterion of overwhelming likelihood, his analysis remains within the realm of the standard of plausibility and reasonableness.  Should it be necessary at all to distinguish between "*overwhelming likelihood*" and "*reasonableness*", the Tribunal will address this in its evaluation of the Report.  On no account, however, does this distinction prove any bias.

66.     On p. 82 *et seq.* of the Report, the Expert comments on the financing possibilities and lists the external sources in detail.  In addition to investors' equity and mezzanine capital, factoring facilities, the operating loan from Dresdner Bank AG and leasing cash stream I and II, no further sources of financing were to be expected in the Expert's opinion.  In the Expert's opinion, applications for bank loans would probably have been rejected due to the lack of free collateral security at the AgfaPhoto Group (Final Report, p. 86).

67.     In his comments of September 4, 2012, the Expert also refers to the requirements of IDW S1, which he largely took into consideration for the business plan and which also correspond to the requirements of the Terms of Reference.  The Expert rightly notes that a management plan cannot be deemed realistic, free of contradictions, plausible and reasonable if its occurrence not even the management itself believes in (see comments of the Expert of September 4, 2012, p. 10).  In the corresponding elaborations in the Catalogue of responses (p. 47/48), the Expert makes reference concerning "*financing from land and buildings*", "*overdraft facility*" to Mr. Nellissen's misgivings, and based on this assessment by the CFO, concludes that no such financing options could realistically have been expected.  None of these statements therefore allows the conclusion to be drawn that the Expert was biased.

---

[5] Higher Regional Court of Stuttgart of April 3, 2012 (B-R-Lex 153); Higher Regional Court of Stuttgart of October 14, 2010 (B-R-Lex 77).

3)      **Arbitrary modification of management's assumptions**

68.     Respondents criticize the reduction of receivables in the Opening Balance Sheet by EUR 25 million.   The Expert points out that there are differing statements or assumptions on the part of Respondents in this regard, and that he considers the valuation in the Mezzanine Balance Sheet as decisive.  In the Catalog of responses (p. 46), the Expert states:

> *"The criticism leveled at my assumption of old receivables totaling EUR 175 million is unsubstantiated and does nothing to refute my assumption that 'insights were gained that pointed to impairment'. In addition, it was broad forward that the lower figure in the mezzanine balance sheet was due to the brokering of a lower purchase price to the investors. This seems to be speculation and thus cannot be judged. I would point out that Article 15.10.3 of the Mezzanine Facility Agreement (B-R-136) assures the reader that the information provided is 'true, complete and accurate in all respects'. I cannot follow an argument that says EUR 175 million is too low because all other planning calculations at the time assumed higher figures: None of these plans provide objective and substantive evidence why these assumes should be better. The fact that different planning statuses prepared by an identical group of people arrives at comparable results warrants no conclusions whatsoever about the quality of these results."*

69.     On p. 14 of his comments of September 4, 2012, the Expert further states that in the absence of an objective valuation – as in the present case – and in a case going back several years, receivables must be measured according to objective standards.  The value established by him differed from that of the CI management.  However, it had to noted that the same people had considered another value to be appropriate in one place (the Mezzanine Balance Sheet) than that which they had stated in their testimonies. To opt for the lower valuations in the Mezzanine Balance Sheet given these different stated values cannot be described as unjustified, much less as an expression of the Expert's bias.

70.     The Expert's further statements on this subject at the hearing of May 7/8, 2012 clarify his approach and show neither arbitrariness nor inadmissible generalization with respect to relevant planning documents.[6]  The valuation of the old receivables is backed by objective considerations, such that there is no evidence of an approach that would indicate bias.

71.     Respondents accuse the Expert of having reduced the valuation of the old receivables in a speculative and sweeping manner.  In this regard, the Expert points out (comments of September 4, 2012, p. 16) that none of the available business plans could be used in full due to the numerous contradictions between different planning statuses and in comparison with the other available information, which was why it had

---

[6] Hearing Transcript of May 7, 2012 (English version) 102-113.

17

been imperative to prepare an objectified valuation.  The Expert's Report states on p. 49-50:

> "*The CI carve-out pro-forma balance sheet as of September 30, 2004 puts inventories at EUR 221.4 million. Concerning the value of the inventory in the opening balance sheet as of November 1, 2004 diverging information exist. The Investor Concept states EUR 186.9 million. The 2005 Business Plan values the inventory at only EUR 171.4 million. Despite these different figures, a general need for devaluation of the inventory becomes apparent. In order to satisfy this need, I recalculated the inventory based on the historical range of 98 days and the sales forecast for the next three months. Following this approach, I reached a value of inventories of EUR 177.0 million (a reduction of EUR 44.4 million).*"[7]

This valuation of the old receivables cannot be described as speculative and sweeping, especially as the planning documents used by the Expert contain different values and the 2005 Business Plan, with EUR 171.4 million, was even under the value which the Expert used as the basis for his valuation.

72.    Respondents also accuse the Expert based his planning of accounts receivable on the Mezzanine Balance Sheet, but not for the valuation of inventories.  This criticism fails to recognize that the Expert had to verify separately with respect to each valuation which sources should reasonably be used as the basis for those valuations.  It was therefore neither mandatory nor necessary due to the overall evaluation of sources for the Expert to deem the Mezzanine Balance Sheet to be decisive in both cases.  In his comments of September 4, 2012, p. 16, the Expert states:

> "*With regard to the selection of sources, I would like to refer to what was termed as 'using the available planning documents as quarry' in the discussion held at the hearing. As it turned out during the course of work that none of the available business plans could be used in full due to the numerous contradictions between different planning statuses and in comparison with the other available information, recourse to different sources for different assumptions was unavoidable.*"

73.    In regard of the criticism of the "*sweeping*" reduction of days payable outstanding, calculated  without any "*reliable evidence*", the Expert states that the 30 days was at the lower end of an acceptable range, but was based on an adequate information basis and reliable evidence.  Annex 5 to the Report shows the historical payment target of the CI Division on the basis of the 2005 Business Plan in conjunction with the Liquidity Plan of October 25/28, 2005.  Further calculations performed by the Expert in this context and data sources are summarized on p. 4/4 of Annex 5 and show median/mean payment targets between 24 and 97 days.

---

[7] See also Hearing Transcript of May 7, 2012 (English version) 181:14 *et seq.*; 189:7 *et seq.*

74.   Respondents point out in this context that the Expert failed to take into account detailed historical and contemporaneous data as of the Contribution date.  In particular, Annex B-R-74 (Investor Concept of May 24, 2004) and Annex 81 on the "Expert Report of Merryck Lowe and Alvarez & Marsal" allegedly provided an overview of suppliers with accounts payable in excess of EUR 100,000, which was the authoritative source for the calculation of the days payables outstanding.

75.   The Investor Concept shows payment targets between 20 and 30 days.[8]  In summary, the Expert's calculation of days payable outstanding appears sufficiently supported and cannot be described as arbitrary.  To the extent that it is aligned with the assumptions in the Investor Concept, it is not clear how the Expert's assumption should be more disadvantageous to Respondent.

76.   With respect to the increase in days receivable outstanding criticized, the Expert refers to Annex 5 of the Report, which shows the analysis of the historical payment targets through December 2004, as well as the CI management's planned payment targets as from November 2004.  The Expert excluded the reduction in days receivable outstanding by 20 days after the date of Contribution due to improved working capital management from his calculation as unrealistic, and justified his approach on p. 18-19 of his letter.  In particular, the Expert comes to the conclusion that the measures taken to improve days receivable outstanding did not produce any positive effects and that he therefore opted for a reliable historical payment target as a corresponding planning assumption.  Respondents' arguments in their Challenge do not show to what extent the historical figures used by the Expert should not be relevant, especially as by September 2004 they should have reflected the effects of the measures introduced as early as 2001 to improve days receivable outstanding and, as well as the subsequent measure.  The accusation that the Expert had once again driven his own pessimistic ideas to the foreground without detailed knowledge is not justified.

77.   With respect to the reproach of setting the days inventory outstanding (DIO) at 98 days, the Expert states in his comments of September 4, 2012 that he had taken into account all the information available to him regarding the historical and expected holding of inventories.  The value of 98 days was thus within the available range of the historical and CI management planning reference values.

78.   It is not clear to what extent the Expert is supposed to have gone about his work in a particularly biased manner in preparing this planning.  It is precisely the Expert's task to verify that the CI management's planning is reasonable (see paras. 52-54 above), and to make corrections wherever he comes to the substantiated conclusion that the existing planning is not reasonable.  When taking into account the historical figures, the Expert indicated that these were based on significantly higher days inventory outstanding.  However, he reaches the conclusion that, on the basis of the existing planning calculations by the CI management and the historical data regarding the current assets of the competitors, there are not sufficient indicators for the feasibility of the planned improvement/reduction in days inventory outstanding.  The Expert was unable to identify the positive effects of the planned measure to improve working capital management in any documents or calculations of Respondents, with the result that he excluded such merely planned improvements from his calculation.  This

---

[8] Merryck Lowe, "Questions for Mr Max Falckenberg", April 10, 2012, p. 39 Figure Q4.2.

19

approach also does not allow any conclusion of bias on the part of the Expert to be drawn.

79.   In respect of the arithmetical severance payments of EUR 70,000 per employee, Respondents criticize that the Expert was adhering to his calculation with ever-shifting and vague excuses, and had failed to take various circumstances, *e.g.*, that 149 of the employees transferred to the common debtor were already in partial retierement at the date of contribution.  The Expert countered that Respondents also make an identical level of severance payment the basis of their argumentation regarding the business value of the CI Division.  Thus Respondents' Expert, PwC, states in its Opinion of February 5, 2010 (Annex 6, subsection. 124, p. 50) that the corresponding restructuring costs in the Investor Concept were based on a severance payment of EUR 70,000 per employee.  Considering that staff cuts generally bring with them further reorganization costs, PwC deems this approach to be justified.

80.   In the Catalogue of responses, the Expert substantiates the justification for his calculations:

> "*Yes, I was aware of the severance payments agreed in previous phases of restructuring and took these into account. Notwithstanding, severance payments of EUR 70,000 per capita remain the figure that I regarded as the most likely to be realized. As explained in my report, various existing plans cited severance costs of as much as EUR 100,000 per capita. To my mind, the fact that some of these figures may be higher than the actual amounts paid in no way detracts from their significance. Therefore, although the social plan envisaged severance payments of no more than EUR 62,000, for example, Agfa-Gevaert's own plans include higher figures. It is therefore to be assumed that risk allowances for possible lawsuits, court costs and legal fees are factored into the Agfa-Gevaert plans. In my opinion, such allowances are absolutely essential and must therefore be an integral component of planned severance costs. Moreover, I would at this point add that, in my experience, citing EUR 70,000 as the average severance payment amount for a corporate group is by no means high.*
> *In my experience, it is essentially a good idea to set up a transitional (or transfer) company, as this can help employers avoid lawsuits on the grounds of protection against dismissal. Employees also often receive larger payments due to government support. However, the cost such an organization can incur for the company varies significantly from case to case and is by no means always a low-cost alternative to normal severance payments.*"

81.   The severance amount applied by the Expert is therefore sufficiently supported and carefully justified.  It does not allow any conclusion of bias on the part of the Expert. In the ongoing case, the Tribunal will have to assess without being bound by this valuation, how these costs should be estimated in the context of the liquidation value of the contribution in kind.

20

4)      **Financial distress**

82.     In their submission of September 24, 2012, Respondents also argue that the assertion that the CI Division "*undisputedly has been in financial distress for many years*" bears witness to the Expert's misguided position.  Counter to this argument, Respondents themselves stated in the Rejoinder (p. 36, para. 106) that: "*The Greenfield scenarios were drawn up as part of extensive restructuring efforts for the purpose of achieving greater cost discipline in the CI division.*"  The Tribunal therefore can see no reason why the Expert's reference to the company's distressed situation should be an expression of his alleged bias.

5)      **General bias against Respondents' position**

83.     At several points in their Challenge and with respect to several calculations by the Expert, Respondents allege that the Expert created his business planning unilaterally to the detriment of Respondents.  The Tribunal cannot follow this general accusation.  The Expert examined the available documents and planning with great care, skill and rigor in accordance with the Memorandum's requirements, and performed a balanced analysis.  As he states in his comments of September 4, 2012, a number of corrections to the existing business planning "*to the advantage*" of Respondents.  Thus, *e.g.*, taking the netting procedure into consideration has positive effects on liquidity.  He also took account of the leading principle of "*manage for cash*" prescribed in the Investor Concept, and accordingly stated the necessary investments at the lower end of the possible range, which in turn has a positive effect on the liquidity situation.  The allocation of pension obligations within the Expert's planning would also have adversely affected liquidity, if one had taken into account in the course of more conservative planning that the pension scheme was in the payout phase.

6)      **Breach of disclosure obligations**

84.     Respondents further contend that the Expert had breached its duty to disclose its attorney-client relationship with Claimant's legal representatives.  They begin by stating that the existence of an attorney-client relationship between Orrick Rambaud Martel and Roland Berger in itself would be sufficient to raise justified doubts as to the impartiality of the Expert vis-à-vis Respondents.  Respondents cite several German civil court judgments in support of their argument.  They allege that the Expert's rejection would be justified, where "*there are sufficient objective grounds from the perspective of the refusing party, which seem appropriate to raise doubts with regards to the impartiality of the expert in the opinion of a well-informed third party.*"[9]  Where such doubts existed, it was allegedly irrelevant whether the Expert indeed lacked impartiality or independence.  Consequently, it was only decisive "*if, for the party submitting the rejection application, there is the impression of a lack of complete impartiality.  This may come into consideration, inter alia, if the expert is in an actual attorney-client relationship with the legal representatives of the counterparty or maintains close links with one of the parties. […] [T]he question as to whether the*

---

[9] Federal Court of Justice, January 13, 1987 (B-R-Lex-133).

21

*expert subjectively perceives himself to be in a position to prepare the opinion in a free and wholly impartial manner is not decisive.*"[10]

85.   The decisions cited concerned cases which differ considerably in terms of the facts from the present one.  The issue in these cases was the direct personal or commercial relationship of an arbitrator/expert with one of the parties or their legal representatives.

86.   Here, Roland Berger engaged "Orrick Rambaud Martel", Paris, to provide legal representation in a matter.  No direct personal or commercial relationship of the Expert Falckenberg with Claimant's legal representatives can be derived from this.  In the Federal Court of Justice decision cited[11] the attorney-client relationship existed between the expert himself and the legal representative.  The present case differs fundamentally from that case, since neither the Expert himself nor Claimant's legal representative have an attorney-client relationship.  Moreover, the attorney-client relationship with Orrick's Paris office did not begin until the opinion had been delivered.  The Tribunal does not deny that this attorney-client relationship was probably initiated at an earlier time.  However, there is no indication at all that the Expert had knowledge of this.

87.   Respondents further complain that the Expert had failed to disclose the attorney-client relationship between Roland Berger and Orrick Rambaud Martel in his submission of November 2, 2012, thereby breaching his duty pursuant to Section 1049(3) in conjunction with Section 1036(1) of the German Code of Civil Procedure.  A breach of this disclosure obligation would lead to a rejection (Geimer in Zöller, ZPO, 29th ed. 2010w § 1036 para. 9).  Respondents make reference to a decision by the Higher Regional Court of Karlsruhe.[12]  In this case, the arbitrator had failed to disclose that he had acted for branch office of the respondent.  The Higher Regional Court confirmed the existence of justified doubts from the relevant perspective of the opposing party and granted the challenge due to bias.  The underlying facts of this decision are not comparable to the present case, however.  In the former, the issue was the bias of a co-arbitrator, against whom there were objective grounds to doubt his impartiality, since he had disqualified himself through biased suggestions in the selection of the chair of the arbitral tribunal, and in addition since he himself and his law firm were regularly engaged by the party which had nominated him and its branch offices.

88.   Moreover, it appears doubtful whether the newly formed attorney-client relationship is even a disclosable fact within the meaning of Section 1036 I of the German Code of Civil Procedure.  After all, the attorney-client relationship was formed on July 17, 2012, one day after the Final Report was submitted.  In this regard, Respondents take the view that the disclosure obligation had not lapsed with regard to time.  They allege that after the attorney-client relationship between Roland Berger and Orrick Rambaud Martel had been entered into, the Expert had submitted substantial statements in these arbitrations.

---

[10] Federal Court of Justice, July 24, 2007 (B-R-Lex-157).
[11] Federal Court of Justice, January 13, 1987 (B-R-Lex-133).
[12] Higher Regional Court of Karlsruhe, July 14, 2006 (B-R-Lex-160).

22

89.   The Expert already prepared the draft Report in early 2012.  The Arbitral Tribunal obtained the final version, containing the outcomes of the hearing with the Expert and the Parties of May 7/8, 2012, on July 16, 2012.  This marked the end of the Expert's engagement.  Further elaborations by the Expert in the case concerning Respondents' accusations of bias do not come under the mandate, nor did they extend its term.

90.   The complaint of bias should also ultimately be dismissed because the Expert has furnished credible evidence of the fact that he could not have known anything of the relationship with Orrick Rambaud Martel.  It seems perfectly plausible that in a large consulting firm such as Roland Berger that the only option available to individual employees is to inform themselves of potential attorney-client relationships using the internal conflicts check system.  Mr. Falckenberg provided evidence of the fact in an understandable and logical way to the Tribunal that there were no apparent attorney-client relationships with Orrick based on Roland Berger's internal tools, nor did he know of any such relationships.  The Expert can therefore not be accused of a violation of due care in this regard that would allow any conclusions to be drawn about his bias.  The Expert cannot be expected to make any additional inquiries beyond the scrutiny of the internal records of Roland Berger.  Such extensive duties of due care cannot be placed on him in particular in view of the fact that his work assignment ended on submitting the Final Report.

91.   In his comments of November 2, 2012, the Expert explains that based on the records of Roland Berger Strategy Consultants GmbH of the past 10 years there had only been one attorney-client relationship with Orrick.  This was a relationship in 2002 involving the New York office of Orrick, Herrington & Sutcliffe LLP.  The Expert assured that neither he nor any other member of his team involved in preparing the Report had participated in this internal project.  Respondents incidentally do not dispute this either.

92.   Finally it should be pointed out in this regard that Respondents did not assert that Roland Berger had been mandated by Orrick;  to the contrary, Orrick was mandated by Roland Berger.  There is thus no suspicion in this regard that Orrick wanted to make Roland Berger be well-disposed to Orrick by awarding a mandate to Roland Berger.

93. The Tribunal therefore concludes that the Expert did not violate any disclosure duties under Section 1049(3) in conjunction with Section 1036(1) of the German Code of Civil Procedure.

94. Respondents also contend that the necessity of dismissing the Expert was also based on the ICC Rules of Arbitration and the decision practice of the ICC Arbitral Tribunal. In support thereof, Respondents cite a number of past decisions by the Tribunal. The decisions cited by Respondents from the decision practice of the ICC Tribunal do not provide any information relevant to this matter, and equally so as little the decision by the French court of appeal of Reims. The ICC Rules of Arbitration are – as opposed to Respondents' pleading – in particular not applicable to the rejection of an expert. They apply only to arbitral judges. Even if one were to apply the practice of the ICC Arbitral Tribunal to the Expert in analogy, this does not result in any new insights on this matter, because the practice regarding Section 1049(3) in conjunction with Section 1036(1) of the German Code of Civil Procedure is based on the same grounds for bias. This is also the case in regard to the IBA Guidelines on Conflict of Interest in International Arbitration which Respondents refer to in this regard.

## VI. CONCLUSION

95. Based on the above arguments the Tribunal herewith concludes that the Expert did not exhibit any conduct allowing any conclusions to be drawn as to his being biased in the preparation of the Report and in particular in connection with his planning.

96. There are no circumstances warranting the conclusion that the Expert had arbitrarily and one-sidedly deviated from the available planning to the detriment of Respondents. The approach taken by the Expert and the preparation of the Report with the Catalogue or Responses do not provide any evidence that the Expert was biased.

97. The Expert did not violate his duty of disclosure under Section 1049(3) in conjunction with Section 1036(1) of the German Code of Civil Procedure.

98. The Challenge due to the concern of bias should therefore be dismissed.


Based on the above arguments, the Arbitral Tribunal herewith hands down the following

24

*Courtesy Translation*

## Order:

(1)     Respondents' Challenge due to the concern of bias is herewith dismissed.

(2)     A decision regarding the expenses of the Tribunal for this Challenge proceeding and in regard to the costs of the Parties related to the Challenge proceeding shall be decided at a later time in this arbitration.

(3)     This Order is herewith signed solely by the presiding judge with the approval and authorization of his co-judges.

(4)     This Order shall be served to the legal counsel of the Parties in advance by fax and thereafter in duplicate by registered mail against return receipt, and by regular mail and fax to the co-judges, the Expert and the ICC.

Frankfurt, March 5, 2013

The Arbitral Tribunal

[*Signature*]

_____

Dr. Georg von Segesser

Chairman of the Arbitral Tribunal

25