Exhibit 23



ORRICK

Orrick · Friedrichstrasse 31 · 60323 Frankfurt

**ORRICK, HERRINGTON & SUTCLIFFE** LLP
FRIEDRICHSTRASSE 31
60323 FRANKFURT

*tel  +49 (69) 71588-0*
*fax  +49 (69) 71588-588*

**WWW.ORRICK.COM**

**Per E-Mail**
Herrn Dr. Georg von Segesser
Schellenberg Wittmer
Löwenstrasse 19
Postfach 1876
CH-8021 Zürich

Herrn Dr. Arndt Overlack
Baas Overlack Witz
Erzbergerstr. 5
D-68165 Mannheim

Univ.-Prof. Dr. Paul Oberhammer
Institut für Zivilverfahrensrecht
Schenkenstrasse 8-10
AT 1010 Wien

Cc:

Cleary Gottlieb Steen & Hamilton LLP, Frankfurt

Cleary Gottlieb Steen & Hamilton LLP, Paris

ICC International Court of Arbitration

Dr. Benedikt Burger
Rechtsanwalt • Partner

*tel* +49 (0)69-71588-221
*fax* +49 (0)69-71588-588
bburger@orrick.com

Assistentin
Sabine Schumacher

210016.8
551686702
25. November 2013

ICC Schiedsverfahren Nr. 15362/JHN/GFG – Dr. Andreas Ringstmeier in seiner Eigenschaft als Insolvenzverwalter über das Vermögen der AgfaPhoto GmbH i.I. ./. Agfa-Gevaert N.V. & Co. KG *et al. – Weiteres Verfahren / Stellungnahme zu möglichen Obergutachter-Kandidaten*

Sehr geehrter Herr Vorsitzender,
sehr geehrte Herren Mitglieder des Schiedsgerichts,

der Schiedskläger nimmt Bezug auf die Verfügung des Schiedsgerichts Nr. 42 vom 25. Oktober 2013 und macht nachfolgend Ausführungen zu seinem Verständnis des weiteren Verfahrens (siehe I. unten), insbesondere der erforderlichen nächsten Schritte im Vorfeld der Gutachterbestellung (siehe II. unten), sowie zu der vom Schiedsgericht erlassenen Entscheidung

*Orrick, Herrington & Sutcliffe LLP, eine Partnerschaft mit beschränkter Haftung nach dem Recht des US- Staates Kalifornien, ist eingetragen beim Secretary of State, State of California, Sacramento California (Registrierungs-Nr. 201996243002). Die persönliche Haftung der Partner ist beschränkt.*

*Orrick, Herrington & Sutcliffe LLP is a Limited Liability Partnership under the laws of the U.S. State of California, is registered with the Secretary of State, State of California, Sacramento California (Registration No 201996243002). The personal liability of the partners is limited.*



Seite 2

betreffend die Urkundenedition (siehe III. unten) und zu den Vorschlägen des Schiedsgerichts für das Amt des Obergutachters (siehe IV. unten).

## I.   **Weiteres Verfahren**

[1]   Mit Blick auf die vom Schiedsgericht in dem vorliegenden Schiedsverfahren erlassene Verfügung Nr. 42 vom 25. Oktober 2013 möchte der Schiedskläger vorab sein Verständnis des bisherigen Verfahrensstandes sowie des weiteren Vorgehens zusammenfassen:

[2]   Bekanntlich hatte das Schiedsgericht mit seiner Verfügung Nr. 37 vom 17. Dezember 2012 festgelegt, dass das Schiedsgericht mit den Parteien anlässlich einer mündlichen Verhandlung die eingereichten Parteigutachten und die Notwendigkeit der Bestellung eines Obergutachters besprechen wolle. Als Termin für eine derartige mündliche Verhandlung war ursprünglich der 28. November 2013 vorgesehen.

[3]   Der Schiedskläger sieht die Aufhebung des reservierten Termins für die Schiedssitzung vor allem in dem Umstand begründet, dass das Schiedsgericht gegenüber den Schiedsbeklagten mit der Verfügung Nr. 42 vom 25. Oktober 2013 eine Urkundenedition bis 25. November 2013 angeordnet hat. Nachdem diese Urkundenedition, wie das Schiedsgericht unter Ziffer II.10 ausdrücklich hervorhebt, gerade mit Blick auf Unterlagen erfolgte, welche für eine Bewertung zu Liquidationswerten *„relevant und aussagekräftig"* sind, kann unterstellt werden, dass die von den Schiedsbeklagten herausgegebenen Dokumente, sofern diese nach einer sorgfältigen Prüfung durch den Schiedskläger für aussagekräftig und relevant im Sinne der vorgenannten Bewertung gehalten werden, noch Berücksichtigung im Verfahren finden. Dies könnte beispielsweise durch eine Überarbeitung des vom Schiedsklägers unter dem Datum 31. Mai 2013 vorgelegten Liquidationswerts-Gutachtens erfolgen. Bei dieser Sachlage würde auch auf der Hand liegen, dass ein Obergutachter erst dann tätig werden könnte, wenn für den Schiedskläger Gelegenheit bestand, die von den Schiedsbeklagten noch herauszugebenden Urkunden zu sichten und in der vorgenannten Weise in das Verfahren einzuführen. Sobald – auch unter Berücksichtigung des Fristverlängerungsantrages der Schiedsbeklagten für die Vorlage der Urkunden (hierzu auch noch unter III.) – abzusehen wäre, innerhalb welches Zeitrahmens die Einführung dieser Dokumente in das Schiedsverfahren aus Sicht des Schiedsklägers umzusetzen ist, könnte das in der Verfügung Nr. 37 vom 17. Dezember 2012 angelegte Verfahren sodann weiter aufgegriffen werden.



Seite 3

## II.  <u>Nächste Schritte im Vorfeld der Gutachterbestellung: *Terms of Reference* und Rechtsmemorandum</u>

[4]  Unabhängig von der Auswahl des Gutachters regt der Schiedskläger im Sinne der Prozessökonomie insbesondere an, die weiteren Schritte zur Gutachterbeauftragung bereits jetzt parallel in Angriff zu nehmen. Hierzu gehören die Spezifizierung des Gutachtenauftrags durch konkrete Fragen an den Gutachter und die Festlegung der rechtlichen Rahmenbedingungen für die Erstellung des Gutachtens. Dabei geht der Schiedskläger davon aus, dass das Gericht wie bei der Beauftragung des Sachverständigen Max Falckenberg den Parteien Gelegenheit geben wird, zum konkreten Gegenstand des Gutachtens wie auch zu den dabei zu beachtenden Rechtsmaßstäben Stellung zu nehmen. Die Durchführung der vorgenannten Schritte ist auch zur Vorbereitung der anstehenden mündlichen Verhandlung zweckmäßig.

[5]  Die Konkretisierung des Gutachtenauftrags soll sicherstellen, dass sich der Gutachter mit den hier relevanten Fragestellungen befasst und seine Feststellungen auf die richtige Grundlage stützt. Hierzu gehört insbesondere die Prüfung, welche der abstrakt denkbaren Abwicklungsszenarien hier überhaupt realisierbar und insbesondere finanzierbar waren. Nur mit hinreichender Spezifizierung seines Auftrags und den richtigen Leitlinien an der Hand kann der Gutachter das fallbezogen richtige Abwicklungsszenario finden und die relevanten Vermögens- und Schuldposten hier richtig bestimmen und bewerten. Anderenfalls besteht das Risiko, dass der Gutachter sich mit irrelevanten Gesichtspunkten beschäftigt oder seine Beurteilung auf falsche Annahmen stützt, so dass das Gutachten im schlimmsten Fall unbrauchbar wäre.

[6]  Dem Gutachter sind in diesem Zusammenhang die Rechtsmaßstäbe an die Hand zu geben, die er bei der Bearbeitung des Gutachtens zu beachten hat.[1] Der Schiedskläger regt an, die Parteien zur Vorbereitung der Verhandlung und einer etwaigen Gutachterbeauftragung bereits jetzt aufzufordern, sich zu den für die Tätigkeit des Gutachters relevanten Rechtsmaßstäben zu äußern. Vor allem benötigt der Gutachter klare Leitlinien zur Berücksichtigung des bisherigen Prozessstands, damit er den richtigen Ausgangspunkt für seine Prüfung kennt und das Risiko ausgeschlossen ist, dass er sich in Widerspruch zu den vom Schiedsgericht bereits gewonnenen Ergebnissen setzt. Dieser Gesichtspunkt ist wichtig, weil eine Prüfung und Begutachtung durch den Sachverständigen, die vom bisherigen Prozessstand und den zur Überzeugung des

---

[1]  Vgl. hierzu bereits Schriftsatz des Schiedsklägers vom 15. August 2013, Tz. 11 mit Verweis auf OLG Düsseldorf, Urteil vom 5. Mai 2011 – 6 U 70/10, dort beigefügt als Anlage 1, sowie Verweis auf OLG Köln, Beschluss vom 20. März 2013 – 18 U 106/12, dort beigefügt als Anlage 2.

OHSEUROPE:551686702.1
210016-8



Seite 4

Schiedsgerichts feststehenden (Zwischen-)Ergebnissen abweicht, für den weiteren Prozess unbrauchbar wäre. Insbesondere das Schiedsgericht selbst sollte für den Sachverständigen klärende Feststellungen zur Geltung der im Memorandum vom 10. Oktober 2011 formulierten Rechtsgrundsätze und zur Maßgeblichkeit des vom Sachverständigen Max Falckenberg erstellten Gutachtens treffen (z.B. Zahlungsunfähigkeit des Unternehmens im März 2005, Anfangsbestände per 2. November 2004, Kapitalbindungsdauer im Working Capital und Kostenstrukturen jeweils aus *ex ante*-Sicht für den Fortführungsfall). Dem Gutachter muss verdeutlicht werden, dass die Feststellungen des Sachverständigen Falckenberg Ausgangspunkt der Liquidationswertermittlung sind, und dass die sich notwendigerweise zwischen Fortführungsfall (Gutachten Falckenberg) und Liquidationsfall (neues Gutachten) ergebenden Unterschiede hinsichtlich Gesamturteil und Einzelaspekten plausibel und erklärbar sein müssen.

[7]   Weiterhin stellt sich die Rechtsfrage, ob der Gutachter seiner Liquidationswertermittlung jedes abstrakt denkbare Abwicklungsszenario zugrunde legen darf, oder ob er bei der Bestimmung der besten Verwertungsalternative ausschließlich solche Abwicklungsszenarien berücksichtigen darf, die realisierbar und insbesondere finanzierbar sind. Im Rahmen der Beauftragung (*Terms of Reference*) sollte der Gutachter in letzterem Fall verpflichtet werden zu klären, welche Liquidität bei beabsichtigter Schließung überhaupt für eine Ausproduktion zur Verfügung gestanden hätte. Die zu erwartende Liquidität und damit die Bestimmung des Abwicklungsszenarios hängt in diesem Fall maßgeblich davon ab, ob die beabsichtigte Beendigung der Geschäftsbeziehung geheim gehalten werden kann. Denn die Stakeholder werden ihr Verhalten nach Bekanntwerden der Schließungsabsicht grundlegend ändern. In diesem Zusammenhang muss dem Gutachter entweder positiv vorgegeben werden, wann die Schließungsabsichten bekannt geworden wären. Alternativ wären ihm die rechtlichen Rahmenbedingungen vorzugeben (bspw. arbeitsrechtliche Informationspflichten gegenüber Belegschaft und Belegschaftsorganen), auf deren Basis er ermitteln kann, wann die Schließungsabsichten gegenüber den Stakeholdern voraussichtlich publik geworden wären.

[8]   Ferner sollte über die Beauftragung (*Terms of Reference*) sichergestellt werden, dass der Gutachter alle relevanten Aspekte des Falls in seine Würdigung einbezieht. Mit Blick auf die zu erwartenden Reaktionen der Stakeholder nach Bekanntwerden einer bevorstehenden Beendigung der Geschäftsbeziehung ist u.a. zu klären, inwieweit Lieferanten dann nur noch gegen Vorkasse liefern, Kunden wegen des Angebotsüberhangs im Markt Zahlungen einstellen oder verzögern und kurzfristig zur



Seite 5

Konkurrenz wechseln, Arbeitnehmer streiken oder durch Kündigung, Krankmeldung und Minderleistung die Produktionsabläufe gefährden und das gemeinsame Cash Management mit den Vertriebstöchtern nicht mehr reibungslos funktioniert. Soweit der Gutachter zur Prüfung der Finanzierung (Mezzanine, KBC-Factoring, etc.) vorhersehbar rechtliche Unterstützung benötigt (z.B. bei der Auslegung der Verträge im Schließungsfall), sollte diese bereits im Beauftragungsprozess geleistet werden.

[9]    Kommen nach Auffassung des Gerichts nur realistische und realisierbare Abwicklungsszenarien in Frage, wäre zu klären, ob der Gutachter einen rechtmäßig handelnden Geschäftsführer unterstellen muss, der auf informierter Grundlage handelt und keine neuen Verbindlichkeiten eingeht, die er voraussichtlich nicht erfüllen kann. So stellt sich z.B. die Frage, ob ein rechtmäßig handelnder Geschäftsführer überhaupt noch Arbeitnehmer weiterbeschäftigen oder zur Ausproduktion benötigte Ware bestellen wird, wenn er *ex ante* nicht hinreichend sicher sein kann, ob er die daraus resultierenden, neuen Verbindlichkeiten bei Fälligkeit auch bezahlen kann (Stichwort: Eingehungsbetrug).

[10]   Eine weitere zentrale Rechtsgrundlage für die Bestimmung des konkreten Abwicklungsszenarios und die Höhe der personalbezogenen Schließungskosten ergibt sich aus der Frage, ob zur Bestimmung der Höhe des Differenzhaftungsanspruchs eine stille, freiwillige Liquidation des eingelegten Unternehmens zu unterstellen ist oder insolvenzrechtliche Erleichterungen bei der Abwicklungsplanung zu berücksichtigen sind (Liquiditätsschonung durch „*Einfrieren*" fälliger Schulden, Begrenzung von Lohnfortzahlungen und Abfindungen) oder gar auf einen tatsächlich entstandenen Schaden der AgfaPhoto GmbH abzustellen ist. Außerdem ist zu klären, in welcher Form bei der Kalkulation der Abfindungshöhe für die Mitarbeiter der durch die überbewertete Sacheinlage entstehende Differenzhaftungsanspruch zu berücksichtigen ist.

[11]   Neben den vorgenannten zentralen Rechtsfragen bestehen darüber hinaus noch zahlreiche weitere rechtliche Punkte und Fragestellungen (z.B. Stand alone-Bewertung der Einlage, nicht der aufnehmenden Gesellschaft; Rechtsmaßstab für die Annahme der Veräußerung von Teilbetrieben; rechtliche Existenz von Verpflichtungen zur Tragung von Ausfallrisiken aus Leasingcashstreams der AgfaPhoto Holding; rechtliche Nichtexistenz der Forderung gegen AgfaPhoto Holding aus Verkauf der Leasing GmbH wegen unwirksamer Einlage; rechtliche Notwendigkeit zur Plausibilisierung bspw. anhand der eigenen Schließungsplanung Agfa-Gevaerts (Baseline), des Kaufpreises und der Kapitalmarktreaktionen). Auch diesbezüglich benötigt der Gutachter rechtliche Hilfestellung, um seine Aufgabe erfüllen zu können.



Seite 6

### III. Von den Schiedsbeklagten im Rahmen der Urkundenedition vorzulegende Unterlagen

[12] Die Schiedsbeklagten haben den Schiedskläger am 22. November 2013 darüber informiert, dass sie beabsichtigen, das Schiedsgericht um eine Fristverlängerung bis zum 20. Dezember 2013 für die Vorlage der im Rahmen der ergänzenden Discovery herauszugebenden Unterlagen zu bitten. Der Schiedskläger steht diesem Ersuchen der Schiedsbeklagten nicht grundsätzlich ablehnend gegenüber, möchte aber die Frage des Umfangs der Fristverlängerung in die prozessleitenden Hände des Schiedsgerichts legen.

[13] Im Übrigen stellt der Schiedskläger nach Durchsicht der Entscheidung, die das Schiedsgericht in seiner Verfügung Nr. 42 vom 25. Oktober 2013 und des dieser Verfügung angehängten *Redfern Schedule* fest, dass das Schiedsgericht hinsichtlich bestimmter Unterlagen, die Entscheidung getroffen hat, dass die Schiedsbeklagten die Unterlagen nicht herauszugeben haben, da „*davon auszugehen* [sei]*, dass die beantragten Unterlagen sich im Gewahrsam des Klägers befinden.*" Diese Entscheidung bezieht sich auf die im *Redfern Schedule* unter den folgenden Ziffern beantragten Unterlagen:

- Ziffer 5: Auszüge aus der elektronischen Buchhaltung zu den im Rahmen der LASTAs zum 1./2. November 2004 auf die Landesgesellschaften übertragenen Vorräten mit bestimmten Informationen zu den einzelnen Vorratsgegenständen;[2]

- Ziffer 6: Elektronisch auswertbare Auszüge aus der Debitorenbuchhaltung zu den im Rahmen der LASTAs zum 1./2. November 2004 auf die Landesvertriebsgesellschaften übertragenen Forderungen aus Lieferungen und Leistungen mit bestimmten Informationen zu den einzelnen Forderungen;[3]

- Ziffer 7: Im Rahmen der LASTAs zum 1./2. November 2004 auf die Landesgesellschaften übertragenes Anlagevermögen;[4]

- Ziffer 8: Elektronisch auswertbare Daten aus der Finanzbuchhaltung zu den im Rahmen der LASTAs zum 1./2. November 2004 auf die Landesgesellschaften übertragenen übrigen Aktiva (insbes. Kurzfristige Ausleihungen und

---

[2]    Seite 35 ff. des *Redfern Schedule*.

[3]    Seite 41 ff. des *Redfern Schedule*.

[4]    Seite 46 ff. des *Redfern Schedule*.



Seite 7

Zinsabgrenzungen), soweit nicht im *Closing Balance Sheet* vom 18. Februar 2005 bereits unter „*sonstige Forderungen*" erfasst;[5]

- Ziffer 9: Im Closing Balance Sheet vom 18. Februar 2005 unter dem Oberbegriff „*Sonstige*" zusammengefasste Positionen;[6]

- Ziffer 10: Auszüge aus der elektronischen Buchhaltung zu den im Rahmen der LASTAs zum 1./2. November 2004 von den Landesgesellschaften übernommene Verbindlichkeiten;[7]

- Ziffer 11: Unterlagen zu den im Liquidationsfall zu erwartenden Schließungskosten der Landesvertriebsgesellschaften (ausgenommen Personal);[8]

- Ziffer 13 bis Ziffer 24: Unterlagen zu den zu erwartenden Schließungskosten im Hinblick auf das Personal einzelner Landesvertriebsgesellschaften unter genauer Bezeichnung der einzelnen Landesgesellschaften.[9]

[14] Hierzu weist der Schiedskläger darauf hin, dass die Annahme des Schiedsgerichts, dass sich die in den vorgenannten Ziffern angeführten Dokumente in seiner Verfügungsgewalt befänden, unzutreffend ist. Schon im Ersuchen um Urkundenedition vom 22. März 2013 sowie nochmals mit Schreiben vom 30. April 2013 hat der Schiedskläger vielmehr ausführlich dargelegt,[10] dass und warum gerade die hier genannten Unterlagen sich nicht in seinem Besitz oder anderweitigen Zugriff befinden und in sehr vielen Fällen insbesondere auch nie von Agfa-Gevaert zur Verfügung gestellt wurden. Auf den seinerzeitigen Vortrag nimmt der Schiedskläger nochmals ausdrücklich Bezug und macht diesen Vortrag durch Bezugnahme zum Gegenstand auch des vorliegenden Schreibens.

[15] Der Schiedskläger weist (wie bereits mit Schreiben vom 22. März 2013 und 30. April 2013 eingehend erläutert) insbesondere nochmals darauf hin, dass die AgfaPhoto GmbH, ebenso wie die AgfaPhoto-Landesgesellschaften, weder zum Einbringungsstichtag noch danach jemals auf die entsprechenden Daten zugreifen konnten, weil diese entgegen der Annahme des Schiedsgerichts gerade *nicht* in die EDV-Systeme der AgfaPhoto-

---

[5]   Seite 50 ff. des *Redfern Schedule*.

[6]   Seite 53 ff. des *Redfern Schedule*.

[7]   Seite 61 ff. des *Redfern Schedule*.

[8]   Seite 64 ff. des *Redfern Schedule*.

[9]   Seite 69 bis Seite 97 des *Redfern Schedule*.

[10]  Gesuch um Urkundenedition vom 22. März 2013, Seite 3 ff. sowie Schreiben vom 30. April 2013, Seite 4 ff. [**Anlage 1**].



Seite 8

Gesellschaften migriert wurden. Eine solche Migration war gerade für die Daten der Vertriebsgesellschaften überhaupt erst sukzessive für einen späteren Zeitpunkt im Jahr 2005 beabsichtigt; eine unmittelbare Migration in das eigene EDV-System der AgfaPhoto GmbH war überhaupt nicht vorgesehen. Selbst nach Abschluss der LASTAs waren deshalb die hier angeforderten Daten und Unterlagen weder bei den Landesgesellschaften noch bei der AgfaPhoto GmbH selbst vorhanden. Wie ebenfalls bereits dargelegt – und wie dem Schiedsgericht aus dem Wortlaut der PEU (dort Ziffer 9) auch bekannt – machte Agfa-Gevaert sodann nach Insolvenzantragstellung jegliche weitere Zusammenarbeit mit dem Schiedskläger und den AgfaPhoto-Gesellschaften davon abhängig, dass der per 27.05.2005 vorhandene *status quo* der EDV-Infrastruktur erhalten bleibe und keinerlei Modifikationen vorgenommen würden. Dieser *status quo* jedoch umfasste mangels entsprechender Datenmigration die Daten und Unterlagen, die Gegenstand des Antrags des Schiedsklägers auf Urkundenedition sind, gerade nicht. Gerade die Herausgabe derjenigen EDV-Buchhaltungsunterlagen, die bis zum Schluss ausschließlich auf den Agfa-Gevaert-Servern gespeichert waren, , hat der Schiedskläger hier beantragt.

[16]   Der Schiedskläger widerspricht mit Nachdruck der Annahme, dass sich die in der unter Ziffer **[13]** genannten Dokumente in seinem Zugriff befinden und daher von ihm in das Verfahren hätten eingeführt werden können. Wäre dies der Fall, hätte er sich nicht (auch und gerade) im Hinblick auf diese Unterlagen zur Stellung eines Discovery-Antrages veranlasst gesehen.

[17]   Der Schiedskläger bittet ausdrücklich darum, die insoweit ablehnende Entscheidung des Schiedsgerichts nochmals zu überprüfen und ggf. inhaltlich abzuändern.

## IV.   **Kommentierung der Vorschläge des Schiedsgerichts für das Amt des Obergutachters / Ergänzende Hinweise**

### A.   **Vorschläge des Schiedsgerichts**

[18]   Der Schiedskläger nimmt nachfolgend zu den vom Schiedsgericht in seiner Verfügung Nr. 42 vom 25. Oktober 2013 unter Ziffer (4) genannten Gutachterkandidaten Stellung.

[19]   Im Hinblick auf die Rödl & Partner GbR bittet der Schiedskläger das Schiedsgericht um Verständnis, dass er sich ohne Nennung eines konkreten Berufsträgers nicht in der Lage sieht, zu beurteilen, ob der betreffende Kandidat aufgrund seines Qualifikationsprofils

OHSEUROPE:551686702.1
210016-8



Seite 9

und seiner praktischen Erfahrung als Obergutachter geeignet erscheint. Eine pauschale Beauftragung der genannten Gesellschaft ohne klare Festlegung dahingehend, welcher Berufsträger *in personam* hier tätig werden soll, würde der Schiedskläger hier nicht für zielführend halten. Aus diesem Grund ersucht der Schiedskläger das Schiedsgericht höflich, ihm den oder diejenigen Berufsträger zu nennen, welchen/welche es für die Betrauung mit dem Gutachtenauftrag in Betracht zieht.

[20]   Aus Gründen äußerster Vorsorge und Transparenz weist der Schiedskläger im Übrigen schon jetzt darauf hin, dass der von ihm als Gutachter beigezogene Dr. Matthias Popp von Ebner Stolz GmbH & Co. KG Wirtschaftsprüfungsgesellschaft Steuerberatungsgesellschaft („*Ebner Stolz*") bis zum Jahre 1998 bei der Rödl & Partner GbR im Büro Nürnberg tätig war. Aus dieser Zeit bestehen auch noch persönliche, freundschaftliche Kontakte zu verschiedenen Partnern dieser Gesellschaft. Auch wenn dieser Umstand allein aus Sicht des Schiedsklägers keine Ablehnung der Rödl & Partner GbR als Ganzes oder jedes einzelnen Berufsträgers rechtfertigen würde, hält es der Schiedskläger im Sinne größtmöglicher Transparenz für angezeigt, diesen Umstand möglichst frühzeitig offenzulegen.

[21]   Im Hinblick auf die RölfsPartner Gruppe (nunmehr firmierend als „*Baker Tilly Roelfs*") gelten im Grundsatz zunächst die vorstehend zur Benennung eines einzelnen Berufsträgers als möglicher Obergutachter gemachter Aussagen sinngemäß. Unabhängig hiervon bestehen aus Sicht des Schiedsklägers aber große Bedenken gegen die Benennung eines Berufsträgers aus der RölfsPartner Gruppe als Obergutachter. Hintergrund dieser Bedenken ist, dass ein Obergutachter im Hinblick auf das vom Schiedskläger unter dem Datum 31. Mai 2013 eingereichte Liquidationswertgutachten insbesondere zu der von Ebner Stolz vorgenommenen Bewertung der Aktiva und Passiva (oder einzelner Aspekte hiervon) Stellung nehmen müsste. In diesem Zusammenhang wurde der Schiedskläger von Herrn Dr. Popp von Ebner Stolz darauf hingewiesen, dass sich die RölfsPartner Gruppe einerseits und Ebner Stolz andererseits in verschiedenen gerichtlichen Auseinandersetzungen befinden. Diese entstanden aufgrund der Tatsache, dass sich im Jahre 2011 eine Gruppe von ca. 35 Unternehmensberatern der RölfsPartner Gruppe an den Standorten Düsseldorf und Dortmund entschloss, zu Ebner Stolz zu wechseln. Die RölfsPartner Gruppe ist der Ansicht, dass ihr aufgrund dieses Wechsels Ansprüche gegen Ebner Stolz bzw. bestimmte der damals wechselnden Personen zustünden. Umgekehrt haben auch einzelne der damals gewechselten Personen Widerklage gegen die RölfsPartner Gruppe erhoben. Ganz unabhängig von der Frage, in welchem Umfang die von der RölfsPartner Gruppe erhobenen Ansprüche überhaupt bestehen, hat der Schiedskläger massive



Seite 10

Zweifel, dass ein aus dem Hause RölfsPartner Gruppe stammender Obergutachter das Gutachten eines Berufsträgers von Ebner Stolz unbefangen bewerten könnte. Aus diesem Grunde lehnt der Schiedskläger jeden Berufsträger aus dem Hause RölfsPartner Gruppe als Obergutachter ab.

**B.     Ergänzende Hinweise**

[22]     Ergänzend und vorsorglich verweist der Schiedskläger darauf, dass im Zusammenhang mit Fragen der Unternehmensbewertung regelmäßig Fachveranstaltungen stattfinden, in deren Rahmen zum Teil auch auf Fragen der Liquidationswertermittlung eingegangen wird. Nach Auskunft der von ihm eingeschalteten Gutachter sind hier vor allem das *Jahresforum Unternehmensbewertung der WSF* und die *Jahreskonferenz für Bewertungsprofessionals der IACVA* als die zwei führenden Veranstaltungen in diesem Bereich zu nennen. Nach Ansicht des Schiedsklägers könnte es sich anbieten, in den Kreis denkbarer Gutachterkandidaten auch  die auf diesen Veranstaltungen beim Thema Liquidationswert auftretenden Berufsträger – sofern sie nicht wegen Vorbefassung ausscheiden oder in der Vergangenheit bereits von einer der Parteien als Gutachter abgelehnt worden sind – mit einzubeziehen.

[23]     Der Schiedskläger erlaubt sich, als Handreichung für das Schiedsgericht die Programme der oben genannten Fachveranstaltungen für die Jahre 2011 bis 2013 diesem Schreiben als Anlage 2 beizufügen.[11]

Mit freundlichen Grüßen

Dr. Benedikt Burger
Rechtsanwalt

---

[11]   Veranstaltungsprogramme des *Jahresforum Unternehmensbewertung - WSF* und der *Jahreskonferenz für Bewertungsprofessionals - IACVA* für die Jahre 2011 bis 2013 [**Anlage 2**].

*Courtesy Translation*

[ORRICK LETTERHEAD]

**Via e-mail**
Dr. Georg von Segesser
Schellenberg Wittmer
Löwenstrasse 19
P.O. Box 1876
CH-8021 Zurich


Prof. Dr. Arndt Overlack
Baas Overlack Witz
Erzbergerstr. 5
D-68165 Mannheim

November 25, 2013

Prof. Dr. Paul Oberhammer
Institut für Zivilverfahrensrecht
Schenkenstrasse 8-10
AT 1010 Vienna

<u>Cc:</u>

Cleary Gottlieb Steen & Hamilton LLP, Frankfurt

Cleary Gottlieb Steen & Hamilton LLP, Paris

ICC International Court of Arbitration


ICC Arbitration Proceeding No. 15362/JHN/GFG – Dr. Andreas Ringstmeier in his capacity as insolvency receiver for the assets of AgfaPhoto GmbH i.L. ./. Agfa-Gevaert N.V. & Co. KG *et al. – Further procedure / Comments on super expert Nominees*

_____

Dear Chairman,
Dear members of the Tribunal,

Claimant refers to the Tribunal's Procedural Order Nr. 42 in the arbitration proceeding ICC Case No. 15362/JHN/GFG of October 25, 2013, and herewith states the following in regard to its understanding of the further course of action  (see I. below), in particular  the next steps required to be taken in advance of the expert's appointment (see II. below), and to the decision

*Courtesy Translation*

Page 2

by the Tribunal in regard to the production of the documents (see III. below) and to the proposals by the Tribunal for the office of the super expert (see IV. below).

## I.      Further course of action

[1]   Preliminarily, Claimant would like to summarize his understanding of the status of the proceedings to date and the further course of action in light of the Procedural Order No. 42 of October 25, 2013 issued by the Tribunal in this arbitration proceeding:

[2]   As everyone is aware, in its Procedural Order No. 37 of December 17, 2012 the Tribunal established that it intended to discuss the Opinions submitted by the Parties' experts and the necessity for the appointment of a super expert with the Parties at a hearing. The date scheduled for the hearing was originally November 28, 2013.

[3]   Claimant believes that the postponement of the date for the hearing before the Tribunal was largely triggered by the fact that the Tribunal issued an order to Respondents in Procedural Order No. 42 of October 25, 2013 to produce the documents by November 25, 2013. Once such documents were produced, as the Tribunal expressly stresses under Item no. II.10, particularly with a view toward the documents that were "*relevant and significant*" for a valuation at liquidation values, it can be assumed that the documents surrendered by Respondents, to the extent that after being diligently examined these were considered by Claimant to be significant and relevant in the sense of the aforesaid valuation, will still be taken into account in the proceeding. For example, this might occur in connection with a revision of the liquidation value opinion submitted by Claimant under the date of May 31, 2013. Given these circumstances it would also be logical that a super expert could only undertake his assignment if the Claimant would still be given the opportunity to inspect the documents to be produced by Respondents and in said fashion introduce them into the proceeding. The proceeding scheduled in Procedural Order No. 37 of December 17, 2012 could then recommence as soon as it could be foreseen from Claimant's point of view, within which period of time the introduction of the documents into the arbitration proceeding could be implemented (including in consideration of the application by Respondents for an extension of the deadline for the production of the documents (see also below under III.)).

*Courtesy Translation*

Page 3

## II.   Next steps in advance of the appointment of the expert : *Terms of Reference* and legal memorandum

[4]   In particular in the spirit of procedural economy Claimant herewith proposes, independently of the selection of the expert, to already begin now in parallel to initiate the further steps necessary in connection with the engagement of the expert. This includes the specification of the Terms of Reference of the Opinion by presenting specific questions to the expert and establishing the legal parameters for the preparation of the Opinion. In this respect,  Claimant presumes that the Tribunal will give the Parties opportunity to comment on the exact subject of the Opinion and the legal standards to be observed in the process, just as it did so in engaging the expert Max Falckenberg. Taking the above steps will also expedite preparations for the upcoming hearing.

[5]   The specification of the Terms of Reference is intended to warrant that the expert addresses the issues of relevance here and that his findings are based by the proper foundation. This includes in particular the examination of which if any of the abstractly conceivable wind-down scenarios was realizable here, and in particular, financeable at all. Only with an adequate specification of these Terms of Reference and the proper guidelines in hand will the expert be able to pinpoint the correct wind-down scenario in this case and identify and value the relevant asset and liability positions here correctly. Otherwise, there is the risk of the expert dealing with irrelevancies or basing his assessment on false assumptions, resulting in the fact that the Opinion in the worst case will be of no use.

[6]   The expert must be provided in this respect with the proper legal standards called for him to observe in preparing the Opinion.[1] Claimant proposes that the Parties already furnish their comments now on the legal standards relevant to the tasks to be performed by the expert in preparation for the hearing and engagement of the expert. Above all, as to the consideration of the status of the proceedings to date, the expert must have clear guidelines enabling him to recognize the proper point of departure for his analysis and eliminating the risk of contradicting the results already obtained by the Tribunal. This is an important consideration, because an examination and opinion by the expert deviating from the status of the proceedings to date and the (intermediate) results established to the conviction of the

---

[1]   Cf. on this topic already Claimant's brief of August 15, 2013, para. 11, with reference to the Judgment by the Higher Regional Court of Düsseldorf of May 5, 2011 – 6 U 70/10, included there as Annex 1, and reference to the Higher Regional Court of Cologne, Decision of March 20, 2013 – 18 U 106/12, included there as Annex 2.

Page 4

Tribunal, would be of no use in the further proceeding. In particular, the Tribunal itself should issue findings for the expert clarifying the validity of the legal principles formulated in the Memorandum of October 10, 2011 and in regard to the definitive nature of the Opinion prepared by the expert Max Falckenberg (e.g., insolvency of the company in March 2005, the opening balance sheet as of November 2, 2004, the respective duration of the capital lock-up for the working capital and cost structures from an *ex ante*-point of view for the going concern). It must be made clear to the expert that the findings of the expert Falckenberg should form the basis for the calculation of the liquidation value, and that in regard to the overall assessment and the individual aspects thereof the differences inevitably arising between the going concern case (Falckenberg Opinion) and liquidation case (new Opinion) must be plausible and coherent.

[7]  Furthermore, the legal issue arises of whether the expert can base his calculation of the liquidation value on just any abstractly conceivable wind-down scenario, or whether in the determination of the best realization alternative is permitted to employ only those wind-down scenarios which are realizable, and in particular financeable. In connection with the Terms of Reference, the expert should in the latter case be required to clarify which liquidity would have been available at all for running out production in the case of the intended closing. The anticipated liquidity and thus the specification of the wind-down scenario essentially depend in this case on whether the intended termination of the business relationship can be kept secret. For the stakeholders will fundamentally alter their conduct once the intention of closing is announced. In this respect the expert must either be positively informed of when the closing intentions were announced. Alternatively, he would have to be informed of the legal parameters (e.g., duties of information to the staff and representatives of the staff specified by labor law), on the basis of which he can conduct his investigation as to when the closing intentions to the stakeholders would have been expected to be made public.

[8]  Furthermore, the Terms of Reference should ensure that the expert takes all relevant aspects of the case into account in his assessment. In light of the anticipated reactions of the stakeholders following the announcement of the upcoming termination of the business relationship, one of the aspects requiring clarification is the extent to which suppliers would then only continue to deliver against payment in advance; customers discontinue or postpone payments due to the surplus of offers on the market and suddenly

Page 5

switch to the competition; employees strike or threaten the production processes by terminating their employment, calling in sick and underperforming, and the joint cash management with sales subsidiaries no longer functions smoothly. To the extent the expert can be seen to be in need of legal support in order to investigate the financing (mezzanine, KBC factoring, etc.) (e.g., in the interpretation of contracts in the event of closing), arrangements for this should already be made during the process of his engagement.

[9]  If only realistic and realizable wind-down scenarios come into question in the Tribunal's opinion, it would have to be clarified whether the expert is required to assume there being a managing director acting in accordance with the law who conducts himself on an informed basis and does not enter into any further liabilities that he prospectively cannot fulfill. For example, the question arises of whether a managing director acting in accordance with the law continues to have employees work at all, or orders goods needed for running out production if *ex ante* he can no longer be adequately certain of whether he can pay the resulting new liabilities on falling due (to whit: enters into contracts under false pretenses).

[10]  A further key legal basis for specifying the concrete wind-down scenario and the amount of personnel-related closing costs arises from the question of whether the determination of the amount of the claim for damages due to the over-valuation of a contribution-in-kind (*Differenzhaftungsanspruch*) should be based on the assumption of a silent, voluntary liquidation of the contributed company or relief should be taken into account in the wind-down planning under insolvency law (preserving liquidity by "*freezing*" debts falling due, limiting continuing wage payments and settlements), or one can even proceed on the basis of damages actually having been incurred by AgfaPhoto GmbH. Further clarification is called for in regard to the form of the claim for damages resulting from the over-valued contribution-in-kind calls for being taken into account in calculating the amounts of employees' settlement payments.

[11]  Beside the above-specified key legal issues, there are in addition numerous other legal points and questions (e.g., stand-alone valuation of the contribution, not of the acquiring company; legal standard for the assumption of the subunits; legal existence of obligations to bear the counterparty risks arising from leasing cashstreams of AgfaPhoto Holding; legal non-existence of the receivable against AgfaPhoto Holding from the sale of Leasing GmbH due to the contribution being invalid; legal necessity for establishing the plausibility., for example, based on Agfa-Gevaert's own closing plans (Baseline), of the purchase price and the capital market reactions). The expert is also in need of legal assistance in this context in order to perform his tasks.

Page 6

### III.   Documents to be surrendered by Respondents in response to the request for the production of documents

[12]   Respondents informed Claimant on November 22, 2013 that they intended to request the Tribunal to extend the deadline to December 20, 2013 for the production of the documents in connection with the additional discovery. Claimant is not fundamentally opposed to the request by Respondents, but would like to leave it up to the Tribunal overseeing the proceedings to decide on the length of the extension.

[13]   Incidentally, after perusing the decision by the Tribunal in the Procedural Order No. 42 of October 25, 2013 and the *Redfern Schedule* attached thereto, Claimant has determined that in regard to certain documents the Tribunal decided that Respondents need not surrender the documents, because "*it could be assumed that the requested documents were in Claimant's possession.*" This decision refers to the documents in the Redfern Schedule requested under the following item nos.:

- Item no. 5: Extracts from the electronic accounts relating to the <u>stock</u> transferred to the regional organizations by way of the LASTAs as of November 1/2, 2004, comprising the following information in respect of the individual stock components;[2]

- Item no. 6: Extracts from the debtor accounts that can be analyzed electronically, relating to the trade receivables transferred to the regional sales organizations by way of the LASTAs as of November 1/2, 2004, comprising the following information in respect of the individual receivables;[3]

- Item no. 7: Fixed assets transferred to the regional organizations by way of the LASTAs as of November 1/2, 2004;[4]

- Item no. 8: Data that can be analyzed electronically from the financial accounts relating to the remaining assets transferred to the regional (sales) organizations by way of the LASTAs as of November 1/2, 2004 (in particular, short-term loans and accrued interest), to the extent that this

---

[2]   Page 35 ff. of the *Redfern Schedule.*
[3]   Page 41 ff. of the *Redfern Schedule.*
[4]   Page 46 ff. of the *Redfern Schedule.*

*Courtesy Translation*

Page 7

is not already included under "Other receivables" on the Closing Balance Sheet from February 18, 2005;[5]

- <u>Item no. 9</u>: In the Closing Balance Sheet dated February 18, 2005, the line items summarized under the overall heading "Other" ;[6]

- <u>Item no. 10</u>: Extracts from the electronic accounts relating to the liabilities assumed by the regional organizations under the LASTAs as of November 1/2, 2004, which include the following information in particular;[7]

- <u>Item no. 11</u>: Documents relating to the closure costs of the regional sales organizations (excluding personnel) to be expected in the event of liquidation;[8]

- <u>Item no. 13</u> through <u>item no. 24</u>: Documents relating to the closure costs to be expected for the personnel for each regional sales organization.[9]

[14] Claimant herewith draws attention to the fact that the assumption by the Tribunal is incorrect that Claimant has access to the documents referred to in the above-specified item nos. To the contrary, Claimant has already explained exhaustively in its request for the production of the documents of March 22, 2013 and again in the letter of April 30, 2013,[10] that, and why in particular the documents specified here are not in its possession or otherwise accessible to it, and in many cases in particular were never provided by Agfa-Gevaert. Claimant herewith expressly again refers to this pleading, and herewith renders such pleading a subject of this letter by way of reference.

[15] Claimant herewith points out again in particular (as previously explained in detail in the letters of March 22, 2013 and April 30, 2013) that AgfaPhoto GmbH, never had access to the corresponding data, just as the AgfaPhoto country companies did not, neither at Contribution nor thereafter, because contrary to the Tribunal's assumption these data in particular were *not* migrated into the IT systems of AgfaPhoto-

---

[5]   Page 50 ff. of the *Redfern Schedule.*
[6]   Page 53 ff. of the *Redfern Schedule.*
[7]   Page 61 ff. of the *Redfern Schedule.*
[8]   Page 64 ff. of the *Redfern Schedule.*
[9]   Page 69 through page 97 of the *Redfern Schedule.*
[10]  Request for the production of the documents of March 22, 2013, page 3 ff. and letter of April 30, 2013, page 4 ff. [**Annex 1**].

Page 8

Such a migration was intended only gradually and not at all until a later date in 2005, especially for the data of the sales companies; an immediate migration into AgfaPhoto GmbH's own IT System was not envisaged from the outset. Even after concluding the LASTAs , the data and documents required to do so were neither located at the country companies nor at AgfaPhoto GmbH itself. As we have also already explained – and as the Tribunal is aware from the wording of the PEU (therein Item no. 9) – Agfa-Gevaert thereupon, once the insolvency application was filed, established that any further cooperation with Claimant and AgfaPhoto depended on the IT infrastructure remaining in its *status quo* as of May 27, 2005 and that no modifications of any kind would be made to it. This *status quo*, however, due to the lack of the corresponding data migration, specifically did not include the data and documents that were the subject of Claimant's application for the production of the documents. In particular the surrender of these electronic accounting records, which were only stored on the Agfa-Gevaert servers until the end, have been requested by Claimant.

[16] Claimant expressly rejects the assumption that it has access to the documents specified under Item no. **[13]** and that therefore it could have introduced them into the proceeding. If this were the case, it would not have (also and specifically) in regard to these documents felt it necessary to file a discovery application.

[17] Claimant therefore explicitly requests the Tribunal to review this decision and to amend it if need be.

IV.  **Comments regarding the Tribunal's proposals for the office of the super expert / Additional remarks**

A.  **Tribunal proposals**

[18] Claimant comments in the following on the candidate nominated for the expert by the Tribunal in its Procedural Order No. 42 of October 25, 2013 under Item no. (4).

[19] In regard to Rödl & Partner GbR, Claimant herewith kindly asks for the Tribunal's understanding that in the absence of naming a specific professional Claimant does not consider itself to be in a position to judge whether the candidate concerned, based on his qualification profile

Page 9

and practical experience appears to be suitable as a super expert. Claimant would not consider a sweeping engagement of said company to be productive without clearly specifying which professional *in personam* is intended to perform the assignemnt. For this reason, Claimant kindly requests the Tribunal to name the or those professionals who it has in mind to entrust with the Terms of Reference.

[20] For reasons of extreme precaution and transparency, Claimant incidentally points out at this juncture that the expert Dr. Matthias Popp that it relied on until 1998 from Ebner Stolz GmbH & Co. KG Wirtschaftsprüfungsgesellschaft Steuerberatungsgesellschaft ("*Ebner Stolz*") worked at the Rödl & Partner GbR office in Nüremberg. Personal contacts to and friendships with various partners of this firm from that period also continue to exist. Even if this circumstance, from Claimant's point of view alone, would not justify a rejection of Rödl & Partner GbR as a whole, or any individual professional at the firm, Claimant is convinced that it would be called for in the spirit of the best possible transparency to disclose this circumstance as early as possible.

[21] In regard to the RölfsPartner Group (now called "*Baker Tilly Roelfs*") the statements made above apply first in principle to the above nomination of an individual professional at the firm as a super expert in the same sense. Irrespective thereof, however, Claimant has large reservations against the nomination of a professional from the RölfsPartner Group as a super expert. These reservations originate in the fact that in regard to the liquidation value opinion submitted by Claimant under the date of May 31, 2013, a super expert would in particular have to appraise the valuation of the assets and liabilities (or individual aspects thereof) performed by Ebner Stolz. In this context, Claimant has been informed by Dr. Popp of Ebner Stolz that the RölfsPartner Group on one hand and Ebner Stolz on the other side are engaged in various court disputes. These disputes arose due to the fact that in 2011 a group of approximately 35 corporate consultants in the RölfsPartner Group at the Düsseldorf and Dortmund locations decided to switch to Ebner Stolz. The RölfsPartner Group believes that due to this switching it has claims against Ebner Stolz, or certain of the persons switching at the time. Vice versa, some of the people switching at the time have filed counterclaims against RölfsPartner Group. Completely irrespective of whether the scope of the claims filed against RölfsPartner Group exists at all, Claimant harbors enormous

Page 10

doubts that a super expert from the RölfsPartner Group would be capable of an unbiased judgment of the opinion of a professional from Ebner Stolz. For this reason, Claimant rejects any professionals from the firm of the RölfsPartner Group as a super expert.

## B.    Additional remarks

[22]    Additionally and as a precaution Claimant herewith draws attention to the fact that in connection with the questions regarding the valuation of companies, professional conventions take place on a regular basis addressing in part the issues of the calculation of the liquidation value. According to information furnished by the expert it inquired with in this regard, the *Jahresforum Unternehmensbewertung der WSF* and the *Jahreskonferenz für Bewertungsprofessionals der IACVA* should be named in particular as the two leading events in this area. Claimant believes that in the group of conceivable candidates for expert it may also be worth including professionals who also appear at these events on the topic of the liquidation value – provided they cannot already be ruled out due to bias or have already been rejected as an expert by one of the Parties in the past.

[23]    Claimant herewith takes the liberty of handing in the programs for the aforesaid professional conventions for 2011 through 2013 to the Tribunal with this letter as Annex 2.[11]

Yours sincerely,

Dr. Benedikt Burger

---

[11]    Programs of the *Jahresforum Unternehmensbewertung – WSF* and *Jahreskonferenz für Bewertungsprofessionals – IACVA* for 2011 through 2013 [**Annex 2**].