# Exhibit 34

| § 6 Verpflichtung auf den gemeinsamen Zweck | Weipert | Münchener Handbuch des Gesellschaftsrechts Bd. 1 4. Auflage 2014 | Rn. 40-51 |

## b) Inhalt und Dauer der Treuepflicht.

## aa) Pflicht zur Sicherung rechtlicher Existenzvoraussetzungen.

Im gesetzlichen Grundtypus ist die BGB-Gesellschaft auf Kurzfristigkeit angelegt: Die Gesellschafterrechte sind nicht übertragbar (§ 717 BGB), und die Gesellschaft ist jederzeit, also fristlos, kündbar (§ 723 Abs. 1 Satz 1 BGB). Kündigung, auch Kündigung durch Gläubiger von Gesellschaftern, Gesellschafterinsolvenz und Tod eines Gesellschafters führen zur Auflösung der Gesellschaft. Dieselbe Wirkung kommt einer Unmöglichkeit weiterer Zweckverfolgung zu, was – wie oben dargelegt (vgl. Rdnr. 38) auch schon als Folge von Leistungsstörungen im Beitragsschuldverhältnis eintreten kann. Allein § 723 Abs. 2 Satz 1 BGB beschreibt die **Kündigung zur Unzeit** als Verletzung gesellschaftsvertraglicher Pflichten. Dieselbe Vorschrift (§ 723 Abs. 2 Satz 2 BGB) sanktioniert aber gleichzeitig die mit der unzeitigen Kündigung ausgelöste Beseitigung der rechtlichen Existenzvoraussetzungen für die Gesellschaft, indem sie nicht deren Unwirksamkeit anordnet, sondern den kündigenden Gesellschafter zum **Schadenersatz** verpflichtet.[74] Ganz allgemein ist die BGB-Gesellschaft als Verband konzipiert, innerhalb dessen das **Beendigungsinteresse** des einzelnen Mitglieds deutlich höherrangig eingestuft ist als das Fortsetzungsinteresse aller anderen Verbandsmitglieder. Zu Recht haben der BGH in ständiger Rechtsprechung[75] und ihm folgend vor allem *Ulmer*[76] die Vertragsbeendigungsfreiheit des einzelnen Gesellschafters über den Missbrauchseinwand der anderen gestellt, so dass am Ende nur seltene Konfigurationen zur Unwirksamkeit der Kündigung wegen Rechtsmissbrauchs führen können.

Das eigentliche Feld für die Berufung auf die Treuepflicht im Zusammenhang mit Rechtsgestaltungsmaßnahmen zur Sicherung rechtlicher Existenzvoraussetzungen der Gesellschaft sind danach die vom gesetzlichen Grundtypus abweichenden Verbandsverfassungen, also insbesondere solche Vertragsgestaltungen, mit Hilfe derer die Ausübung des Kündigungsrechts zeitlich beschränkt ausgeschlossen oder an die Einhaltung von Fristen geknüpft sind oder aber – vor allem – jene bei den BGB-Gesellschaften sehr häufigen Fälle, in denen die Gesellschaft von vornherein der grundlosen (ordentlichen) Kündbarkeit entzogen ist, weil sie nicht auf unbestimmte Zeit vereinbart wurden. Auch wenn es in diesem Zusammenhang an einer ausdrücklichen Vereinbarung fehlt, hilft die Rechtsprechung mit großzügiger Auslegung. Immer dann, wenn der Gesellschaftszweck als solcher – nach der Projektnatur – planmäßig erreicht werden soll, handelt es sich um Gesellschaften, die für eine **bestimmte Zeit** eingegangen wurden.[77]

Nur, wo hiernach eine nicht durch wichtigen Grund gerechtfertigte Kündigung ausgeschlossen und wo die gleichwohl ausgesprochene Kündigung deshalb unwirksam ist, besteht **Fortsetzungspflicht** für den kündigenden Gesellschafter in Bezug auf die Gesellschaft. Das hat noch nichts mit der hier erörterten Treuepflicht zu tun, weil der kündigungswillige Gesellschafter nur hinnehmen muss, dass alles bleibt, wie es ist, während die Treuepflicht in den Blick kommt, wenn es darum geht, die rechtlichen Umstände zu **ändern,** damit alles so weitergehen kann, wie es der Verbandszweck vorgibt. Das kommt in Betracht, wenn ein Auflösungstatbestand geschaffen wurde oder einzutreten droht.

Es ist unbestritten, dass aufgelöste Personengesellschaften als werbende Gesellschaften „fortgesetzt" werden können.[78] Das setzt aber einen Willensakt der Gesellschafter voraus, der vorbehaltlich einer für diesen Fall getroffenen abweichenden Regelung des Gesellschaftsvertrages nur bei Einstimmigkeit aller Gesellschafter zustande kommt. Geschieht dies, dann bleibt die

Case 1:14-mc-91289-PBS   Document 8-27   Filed 09/26/14   Page 3 of 10

Identität der Gesellschaft erhalten. Der Fortsetzungsbeschluss ist rechtstechnisch nichts anderes als die Wiederherstellung des ursprünglichen Verbandszwecks, welcher sich infolge der vorangegangenen Auflösung von Gesetzes wegen inhaltlich derart veränderte, dass die Gesellschaft nur noch abzuwickeln war. Die Treuepflicht kann gebieten, dass alle Gesellschafter einen **Fortsetzungsbeschluss** fassen oder dass einzelne Gesellschafter auf ihren Anspruch darauf verzichten, dass das Gesellschaftsvermögen liquidiert werde und dass sie selbst an dieser Liquidation beteiligt werden. Regelmäßig wird nur das Letztere in Betracht kommen: Wenn eine Gesellschafterkündigung wirksam ist, muss der kündigende Gesellschafter jedenfalls ausscheiden dürfen. Auch der Tod eines Gesellschafters führt in Ermangelung abweichender gesellschaftsvertraglicher Regelung nicht dazu, dass die Erben in irgendeiner Weise gesellschaftsvertraglichen Verpflichtungen unterworfen sind; sie können deshalb auch nicht unter dem Gesichtspunkt der Treuepflicht gehalten sein, einer Fortsetzung der Gesellschaft unter nunmehr eigener Beteiligung zuzustimmen.

Die Thematik spitzt sich deshalb auf die Frage zu, ob Gesellschafter, in deren Peson ein die Gesellschaft auflösendes Ereignis eintritt (Kündigung, Tod, Privatgläubigerpfändung oder Gesellschafterinsolvenz) sich auf die Rechtsfolge des **§ 736 BGB** (Ausscheiden gegen Abfindung) verweisen lassen müssen. Unter zwei verschiedenen Blickwinkeln hat der BGH das bejaht: Nachdem eine Personengesellschaft durch Tod eines ihrer Gesellschafter aufgelöst worden war, verpflichtete der BGH die Gesellschaftererbin, sich mit einem Anspruch auf angemessene Abfindung zu begnügen, weil alle anderen Gesellschafter die Gesellschaft fortsetzen wollten.[79] In einem früher entschiedenen Fall[80] drohte dem Gesellschafter einer Personengesellschaft der Konkurs. In der Absicht, die Gesellschaft vor der damit verbundenen Auflösungsfolge zu bewahren, vereinbarte er für sich und zugleich als gesetzlicher Vertreter eines minderjährigen Mitgesellschafters für diesen die Änderung des Gesellschaftsvertrages durch eigenes Ausscheiden. Im späteren Streit über die Wirksamkeit dieser Vereinbarung entschied der BGH, dass kein Verstoß gegen § 181 BGB vorgelegen habe, weil das gesellschaftsrechtliche Treuegebot zur Zustimmung verpflichtete.

Beide Beispiele lassen sich auch auf diejenigen Fälle übertragen, bei denen die Fortsetzung der Gesellschaft nach vorangegangener Kündigung durch Gesellschaftergläubiger oder Gesellschafterkonkurs nur mit Zustimmung des **Pfändungsgläubigers** oder **Insolvenzverwalters** zulässig ist:[81] Auch der Pfändungsgläubiger und der Insolvenzverwalter müssen sich mit dem Abfindungsanspruch begnügen, weil es die Treuepflicht gebietet und weil sie infolge der Beschlagnahmewirkung jedenfalls über dasjenige der Gesellschafter-Verwaltungsrechte disponieren können, an deren Ausübung sich hier die Gesellschafter-Treuepflicht knüpft. Überhaupt dürften all jene Fälle unproblematisch sein, bei denen das auflösende Ereignis nicht durch Ausübung eines Gesellschafterrechtes (das Recht zur Kündigung ist ein Gesellschafterrecht) ausgelöst wird: Immer, wenn alle anderen Gesellschafter fortsetzen wollen, dürfen sie Erben und Gläubiger (bzw. Insolvenzverwalter) desjenigen Gesellschafters, in dessen Person das auflösende Ereignis eintrat, auf die Liquidation des gesetzlichen Abfindungsanspruchs verweisen.

### bb) Pflicht zur Sicherung wirtschaftlicher Funktionsvoraussetzungen.

Wirtschaftliche Funktionsfähigkeit der Gesellschaft ist nicht allein eine Frage zweckmäßiger Geschäftsführung – insoweit gibt es keine justitiablen Steuerungsansprüche.[82] Sie kann auch bedingt sein durch den Umfang der Gesellschafterbeiträge und die Notwendigkeit zur Liquiditätssicherung. Hierher gehören die Fälle, in denen der BGH eine Zustimmungspflicht zu Entnahmeverboten bejahte[83] oder es dem ausgeschiedenen Gesellschafter mit Rücksicht auf die nachwirkende Pflicht, den Fortbestand der Gesellschaft auch nicht durch die Art und Weise seines Ausscheidens zu gefährden, zuzumuten, tragbare Zahlungsmodalitäten für die Erfüllung der Auseinandersetzungsforderung hinzunehmen.[84]

Case 1:14-mc-91289-PBS    Document 8-27    Filed 09/26/14    Page 4 of 10

Ob die Gesellschafter mit Rücksicht auf ihre Verpflichtung, die wirtschaftliche Funktionsfähigkeit der Gesellschaft konstitutionell abzusichern, auch gehalten sind, die geschäftsführenden Organe **angemessen zu dotieren,** ist umstritten. Der BGH[85] beschränkte eine solche, aus dem Gedanken der Treuepflicht abgeleitete – Verpflichtung auf „besondere Ausnahmefälle" – womit nicht viel gewonnen ist. Änderungen dieses Inhalts sind Eingriffe in die Ergebniszurechnungsstruktur, also in Individualrechte und -pflichten der Gesellschafter aus dem Gesellschaftsverhältnis. Sie haben mit der konstitutionsbedingten Funktionsfähigkeit der Gesellschaft nichts zu tun, und zu Recht betrachtet deshalb die inzwischen ganz herrschende Meinung etwaige Äquivalenzstörungen in diesem Bereich genauso wie überall im Schuldrecht, nämlich unter dem Gesichtspunkt von Änderungen der Geschäftsgrundlage.[86] Die schwierige Anpassungstechnik, wie sie sonst bei erzwungenen Änderungen des Gesellschaftsvertrages beachtet werden muss, braucht in solchen Fällen nicht bemüht zu werden, weil sich die Veränderung außerhalb der Gestaltungskompetenz der Gesellschafter vollzieht und deshalb durch Feststellungsklage geltend gemacht werden kann.[87]

**47**

Von der durch die gesellschaftsvertragliche Zweckförderungspflicht gebotenen funktionsgerechten Gestaltung des Gesellschaftsvertrages zu unterscheiden, ist die **Ausstattung der Gesellschaft** mit den für ihre Lebens- und Funktionsfähigkeit erforderlichen Mitteln, den Gesellschafterbeiträgen also. Die Zweckförderungspflicht ist keine Zweckperpetuierungspflicht.[88] Sie gebietet deshalb keine Anpassung der Gesellschafterbeiträge an veränderte Bedürfnisse.[89] Auch in Krisensituationen gilt der allgemeine Grundsatz des Verbandsrechts, wonach kein Gesellschafter verpflichtet ist, höhere als die vereinbarten Beiträge aufzubringen (§ 707 BGB; § 53 Abs. 3 GmbHG). Dieser Grundsatz berührt jedoch nicht die Verpflichtung, einer Änderung des Gesellschaftsvertrages zuzustimmen, damit wenigstens die nachschussbereiten Gesellschafter in die Lage versetzt werden, die objektiv gebotene und sinnvolle Beitrags-, meist Einlagen-Erhöhung, durchzuführen.[90]

**48**

### cc) Dauer der Treuepflicht.

Die Treuepflicht (Rechtsgestaltungspflicht) ist durch die vereinbarte Dauer des Gesellschaftsvertrages, jedenfalls durch die Möglichkeit der Zweckerreichung zeitlich begrenzt. Das muss aber in zweifacher Weise ergänzt werden:

**49**

Wird die Gesellschaft aus welchem Grunde auch immer aufgelöst, so erledigt sich ihr bisher verfolgter Zweck. Sie wandelt sich um in eine **Abwicklungsgesellschaft,** und bis zur Beendigung der Abwicklung bleibt jeder Gesellschafter dem damit vorgegebenen Gesellschaftszweck, nämlich der Abwicklung, verpflichtet. Die Treuepflicht wirkt mit dieser Maßgabe bis zur Beendigung der Abwicklung nach. Divergenzen der Gesellschafter während der Liquidation werden sich in den meisten Fällen auf Fragen der Liquidations-Geschäftsführung beschränken; vor diesem Hintergrund wird das Gesellschafterverhalten nicht unter dem Gesichtspunkt von Treuepflichtverletzungen bewertet werden müssen, sondern unter dem Gesichtspunkt rechtsmissbräuchlicher und deshalb unbeachtlicher Zustimmungsverweigerung. Anders kann es sein, wenn die Liquidation durch Übertragung des Gesellschaftsvermögens mit allen Aktiven und Passiven auf einen oder einige Gesellschafter bewirkt werden soll. In diesem Fall führt das Gebot der nachwirkenden Treuepflicht zum **Anspruch auf Zustimmung,** der im Gegensatz zur ersten Variante nicht mit der Feststellungsklage, sondern mit der Leistungsklage durchgesetzt werden muss.[91]

**50**

Die **nachwirkende Treuepflicht** bindet auch den aus der fortbestehenden Gesellschaft ausscheidenden Gesellschafter. Er bleibt verpflichtet, das Abfindungsschuldverhältnis so zu gestalten, dass die Existenzvoraussetzungen der fortbestehenden Gesellschaft dadurch nicht beeinträchtigt werden,[92] ja er kann, wie die oben erörterten Fälle zeigen (vgl. Rdnr. 43, 44) sogar verpflichtet sein, an der Änderung des Abwicklungsschuldverhältnisses in ein Abfindungsschuldverhältnis dergestalt mitzuwirken, dass er das Gesellschaftsvermögen mit allen

**51**

Case 1:14-mc-91289-PBS    Document 8-27    Filed 09/26/14    Page 5 of 10

Aktiven und Passiven gegen Zahlung einer angemessenen Abfindung denjenigen Gesellschaftern überlässt, die gewillt sind, die Gesellschaft fortzusetzen.

---

[74] MünchKomm./*Ulmer/Schäfer* § 723 Rdnr. 55; a. A. *van Veenrooy* JZ 1981, 53/57 ff.

[75] BGHZ 23, 10/16; BGH LM, § 132 HGB, Nr. 2; BGH WM 1977, 736/738.

[76] MünchKomm./*Ulmer/Schäfer* § 723 Rdnr. 51, 52, 58.

[77] Beispiele: BGH NJW 1979, 2304/2305, BGHZ 50, 316/321; BGH WM 1962, 880/881; BGH LM, § 339 HGB, Nr. 2; weiter MünchKomm./*Ulmer/Schäfer* § 723 Rdnr. 20 ff.

[78] MünchKomm./*Ulmer/Schäfer* Vor § 723 Rdnr. 11; *Soergel/Hadding* Vor § 723 Rdnr. 3.

[79] BGH JuS 1986, 407 m. Anm. *K. Schmidt* NJW-RR 1986, 256.

[80] BGH NJW 1961, 724/725.

[81] *Soergel/Hadding* Vor § 723 Rdnr. 3.

[82] BGH ZIP 1985, 1134; BGH WM 1988, 968.

[83] BGH NJW 1985, 972, und 1985, 974.

[84] BGH NJW 1960, 718/719.

[85] BGHZ 44, 40.

[86] *K. Schmidt* GesR § 5 IV 4c (S. 133); *Zöllner* Schranken S. 57; *H. P. Westermann,* FS Hefermehl S. 240; GroßKomm.HGB/*Ulmer* § 105 Rdnr. 247.

[87] *Zöller* Schranken S. 57; a. A. *Coing* ZGR 1978, 659/668 unter Berufung auf HansOLG Bremen BB 1972, 811, bestätigt durch BGH NJW 1974, 1656 – das ist jedoch mißverständlich, weil es nur für den Fall des Wegfalls der Gesellschafterstellung durch Änderung der Geschäftsgrundlage zutrifft und der BGH ausschließlich für diesen Fall „im Interesse der Rechtssicherheit und Rechtsklarheit mangels ausreichender Bestimmungen im Gesellschaftsvertrag" das gerichtliche Verfahren gem. § 140 HGB für unvermeidlich hielt (BGHZ 10, 44/52).

[88] *K. Schmidt* GesR § 5 IV 5b (S. 135).

[89] A. A. *Wiedemann* GesR I § 7 IV 1, S. 395.

[90] *K. Schmidt* GesR § 5 IV 5a (S. 134).

[91] BGH NJW 1960, 434.

[92] MünchKomm./*Ulmer/Schäfer* § 738 Rdnr. 18; BGH NJW 1960, 718/719.

Zitiervorschlag:

MHdB GesR I/Weipert § 6 Rn. 40 - 51

*Courtesy Translation*

Section 6 Obligation to the common purpose

Weipert Münchener Handbuch des Gesellschaftsrechts vol. 1

4th Edition 2014                                              para. 40-51

**Content and duration of the duty of loyalty.**

**aa) Duty to secure statutory conditions of existence.**

The fundamental legal character of the company constituted under civil law (*BGB-Gesellschaft*) is designed for the short-term: the partner rights are non-transferrable (Section 717 of the German Civil Code (*Bürgerliches Gesetzbuch*: BGB)) and the company may be terminated at any time, i.e. without notice (Section 723(1) Sentence 1 BGB)).  Termination, also termination by creditors of the partners, partner insolvency and death of a partner lead to the dissolution of the company. The impossibility of continued pursuit of objectives has the same effect, which – as described above (cf. para. 38) may also occur as a consequence of defaults under contractual obligations to pay contributions.  Section 723(2) Sentence 1 BGB alone describes **premature termination** as a breach of duties under the articles of association.  However, the same provision (Section 723(2) Sentence 2 BGB) simultaneously sanctions the removal of the statutory conditions of existence for the company caused by the premature termination, not by ordering its ineffectiveness, but by obliging the terminating partner to pay **damages**.[74]  Broadly speaking, the company constituted under civil law is conceived as an association within which the **termination interest** of the individual member is classified at a significantly higher level than the continuation interest of all other members of the association.  The Federal Court of Justice (*Bundesgerichtshof*: BGH) in its established case[75] law and, based on this, in particular *Ulmer*[76] rightly place the freedom to terminate an agreement of the individual partner above the objection of abuse of the others, such that only rare configurations may lead to the ineffectiveness of the termination due to abuse of law.

The actual domain for the appeal to duty of loyalty in connection with the measures to shape the law to secure the company's statutory conditions of existence are accordingly articles of association that deviate from the fundamental legal type, therefore, in particular such contractual structures by means of which the exercise of the right to termination is limited in time, excluded or linked to the observance of a period of notice or, however – in particular – those frequent examples in the case of companies constituted under civil law in which the company evades being subject to (orderly) termination without good cause from the outset because they were not agreed for an unlimited period.  Even if in this context, an express agreement is lacking, case law helps if interpreted generously.  Whenever the corporate purpose as such – according to the nature of the project – must be met according to schedule, it always relates to companies that were entered into for a **specific period**.[77]

Only in cases where, according to this, a termination that is not substantiated by good cause is excluded and where the termination that has nonetheless been

*Courtesy Translation*

pronounced is therefore ineffective, is there a **duty to continue** for the terminating partner in respect of the company.  This still does not concern the duty of loyalty under discussion because the partner intending to terminate only has to accept that everything remains as it is, whereas the duty of loyalty only comes into consideration if it relates to **changing** the legal conditions so that everything may continue in the way prescribed by the purpose of the association.  This may be considered if the circumstances of a dissolution have been created or threatened to occur.

It is undisputed that dissolved business partnerships may be "continued" as soliciting companies.[78]  However, this assumes an act of volition of the partners that would only take place with the unanimity of all of the partners unless a deviating provision of the articles of association has been made for this case. If this happens, then the identity of the company remains intact.  Technically, the resolution to continue is nothing other, in terms of the law, than the reinstatement of the original purpose of the association that changed in substance as a result of the previous dissolution to the extent that the company could only be liquidated.  The duty of loyalty may require that all partners adopt a **resolution of continuation** or that individual partners waive their claim to the company's being liquidated and their own participation in this liquidation.  Generally, only the latter would come into question: if a partner's termination is effective, the terminating partner must be allowed to leave in any event.  In the absence of a deviating provision in the articles of association, even the death of a partner does not lead to the heirs being subject to obligations under the articles of association in any way at all; therefore they can also not be obliged from the perspective of the duty of loyalty to agree to the continuation of the company and, from then on, without their own participation.

The theme therefore leads to the question as to whether partners that produce an event that would dissolve the company (termination, death, private creditor attachment or partner insolvency) have to have themselves referred to the legal consequence of **Section 736 BGB** (withdrawal against settlement).  The BGH have answered this in the affirmative from two different perspectives:  After a business partnership had been dissolved due to the death of one of its partners, the BGH obliged the heir of the partner to be satisfied with a claim to an appropriate settlement because all the other partners wanted to continue the company.[79]  In a case decided earlier,[80] the partner of a business partnership was under the threat of bankruptcy.  With the intention of preventing the related consequence of dissolution, he agreed on his own behalf and at the same time on behalf of a co-partner who was a minor, in his capacity as the minor's legal representative, to amend the articles of association by means of his own withdrawal.  In a subsequent dispute on the validity of this agreement, the BGH ruled that there had been no infringement of Section 181 BGB because the duty of loyalty under corporate law made it an obligation that the amendment be approved.

Both examples may be transferred to those cases in which the continuation of the company after prior termination by partner creditors or company bankruptcy is only permissible with the approval of the **attachment creditor** or **insolvency administrator**:[81] even the attachment creditor and the insolvency administrator must satisfy themselves with the settlement claim because it is required by the duty of loyalty and because, as a result of the seizure effect, they may use that of the partner administrative rights in any event.  In this case, the partner duty of loyalty is

linked to their exercise.  In the first place, all those cases in which the triggering event is not caused by the exercise of a partner right (the right to termination is a partner right) should be unproblematic: always when all other partners want to continue, they may refer heirs and creditors (or insolvency administrators) of the partner whose person was involved in the triggering event to the liquidation of the statutory settlement claim.

**bb) Duty to secure the conditions of economic function.**

The capacity to function economically of the company is not solely a question of expedient management – in this respect, there are no legally enforceable management requirements.[82]  It may also be determined by the size of the partner contributions and the necessity to secure liquidity.  These cases include those in which the BGH affirmed an approval obligation on withdrawal prohibition[83] or the withdrawing partner cannot be expected to accept sustainable payment conditions for the fulfillment of the receivable resulting from the apportionment of assets in consideration of the ongoing duty not to jeopardize the continuation of the company, also not by the manner of the partner's withdrawal.[84]

Whether the partners are also obliged to **remunerate appropriately** the managing bodies in consideration of their obligation to secure constitutionally the company's capacity to function economically, is debatable.  The BGH[85] restricted such obligation derived from the concepts of duty of loyalty to "special exceptions", which does not help matters.  Amendments to this content are interventions into the structure of profit assignment, therefore into the individual rights and duties of the partners from the corporate relationship.  They do not have anything to do with the company's capacity to function determined by the constitution and prevailing opinion now rightly regards any shifts in the balance in this area, as everywhere in the law of obligations namely from the perspective of amendments to the commercial basis.[86] The difficult adjustment practices as they otherwise have to be observed in the case of forced amendments to the articles of association do not need to be heeded in such cases as the amendment is performed outside the organizational competence of the partners and may therefore be enforced by means of a legal challenge.[87]

The **company's resources** with the required means for its capacity to survive and function, in other words the partner contributions should be differentiated from the functional manner of structuring of the articles of association demanded by the duty to promote the purpose of the articles of association.  The duty to promote the purpose is not a duty to perpetuate the purpose.[88]  It therefore does not require any adjustment of the partner contributions to changed requirements.[89]  The general principle of association law also applies in crisis situations, according to which no partner is obliged to provide higher contributions than those that have been agreed (Section 707 BGB; Section 53(3) of the German Law on Limited Liability Companies (*Gesetz betreffend die Gesellschaften mit beschränkter Haftung*: GmbHG)).  This principle does not however affect the obligation to approve an amendment to the articles of association so that at least those partners willing to provide subsequent payment are put in a position to be able to implement the objectively required and reasonable increase in contributions, in most cases as deposits.[90]

3

*Courtesy Translation*

### cc) Duration of the duty of loyalty

The duty of loyalty (duty to shape the law) is in any event restricted in time by the possibility of achieving the objective.  This must be expanded in two ways:

If for whatever reason the company is dissolved, then its purpose that was previously pursued is completed.  It transforms into a **liquidating company** and each partner remains obliged to the thus predetermined company purpose, i.e. the liquidation until the liquidation has been completed.  The duty of loyalty continues to have an effect with this stipulation until the end of the liquidation.  Divergences of the partners during the liquidation are in most cases restricted to issues of liquidation management; in light of this, the conduct of the partners does not have to be assessed from the perspective of breaches of duty of loyalty, but from the perspective of refusal to grant approval in abuse of the law and therefore of little significance.  It may be different if the liquidation must be effected by transfer of the company assets including all assets and liabilities to one or several partners.  In this case, the principle of the sustained duty of loyalty to the **entitlement to approval** that, contrary to the first alternative, must not be enforced by means of a legal challenge, but through an action for performance.[91]

The **sustained duty of loyalty** also binds the partner withdrawing from the going concern.  It remains obliged to structure the settlement contractual obligations in such a way that the requirements for the existence of the going concern are not detrimentally affected as a result,[92] however it may even be obliged, as the aforementioned cases show, to cooperate in the amendment of the liquidation contractual obligations in to settlement contractual obligations to the extent that, against the payment of an appropriate settlement, it cedes the company assets including all assets and liabilities to those partners that intend to continue the company.

4

*Courtesy Translation*

[74] MünchKomm./*Ulmer/Schäfer* § 723 para. 55; different view *van Veenrooy*JZ 1981, 53/57 ff.

[75] BGHZ 23, 10/16; BGH LM, § 132 HGB, no. 2; BGH WM 1977, 736/738.

[76] MünchKomm./*Ulmer/Schäfer* § 723 para. 51, 52, 58.

[77] Examples: BGH NJW 1979, 2304/2305, BGHZ 50, 316/321; BGH WM 1962, 880/881; BGH LM, §339 HGB, no. 2; further MünchKomm./*Ulmer/Schäfer* § 723 para. 20 ff.

[78] MünchKomm./*Ulmer/Schäfer* before § 723 para. 11; *Soergel/Hadding* before § 723 para. 3.

[79] BGH JuS 1986, 407 with comments *K. Schmidt*NJW-RR 1986, 256.

[80] BGH NJW 1961, 724/725.

[81] *Soergel/Hadding* before § 723 para. 3.

[82] BGH ZIP 1985, 1134; BGH WM 1988, 968.

[83] BGH NJW 1985, 972, and 1985, 974.

[84] BGH NJW 1960, 718/719.

[85] BGHZ 44, 40.

[86] *K. Schmidt* GesR § 5 IV 4c (p. 133); *Zöllner* Schranken p. 57; *H. P. Westermann,* FS Hefermehl p. 240; GroßKomm.HGB/*Ulmer* § 105 para. 247.

[87] *Zöller* Schranken p. 57; different view *Coing*ZGR 1978, 659/668 with reference to HansOLG Bremen BB 1972, 811 confirmed by BGH NJW 1974, 1656 – this is however ambiguous because it only applies to the case of the omission of the partner position by changing the commercial basis and the BGH exclusively considers court proceedings pursuant to Section 140 of the German Commercial Code (*Handelsgesetzbuch*: HGB) to be unavoidable for this case "in the interest of legal certainty and legal clarity in the absence of sufficient provisions in the articles of association" (BGHZ 10 44/52).

[88] *K. Schmidt* GesR § 5 IV 5b (p. 135).

[89] A. A. *Wiedemann* GesR I § 7 IV 1, p. 395.

[90] *K. Schmidt* GesR § 5 IV 5a (p. 134).

[91] BGH NJW 1960, 434.

[92] MünchKomm./*Ulmer/Schäfer* § 738 para. 18; BGH NJW 1960, 718/719.

Citation:
MHdB GesR I/Weipert § 6 para. 40 - 51